# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC and EDWARD FELTEN,
   601 Massachusetts Ave NW,
   Washington, DC 20001

                *Plaintiffs*,

    v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD,
   800 N. Capitol St NW, Suite 565
   Washington, DC 20002,

BETH A. WILLIAMS, in her official capacity as a
Board Member of the United States Privacy and
Civil Liberties Oversight Board,
   800 N. Capitol St NW, Suite 565
   Washington, DC 20002,

JENNY FITZPATRICK, in her official capacity as
Executive Director of the United States Privacy and
Civil Liberties Oversight Board,
   800 N. Capitol St NW, Suite 565
   Washington, DC 20002,

TRENT MORSE, in his official capacity as Deputy
Director of Presidential Personnel,
   1600 Pennsylvania Ave NW
   Washington, DC 20050,

    and

DONALD J. TRUMP, in his official capacity as
President of the United States of America,
   1600 Pennsylvania Ave NW
   Washington, DC 20050.

                *Defendants*.

Civil Action No.1:25-cv-00542

**COMPLAINT**

## INTRODUCTION

1.    Plaintiffs Travis LeBlanc and Edward Felten are Senate-confirmed members of the United States Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), which Congress established to provide independent oversight of the executive branch's counterterrorism policies and to "protect the precious liberties that are vital to our way of life."  42 U.S.C. § 2000ee(b)(2).  On January 27, 2025, Defendants purported to remove Plaintiffs from the Board, without cause.  This suit challenges those unlawful purported removals.

2.    The Board is a multi-member, nonpartisan, independent body of experts charged with reviewing the government's use of surveillance and other counterterrorism powers, commenting and advising on existing and proposed legislation, and reporting to the legislative branch and the public on how the government balances national security activities with privacy and civil liberties protections.  The Board could not carry out these critical functions or provide candid, independent advice to Congress if its members feared that criticizing the executive branch could lead to their dismissal.  Nor could it do so if its members' views had to be submitted to the executive branch for approval, revision, or censorship.  And without the Board's candid, independent analysis, Congress could not obtain the advice and information it needs to exercise its own constitutionally mandated legislative and oversight authorities, including considering whether counterterrorism authorities need to be amended to better protect privacy and civil liberties.

3.    Congress recognized that securing the Board's independence was essential.  Every feature of the Board's organic statute demonstrates that the President lacks authority to remove Board members at will.  Using mandatory language, the statute directs that Board members shall serve a defined term of six years.  It requires members to be selected on the basis of their professional qualifications and relevant expertise "without regard to political affiliation."  It

requires the President to consult with congressional leadership on appointments of members who are not affiliated with the party of the President. And though a prior version of the Board's organic statute placed the Board within the Executive Office of the President and stated that members would serve at the President's "pleasure," Congress subsequently took the Board out of the Executive Office of the President, established it as an "independent agency," required Senate confirmation of all members, and removed the statutory language that had previously authorized the President to remove members at his "pleasure"—precisely to insulate the Board's oversight and advice functions from presidential control. Text, structure, and history all thus confirm that Congress protected Board members from removal without cause.

4.     In defiance of Congress's legislative authority, President Trump has now purported to fire all three of PCLOB's Democratic members without cause, two of whom bring this current suit. President Trump did not fire Plaintiffs in any effort to supervise or direct the officials who wield executive power on his behalf. Indeed, the PCLOB does not exercise any executive power— it cannot regulate, impose penalties, or compel anyone to do anything—and removing its members does not enable any exercise of executive power that the President supports or prevent any exercise of executive power that he opposes. Rather, the sole purpose and sole result of the terminations will be to deny the Board a quorum, prevent Congress and the public from learning about how this Administration respects privacy and civil liberties, and starve Congress of the information it needs to legislate and to oversee the executive branch.

5.     The President's actions strike at the heart of the separation of powers.  Not only do Plaintiffs' removals eradicate a vital check on the infringement of ordinary Americans' civil liberties, they also hobble an agency that Congress created to assist it with oversight of the

executive branch. This Court must declare Defendants' actions unlawful, and reinstate Plaintiffs to their positions on the Board.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1346 because this action arises under federal law. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201-02 and 5 U.S.C. §§ 701-06.

7.    Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because this action seeks relief against federal agencies and officials acting in their official capacities; at least one defendant is located in this district; and a substantial part of the events giving rise to the claim occurred in this district.

## PARTIES

8.    Plaintiff Travis LeBlanc is a Board member of the United States Privacy and Civil Liberties Oversight Board. Mr. LeBlanc was first nominated to that role by President Trump and has served as a Board member since July 2019 following his unanimous confirmation by the U.S. Senate. On March 29, 2022, President Biden renominated Mr. LeBlanc to the Board for a second term and he was subsequently reconfirmed unanimously by the Senate on September 14, 2022. Mr. LeBlanc's term expires on January 29, 2028. Mr. LeBlanc resides in Virginia.

9.    Plaintiff Edward Felten is a Board member of the United States Privacy and Civil Liberties Board. Mr. Felten was first nominated to that role by President Trump, and Mr. Felten has served as a member since October 2018 following his unanimous confirmation by the U.S. Senate. On March 14, 2019, President Trump renominated Mr. Felten to the Board for a second term and he was subsequently reconfirmed unanimously by the Senate on June 27, 2019.  Mr.

Felten's term ran through January 29, 2025, and he is entitled by statute to stay on the Board through January 29, 2026, unless a successor is confirmed.  Mr. Felten resides in Virginia.

10.     Defendant the United States Privacy and Civil Liberties Oversight Board is an independent agency charged with ensuring that national security needs are balanced with privacy and civil liberties. The PCLOB is headquartered at 800 N. Capitol Street NW,  Suite 565, Washington, DC 20002.  The Board members are the collective head of the agency, which is composed of approximately 35 employees.

11.     Defendant Beth A. Williams is a Board member of the United States Privacy and Civil Liberties Oversight Board. Ms. Williams maintains an office at 800 N. Capitol Street NW, Suite 565, Washington, DC 20002. She is sued in her official capacity only.  Ms. Williams resides in Virginia.

12.     Defendant Jenny Fitzpatrick is the Executive Director of the United States Privacy and Civil Liberties Oversight Board. Ms. Fitzpatrick maintains an office at 800 N. Capitol Street NW, Suite 565, Washington, DC 20002. Plaintiffs have great respect for the civil service employees at the Board and sue Ms. Fitzpatrick in her official capacity only pursuant to relevant precedent.

13.     Defendant Trent Morse is the Deputy Director of Presidential Personnel. Mr. Morse maintains an office at 1600 Pennsylvania Avenue NW, Washington DC 20050. He is sued in his official capacity only.

14.     Defendant Donald J. Trump is the President of the United States. He is sued in his official capacity only.

## STATUTORY BACKGROUND

15.     Following the September 11, 2001 terrorist attacks, Congress conferred expansive new national-security authorities on the Executive. In 2004, to help ensure that those powers would be exercised consistent with Americans' civil liberties, Congress created the Privacy and Civil Liberties Oversight Board, an advisory body charged with ensuring that privacy and civil liberties are appropriately considered in the creation and implementation of the nation's counterterrorism policies and practices. *See* Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) § 1061, Pub. L. No. 108-458, 118 Stat. 3638, 3684-88.

16.     From the outset, the Board was designed in part to enable congressional oversight of executive branch activities. The 9/11 Commission had recommended that Congress create "a board within the executive branch to oversee adherence to the guidelines [the Commission] recommend[ed] and the commitment the government makes to defend our civil liberties." *The 9/11 Commission Report*, National Commission on Terrorist Attacks Upon the United States 395 (2004). And as Congress found in implementing that recommendation, the "potential shift of power and authority to the Federal Government" after September 11 "calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life." IRTPA § 1061(a)(2), 118 Stat. 3684.  The Board is a key feature of the post-9/11 enhanced system of checks and balances.

17.     As originally constituted in 2004, the Board proved unable to adequately and independently monitor and safeguard civil liberties. IRTPA had established the Board "within the Executive Office of the President," giving the Executive the ability to closely control the Board's operations. *Id.* § 1061(b), 118 Stat. 3684. Only two of the Board's five members (the chair and vice-chair) were appointed with advice and consent of the Senate; the remaining three were

appointed directly by the President, meaning that the President could exercise total control over the Board at any time. *Id.* § 1061(e), 118 Stat. 3686-87. There was no requirement of partisan balance among Board members; no requirement that members be appointed on the basis of any relevant expertise; and no requirement that all members be confirmed by the Senate or be made available to appear before Congress. *Id.* And all of the Board's members, by statute, "serve[d] at the pleasure of the President," with no defined tenure of office. *Id.* § 1061(e)(1)(E), 118 Stat. 3687.

18.    The results were predictable. In the Board's first annual report to Congress, "the Bush administration made more than 200 revisions," "including the deletion of a passage on anti-terrorism programs that intelligence officials deemed 'potentially problematic' intrusions on civil liberties."[1] Rather than provide candid reporting to Congress, the Board operated essentially as the President's mouthpiece, which a White House spokesperson claimed "was appropriate because the board remains legally under the supervision of the Executive Office of the President."[2]

19.    As one of the Board's members testified to Congress after resigning, "it simply was not possible to have independent oversight while being treated as if [the Board Members] were a part of the White House staff." *Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight Board and the Privacy Officer for the U.S. Department of Homeland Security, Hearing Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 110 Cong. 33 (testimony of Lanny J. Davis).

20.    Congress acted swiftly to reform the Board, guarantee its independence, and refocus its purpose and functions. Less than a month after Mr. Davis's congressional testimony,

---

[1] John Solomon and Ellen Nakashima, *White House Edits to Privacy Board's Report Spur Resignation*, The Washington Post (May 15, 2007), https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/.

[2] *Id.*

Congress removed the Board from the Executive Office of the President and established it "as an independent agency." Implementing Recommendations of the 9/11 Commission Act of 2007 (9/11 Commission Act) § 801(a), Pub. L. No. 110-53, 121 Stat. 266, 352 (codified as amended at 42 U.S.C. § 2000ee).

21.    To further insulate Board members from presidential control, the 9/11 Commission Act deleted language from the prior statute stating that members served at the President's "pleasure." *Id.*, 121 Stat. 356.  The Act required Senate confirmation for all members of the Board, and instructed that they "shall serve a term of 6 years." *Id.*; *see* 42 U.S.C. § 2000ee(h)(4). The statute now further provides that, after the expiration of a member's term of office, the member "may continue to serve for up to one year after the date of expiration, at the election of the member," until appointment of a successor.  42 U.S.C. § 2000ee(h)(4)(D).

22.    The 9/11 Commission Act also deleted language from the prior statute stating that "[t]he Board shall perform its functions within the executive branch and under the general supervision of the President."  IRTPA § 1061(k), 118 Stat. 3688.

23.    In addition to insulating the Board from presidential control, the 9/11 Commission Act also added substantive requirements to ensure that the Board would be nonpartisan and that its members would be independent experts selected on nonpolitical grounds. Members "shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation," with "no more than 3 members" belonging "to the same political party." 42 U.S.C. § 2000ee(h)(2). And the President "shall, before appointing an individual who is not a member of the same political party as the President, consult with the leadership of that party, if any, in the Senate and House of Representatives." *Id.* The Act further insulates Board members from

presidential control by prohibiting the President from appointing any existing "elected official, officer, or employee of the Federal Government," to the Board, and by forbidding Board members from taking on those roles while simultaneously serving on the Board.  *Id.* § 2000ee(h)(3).

24.     The 9/11 Commission Act also refocused the Board's purpose and obligations to include a far more substantial role advising Congress itself. For example, Congress deleted statutory language stating that the Board should carry out various advisory functions "[f]or the purpose of providing advice to the President or to the head of any department or agency of the executive branch." *Compare* IRTPA § 1061(c)(1), 118 Stat. 3684, *with* 42 U.S.C. § 2000ee(d)(1). Congress replaced language directing the Board to "review proposed regulations and executive branch policies related to efforts to protect the Nation from terrorism" with language directing the Board to "review proposed *legislation*, regulations, and policies related to efforts to protect the Nation from terrorism"—expanding the Board's remit well beyond executive branch policies. *Compare* IRTPA § 1061(c)(1)(A), 118 Stat. 3684, *with* 42 U.S.C. § 2000ee(d)(1)(A) (emphasis added). Congress likewise replaced language directing the Board to "review implementation of laws, regulations, and executive branch policies" with language directing the Board to "review the implementation of *new and existing legislation*, regulations, and policies." *Compare* IRTPA § 1061(c)(1)(B), 118 Stat. 3684-85, *with* 42 U.S.C. § 2000ee(d)(1)(B) (emphasis added). And Congress expanded the Board's reporting obligations, requiring semi-annual reports to congressional committees each year detailing the Board's activities and oversight-related conclusions, requiring those reports to contain "minority views," and requiring Board members to appear and testify before Congress.  42 U.S.C. § 2000ee(d)(4), (e)(1), (e)(2).

25.     Pursuant to its organic statute, the Board now serves two purposes: to "(1) analyze and review actions the executive branch takes to protect the Nation from terrorism, ensuring that

the need for such actions is balanced with the need to protect privacy and civil liberties; and (2) ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to efforts to protect the Nation against terrorism." *Id.* § 2000ee(c). To fulfill that purpose, the Board by statute performs four principal functions, each designed to provide an independent voice ensuring that Congress and the public are aware of the extent to which the executive branch protects civil liberties and operates consistent with legal requirements.

26.     First, the Board reviews proposed and existing legislation, regulations, and policies relating to counterterrorism—as well as the implementation thereof—to provide advice to Congress, the Executive Branch, and the courts on compliance with civil liberties protections and on proposals to retain or enhance government counterterrorism powers. *Id.* § 2000ee(d)(1). For example, after the Edward Snowden leaks in 2013, Congress asked the Board to investigate and report on the operation of two National Security Agency surveillance programs detailed in those leaks.[3]  The Board issued two reports[4] about those programs and about the operation of the Foreign Intelligence Surveillance Court (FISC), ultimately offering 22 recommendations to Congress, the Executive Branch, and the FISC.[5] As another example, Congress recently required the Board, by

---

[3] PCLOB, *Report on the Telephone Call Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* at 1-2 (Jan. 23, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/cf0ce183-7935-4b06-bb41-007d1f437412/215-Report_on_the_Telephone_Records_Program%20-%20Completed%20508%20-%2011292022.pdf.

[4] *See id.*; *see also* PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (July 2, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/ba65702c-3541-4125-a67d-92a7f974fc4c/702-Report-2%20-%20Complete%20-%20Nov%2014%202022%201548.pdf.

[5] *See* PCLOB, *Recommendations Assessments Report* at 1 (Jan. 29, 2015), https://documents.pclob.gov/prod/Documents/OversightReport/a97a9918-775d-42eb-b426-2ae01838c2a3/Recommendations_Assessment-Report_2015%20-%20Complete%20-%20Nov%202%202022%201544.pdf.

statute, to produce a report with recommendations to mitigate privacy and civil liberties impacts associated with the government's effort to counter foreign racially motivated violent extremism. *See* Intelligence Authorization Act for Fiscal Year 2022, § 824(b)(3), Pub. L. No. 117-103, 136 Stat. 963, 1022. The Board's recommendations included imposing additional obligations on the Director of National Intelligence.[6]

27.    The Board is often called upon to provide recommendations to Congress when particular authorities are approaching their statutory sunset. In 2023, in the lead-up to Congress's consideration of the re-authorization of the Section 702 surveillance program, the PCLOB issued a comprehensive report about that program, closing with 19 recommendations—7 of which were for Congress, 11 of which were for executive agencies, and 1 of which was for all of government.[7] Congress considers these reports in determining whether and on what terms to reauthorize surveillance authorities.

28.    Article III courts frequently rely on the Board's independent reports in their own work assessing the legality of government surveillance programs. *E.g.*, *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 798-99, 815-18 (2d Cir. 2015); *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F. 3d 193, 202-04, 211 (4th Cir. 2017).

29.    Second, the Board performs an "oversight" function: it is charged to "continually review" executive branch counterterrorism policies, practices, and activities to "determine whether

---

[6] *See* PCLOB, *Assessments and Recommendations: Authorities Addressing Foreign Racially Motivated Extremism & Privacy and Civil Liberties Impacts* at 4 (Jan. 21, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/2810538d-331d-4316-af48-435aa88a631b/PCLOB%20Assessment%20and%20Recommendations%201.17.25%20-%20Completed%20508%20-%20Feb%206%202025.pdf.

[7] PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (Sept. 28, 2023) (2023 FISA Report), https://documents.pclob.gov/prod/Documents/OversightReport/d21d1c6b-6de3-4bc4-b018-6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20Completed,%20Dec%203,%202024.pdf.

such actions (i) appropriately protect privacy and civil liberties; and (ii) are consistent with governing laws, regulations, and policies regarding civil liberties." 42 U.S.C. § 2000ee(d)(2).

30.    Third, the Board reviews reports from privacy officers and civil liberties officers, making recommendations as appropriate. *Id.* § 2000ee(d)(3).

31.    Fourth, "[t]he members of the Board shall appear and testify before Congress upon request." *Id.* § 2000ee(d)(4).

32.    To carry out its functions, the Board must "periodically submit, not less than semiannually, reports" to Congress and the President—reports eventually made public so far as classification authorities permit. *Id.* § 2000ee(e)(1). Those reports, which are directed to the Intelligence, Homeland Security, and Judiciary Committees, must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight" of the executive branch. *Id.* § 2000(e)(2)(B). These reports are required to include "the minority views on any findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions." *Id*. § 2000ee(e)(2)(C).

33.    The President has recognized the PCLOB's independent status in its executive orders.  For example, in Executive Order 14086, the President imposed binding requirements on various arms of the executive branch, but did not attempt to impose any requirements on the Board. The President instead "encouraged" the Board to oversee and certify the procedures of the Data Protection Review Court, Exec. Order No. 14086, 87 Fed. Reg. 62,283 (Oct. 14, 2022), a judicial oversight function the Board has accepted.[8]

---

[8] *See* PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086* (Nov. 5, 2024),    https://documents.pclob.gov/prod/Documents/EventsAndPress/6e6c7a7b-6036-4d6d-b635-ffb53f68e4f4/Statement%20on%20PCLOB%20Review%20Under%20Section%203%20of%20EO%2014086,%20Completed%20508,%20Nov%207%202024.pdf.

34.    Board members are entitled to compensation for their service.    42 U.S.C. § 2000ee(i)(1).

35.    The Board does not exercise any power of the executive branch. It cannot fine or punish anyone. It does not exercise any enforcement power, any power to prescribe regulations, or any power for compulsory process.  It does not have independent litigating authority.  To obtain information by subpoena, the Board must submit a request to the Attorney General, which the Attorney General has authority to issue or deny in her discretion. *Id.* § 2000ee(g).

## FACTUAL ALLEGATIONS

36.    On March 19, 2018, President Trump nominated Plaintiff Edward Felten to be a Board Member on the PCLOB, to fill out the remainder of an existing term. The Senate confirmed Mr. Felten on October 11, 2018. He was subsequently renominated to a second term by President Trump on March 14, 2019, and confirmed by the Senate on June 27, 2019. Mr. Felten's six-year term ended on January 29, 2025. Because no replacement has been confirmed, however, Mr. Felten chose to exercise his statutory right to serve one additional year, until January 29, 2026.

37.    On August 16, 2018, President Trump nominated Plaintiff Travis LeBlanc to be a member of the PCLOB.  The Senate confirmed Mr. LeBlanc on June 27, 2019. He was subsequently renominated to a second term by President Biden on March 29, 2022, and confirmed by the Senate on September 14, 2022. Mr. LeBlanc's term will not end until January 29, 2028. If his seat is not filled at that time, he is eligible at his election to serve an additional year, until January 29, 2029.

38.    Mr. LeBlanc and Mr. Felten have been issued Presidential commissions that are duly executed by both the President and the Secretary of State.  Mr. LeBlanc's Presidential commission states that the President "appoint[s] him a Member of the Privacy and Civil Liberties

Oversight Board for a term expiring January 29, 2028, and do[es] authorize and empower him to execute and fulfill the duties of that Office according to law, and to have and to hold the said Office, with all the powers, privileges, and emoluments thereunto of right appertaining … subject to the conditions prescribed by law." Mr. Felten's commission is substantially similar. Neither Mr. LeBlanc's nor Mr. Felten's commission states that they "serve during the pleasure of the President of the United States for the time being."

39.    At the time President Trump took office, four of the Board's five seats were filled. One seat was filled with an appointee affiliated with the Republican Party—Defendant Williams. Three seats were filled with appointees affiliated with the Democratic Party—Plaintiffs LeBlanc and Felten, as well as chair Sharon Bradford Franklin, whose term would have fully expired on January 29, 2025.

40.    Although the Board is required by statute to be bipartisan, the President purported to terminate only the Democratic members, without cause, and to leave the lone Republican member as the sole remaining member of the Board. On information and belief, that member— Defendant Williams—encouraged the White House to fire her fellow Board Members, including Plaintiffs LeBlanc and Felten, without cause.

41.    On Tuesday, January 21, 2025, at 6:54 p.m., Plaintiffs LeBlanc and Felten each separately received an email from Defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board." Defendant Morse wrote:

> On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

14

Defendant Morse did not allege any cause or offer any explanation for the requested resignation or for the threatened termination.

42.     Plaintiffs did not resign.

43.     One Board member, Defendant Williams, unlawfully ordered PCLOB staff to stay past the close of business on the night of Thursday, January 23, 2025, to effectuate the anticipated removals of her fellow Board members, including having them removed from the PCLOB website. Defendant Williams was not the Chair of the Board, did not consult the existing Board members on her staff directives to oust the other members from office, and lacked authority to order the PCLOB staff to stay late to effectuate other members' removals.

44.     Plaintiffs did not receive notice of any termination by the President on Thursday, January 23.  Nor did they receive any notice of termination on Friday, January 24; Saturday, January 25; or Sunday, January 26.

45.     On Monday, January 27, 2025, Defendant Morse notified Defendant Williams to terminate Plaintiffs (as well as Ms. Bradford Franklin).

46.     Defendant Williams then directed PCLOB staff to cut off Plaintiffs' access to their PCLOB email accounts and terminate them from the agency.

47.     Under Defendant Williams's direction and without prior communication to the Plaintiffs, Plaintiffs received notifications on January 27, 2025 via Microsoft Outlook that they had been locked out of their PCLOB email accounts. The staff at the PCLOB responsible for cutting off Plaintiffs' email access report to Defendant Fitzpatrick, who in turn reports to the full Board.

48.     Subsequently on January 27, 2025, Plaintiffs received, via their non-government email addresses, identically-worded "termination" emails from Defendant Morse.  Those emails stated in their entirety:

Hello,

This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025 at 17:01.

49.     Defendant Morse's one-sentence emails did not allege any cause or offer any explanation for either Plaintiff's termination.

50.     Both Plaintiffs requested a copy of the official Presidential action terminating them. Defendant Morse did not respond to Plaintiff Felten. He responded to Plaintiff LeBlanc: "This email serves as the Presidential action."

51.     President Trump also terminated the Board's third Democratic member and Chair, Sharon Bradford Franklin, on January 27, 2025. He did not provide cause for Ms. Franklin's termination. President Trump terminated Ms. Franklin even though her hold-over term would have expired two days later, on January 29, 2025.

52.     President Trump's actions left in place a single Republican member, Defendant Williams, who works part-time at the agency.  The Board now lacks the quorum necessary to perform any of its statutorily-mandated functions.

53.     Promptly after Plaintiffs received emails from Defendant Morse on Monday, January 27, the Board issued a press release stating that "the White House terminated Chair Sharon Bradford Franklin, and Members Ed Felten and Travis LeBlanc from their positions as of 5 p.m. last Thursday." On information and belief, Defendant Williams directed the drafting and publishing of that press release.

## LEGAL ALLEGATIONS

54.    Congress may protect members of an independent agency from removal in two ways: in the statute's text, or "through the statutory structure and function of an office." *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023) (citing *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2206-07 (2020)). Text, structure, and function all demonstrate that the 9/11 Commission Act bars removal of PCLOB members without good cause.

55.    Under the 9/11 Commission Act, "[e]ach member of the Board *shall serve* a term of 6 years." 42 U.S.C. § 2000ee(h)(4) (emphasis added). "It is . . . fixed usage that 'shall' means something on the order of 'must' or 'will.'" *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009). Thus, the plain statutory text mandates that members serve a fixed six-year term, not only so long as the President chooses to keep them.  Although this Court has previously concluded that language providing that "[t]he term of each member" is "3 years" did not support a removal restriction, *Severino*, 71 F.4th at 1044-45, the 9/11 Commission Act's "shall serve" language is materially distinct.  It is mandatory and unambiguous.

56.    Even if "shall serve" could be read in isolation to mean less than a command, that interpretation would be untenable in the context where it appears. In amending PCLOB's organic statute in 2007 to insert the "shall serve" language, Congress also specifically removed language providing that Board members would "serve at the pleasure of the President." *Compare* IRTPA § 1061(e)(1)(E), 118 Stat. 3638, 3687 *with* 42 U.S.C. § 2000ee(h)(4). Congress's choice to "remove[] language that expressly" authorized removal without cause, while simultaneously adding a tenure provision with mandatory language, confirms that the statute bars removal without cause. *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017); *see also Rumsfeld v. F. for Acad. &*

*Institutional Rts., Inc.*, 547 U.S. 47, 58 (2006) (refusing to interpret statute "in a way that negates its recent revision").

57.    Other amendments in the 9/11 Commission Act confirm that its tenure provision means what it says. For one, Congress indicated its intent to eliminate direct presidential control of Board members by removing the Board from the Executive Office of the President and making it an independent agency instead, *compare* IRTPA § 1061(b), 118 Stat. 3684 *with* 42 U.S.C. § 2000ee(a), by removing language stating that the "Board shall perform its functions … under the general supervision of the President," IRTPA § 1061(k), 118 Stat. 3688, and by prohibiting Board members from contemporaneously serving as executive branch officials. 42 U.S.C. § 2000ee(h)(3). And at the same time, Congress imposed new requirements of partisan balance and consultation with Congress on appointments, *see* 42 U.S.C. § 2000ee(h)(2)—provisions that would be rendered ineffectual if the President had unilateral authority to remove members without cause. As the Supreme Court has repeatedly held, courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)). Reading the statute to permit removal without cause would both contravene the statute's literal meaning and fundamentally undermine the scheme of agency independence that Congress deliberately designed.

58.    The context of the removals challenged in this case only underscore that point. The President must appoint Board members "without regard to political affiliation." 42 U.S.C. § 2000ee(h)(2). That provision would be nugatory if the President could turn around and fire Board members based on their political affiliation, as he has purported to do here.

59.    The Board's structure and function also demonstrate that the President may not remove members without cause.  "[T]he most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in" the body to which the removed officials belong. *Wiener v. United States*, 357 U.S. 349, 353 (1958); *see also Mistretta v. United States*, 488 U.S. 361, 411 (1989).

60.    First, PCLOB exercises no executive power whatsoever. The Supreme Court has recognized that the President has at-will removal authority over certain single-director agencies that exercise substantial executive power. *Seila Law*, 591 U.S. at 220. Unlike the agencies in cases like *Seila Law*, the Board has no authority to impose penalties or fines, promulgate regulations, undertake enforcement actions, or bind members of the executive branch or the public in any way. Instead, it solely operates to provide information about the government's consideration and respect for privacy and civil liberties in conducting counterterrorism activities. That oversight function, adjunct to the legislative process, involves no executive authority and raises no presumption of presidential control.

61.    Second, "when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Severino*, 71 F.4th at 1047 (citing *Humphrey's Executor v. United States*, 295 U.S. 602, 625-26 (1935); *Wiener*, 375 U.S. at 356-57). Courts thus look for an adjudicatory or legislative feature that would "signal a need for some measure of independence from Presidential control." *Severino*, 71 F.4th at 1049.

62.    For example, in *Wiener*, Congress required the War Claims Commission to "adjudicate according to law," meaning that even though it was housed in the executive branch, it

could not perform its quasi-judicial function if its decisions on individual claims could be influenced by the President. 375 U.S. at 355-56. And that meant "a fortiori, must it be inferred that Congress did not wish to hang over the Commission the Damocles' sword of removal." *Id.* As the Supreme Court has long recognized, "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor*, 295 U.S. at 269.

63.    Similarly, in *Humphrey's Executor*, because the FTC made "investigations and reports thereon for the information of Congress," it performed "specified duties as a legislative or as a judicial . . . aid" and, therefore, required insulation from Presidential interference in the form of removal protections. 295 U.S. at 628.

64.    PCLOB's structure and functions confirm that Congress intended to prevent the President from removing its members without cause. One of PCLOB's primary functions is to conduct "oversight" of the actions of the executive branch relating to privacy and civil liberties and to report any findings to Congress and the public. 42 U.S.C. § 2000ee(d)(2). As Congress recognized in reforming the Board's structure in response to White House interference with the Board's oversight functions, it cannot perform this function without independence. That the Board's very purpose would be subverted if the President could remove its members at will is as clear an indication as any that Congress intended their tenures to be protected. If the President could edit the Board's reports before they go to Congress or fire members who took positions the Administration disliked, the Board would simply be an arm of the executive branch unable to perform its key functions, including oversight of the executive branch.

65.    PCLOB also functions as a "legislative . . . aid." *Humphrey's Executor*, 295 U.S. at 628. It is required to submit reports, "not less than semiannually," to a long list of Congressional

Committees, the contents of which must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice [including to the President] and oversight functions," as well as any minority views. 42 U.S.C. §§ 2000ee(e)(1)(B); (e)(2)(B). The requirement to include minority and majority views reflects that Congress intended the Board to operate independently of the President and report its members' positions, not a monolithic executive branch position. The importance of the Board's legislative aid function is emphasized by the additional enumerated requirement that it inform Congress if it advised the executive branch against a certain proposal, but the executive branch implemented it anyway. *Id.* § 2000ee(e)(2)(D). The Board is also required, to the extent possible, to report its oversight findings to the public. *Id.* § 2000ee(f).  The Board can and has commenced oversight investigations at the express request of Congress, and Congress relies on the Board's reports in considering whether to authorize or reauthorize surveillance and other counterterrorism powers.

66.    In addition to its oversight and quasi-legislative functions, PCLOB also serves as a "judicial aid." *Humphrey's Exexcutor*, 295 U.S. at 268. It supplies advice and recommendations to the Foreign Intelligence Surveillance Court—an Article III court—and holds responsibility for certifying the procedures of the Data Protection Review Court—an administrative body that serves adjudicative functions. *See, e.g.*, 2023 FISA Report, *supra*; PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086*, *supra*.

67.    The structure of the Board further indicates that Congress intended to insulate board members from at-will Presidential removal.  PCLOB members serve staggered six-year terms—i.e., terms that deliberately outlast individual Presidential terms. 42 U.S.C. § 2000ee(h)(4). As the D.C. Circuit has explained, "staggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency." *Severino*, 71 F.4th at 1049 (quoting *United States v. Wilson*, 290

F.3d 347, 359 (D.C. Cir. 2002)). The fact that Board members must be appointed "without regard to political affiliation," but rather based on qualifications alone, and that the Board must be divided between the political parties, further reinforce that Congress intended to insulate the Board from political control. *Humphrey's Executor*, 295 U.S. at 624-25.

68.     These features easily distinguish PCLOB from the Administrative Conference of the United States that was at issue in *Severino*. There, members sat for three-year terms and many of them were executive branch officials who were otherwise subject to removal by the President. Most important, the *sole* purpose of the Administrative Conference was to provide advice to the President: "a quintessential example of a purely executive function." 71 F.4th at 1049 (internal quotation omitted). The agency had no "adjudicatory or legislative features that would clearly signal a need for some measure of independence from Presidential control." *Id*.

69.     PCLOB, conversely, conducts oversight of the executive branch—clearly signaling the need for independence from Presidential control. 42 U.S.C. § 2000ee(d)(2). Unlike with the Administrative Conference, PCLOB members cannot simultaneously be executive branch officials. 42 U.S.C. § 2000ee(h)(3). And in the 9/11 Commission Act amendments, Congress specifically *removed* language that had been present in the prior version of the PCLOB's organic statute stating that the Board should carry out various advisory functions "[f]or the purpose of providing advice to the President or to the head of any department or agency of the executive branch." *Compare* IRTPA § 1061(c)(1), 118 Stat. 3684, *with* 42 U.S.C. § 2000ee(d)(1). The current statute reflects that the PCLOB's purpose is much broader, and includes critical responsibilities providing advice to the Judiciary and to Congress—including about whether the executive branch is complying with privacy and civil liberties protections. It would be impossible

for the Board to discharge these functions and to provide candid advice to Congress if the President could fire members for providing advice he dislikes.

## CLAIMS FOR RELIEF

### *FIRST CLAIM FOR RELIEF*
### Administrative Procedure Act—Contrary to Law
### (Against all Defendants Except the President and Morse)

70.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

71.     The text, structure, and history of the 9/11 Commission Act demonstrate that it does not permit removal of PCLOB members without good cause.

72.     By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, Defendants have acted "not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; and "without observance of procedure required by law." 5 U.S.C. § 706.

73.     By removing Board members solely on the basis of their political affiliation, Defendants have also violated the requirement that members be selected "without regard to political affiliation."  For that reason too, Defendants have acted "not in accordance with law"; "in excess of statutory jurisdiction, authority, or limitations"; and "without observance of procedure required by law." 5 U.S.C. § 706.

74.     The Court must accordingly hold Plaintiffs' purported removals unlawful and set them aside.

### *SECOND CLAIM FOR RELIEF*
### Violation of Due Process
### (Against All Defendants)

75.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

76.     Plaintiffs have a protected property interest in their employment as PCLOB members.

77.     By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, or indeed providing any process at all, Defendants have deprived Plaintiffs of a protected property interest without due process of law.

78.     Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unconstitutional actions, to obtain reinstatement from the date of the unlawful removals, and to obtain all other appropriate relief.

### *THIRD CLAIM FOR RELIEF*
### **Ultra Vires**
### **(Against All Defendants)**

79.     Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

80.     The text, structure, and history of the 9/11 Commission Act demonstrate that it does not permit removal of PCLOB Members without good cause.

81.     By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, Defendants exceeded their lawful authority.

82.     By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members based solely on their political affiliation, Defendants exceeded their lawful authority.

83.     Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' ultra vires actions, to obtain reinstatement from the date of the unlawful removals, and to obtain all other appropriate relief.

### FOURTH CLAIM FOR RELIEF
### Mandamus
### (Against All Defendants Except the President)

84.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

85.    The text, structure, and history of the 9/11 Commission Act demonstrate that it does not permit removal of PCLOB members without good cause. Plaintiffs have a clear right to remain in office until the expiration of their tenure or until lawfully removed for good cause.

86.    Because the purported removals of Plaintiffs were unlawful, Defendants have a clear, non-discretionary, and ministerial duty to treat Plaintiffs as if those purported removals had no legal effect.

87.    If no other remedy is available through which the purported terminations can be declared unlawful and set aside, Plaintiffs are entitled to a writ of mandamus pursuant to 28 U.S.C. § 1361 compelling Defendants not to interfere with Plaintiffs' exercise of their duties as PCLOB members.

### FIFTH CLAIM FOR RELIEF
### Equitable Relief for Statutory and Constitutional Violations
### (Against All Defendants)

88.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

89.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members without citing any cause for removal, Defendants have acted unlawfully.

90.    By purporting to remove Plaintiffs from their positions as Senate-confirmed PCLOB members based solely on their political affiliation, Defendants have acted unlawfully.

91.    Plaintiffs have a non-statutory right of action to declare unlawful and enjoin Defendants' unlawful actions, to obtain reinstatement from the date of the unlawful removals, and to obtain all other appropriate relief.

## PRAYER FOR RELIEF

**NOW, THEREFORE,** Plaintiffs requests judgment in their favor against Defendants as follows:

1.      Declare that Defendants have no authority to remove Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board without good cause;

2.      Declare that Defendants have no authority to remove Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board based on their political affiliation;

3.      Hold unlawful and set aside the purported removals of Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board;

4.      Enjoin Defendants (other than the President) from removing Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board without good cause and enjoin Defendants (other than the President) to restore them to those positions and to treat them as Members of the Privacy and Civil Liberties Oversight Board;

5.      Award backpay not exceeding $10,000 from the date of the unlawful removals (Plaintiffs waive any right to monetary recovery above $10,000);

6.      Issue a writ of mandamus compelling Defendants (other than the President) to treat the purported removals of Plaintiffs from their positions as Members of the Privacy and Civil Liberties Oversight Board as having no legal effect and to take no action to interfere with the exercise of Plaintiffs' duties.

7.      Award Plaintiffs reasonable attorneys' fees and costs; and

8.      Grant such other and further relief as the Court may deem appropriate.

Dated: February 24, 2025                     Respectfully submitted,

                                             _/s/ Elisabeth S. Theodore_
                                             Elisabeth S. Theodore (D.C. Bar No. 1021029)
                                             Daniel Yablon (D.C. Bar. No. 90022490)
                                             ARNOLD & PORTER
                                                KAYE SCHOLER LLP
                                             601 Massachusetts Ave., NW
                                             Washington, DC 20001-3743
                                             Tel: (202) 942-5000
                                             elisabeth.theodore@arnoldporter.com
                                             daniel.yablon@arnoldporter.com

                                             Caleb Thompson*
                                             ARNOLD & PORTER
                                                KAYE SCHOLER LLP
                                             250 West 55th St.
                                             New York, NY 10019
                                             Tel: (212) 836-8000

                                             _Counsel for Plaintiffs Travis LeBlanc and Edward Felten_

                                             *application for admission pending

## CERTIFICATE OF SERVICE

I hereby certify that this document will be served on Defendants in accordance with Fed.

R. Civ. P. 4.

_/s/ Elisabeth S. Theodore_

Elisabeth S. Theodore
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000