# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, *et al.*,

       Plaintiffs,

    v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, *et al.*,

       Defendants.

No. 25-cv-542-RBW

# MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION ........................................................................................................ 1

BACKGROUND .......................................................................................................... 3

A.    Congress Creates the Privacy and Civil Liberties Oversight Board ................................... 3

B.    Congress Reconstitutes the PCLOB as an Independent Agency and Removes It from Presidential Supervision ................................................................................................. 5

C.    The PCLOB Plays a Vital Role Advising Congress and the Public about How the Nation's Intelligence Programs Impact Privacy and Civil Liberties ................................ 8

D.    Factual Background ...................................................................................................... 14

LEGAL STANDARD .................................................................................................. 17

ARGUMENT ............................................................................................................... 17

I.    Plaintiffs' Removals Were Unlawful ............................................................................. 17

    A.    Text, History, Structure, and Function Demonstrate that the President Lacks Authority to Remove PCLOB Members Without Cause ...................................... 18

    B.    At Minimum, the 9/11 Commission Act Prevents the President From Removing Board Members Based on their Political Affiliation .......................... 31

    C.    For-Cause Removal Restrictions for PCLOB Members Comport with the Separation of Powers ............................................................................................ 32

    D.    The Plaintiffs' Removals Violated Due Process ................................................... 33

II.    Plaintiffs are Entitled To Reinstatement ....................................................................... 34

    A.    This Court has Authority to Order Reinstatement ............................................... 34

    B.    Permanent Injunctive Relief is Warranted .......................................................... 37

CONCLUSION ............................................................................................................ 40

CERTIFICATE OF SERVICE ..................................................................................... 41

i

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Am. Civil Liberties Union v. Clapper*,
785 F.3d 787 (2d Cir. 2015)..................................................................10, 13, 29

*Berry v. Reagan*,
732 F.2d 949 (D.C. Cir. 1983) ..........................................................................34

*Berry v. Reagan*,
No. 83-cv-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ......................34, 37, 38, 39

*BNSF Ry. Co. v. Loos*,
586 U.S. 310 (2019)..........................................................................................21

*Borders v. Reagan*,
518 F. Supp. 250 (D.D.C. 1981) .......................................................................19

*Borders v. Reagan*,
732 F.2d 181 (D.C. Cir. 1982) ..........................................................................19

*Buckley v. Valeo*,
424 U.S. 1 (1976)...............................................................................................36

*Carlucci v. Doe*,
488 U.S. 93 (1988).......................................................................................24, 31

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)...........................................................................................10

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985)...........................................................................................33

*Corley v. United States*,
556 U.S. 303 (2009)...........................................................................................31

*Dellinger v. Bessent*,
No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025).........................35, 36, 37

*Dellinger v. Bessent*,
No. 24A790 (U.S. Feb. 21, 2025) .................................................................35, 36

*Dellinger v. Bessent*,
No. 25-cv-385, 2025 WL 665041 (D.D.C. Mar. 1, 2025) .........................35, 37, 38

*In re DNI/AG 702(h) Certifications 2018*,
    941 F.3d 547 (Foreign Int. Surv. Ct. Rev. 2019) .................................................13

*Esparraguera v. Dep't of the Army*,
    101 F.4th 28 (D.C. Cir. 2024) ..............................................................................33

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ..............................................................................................34

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    561 U.S. 477 (2010) ..............................................................................................22

*FTC v. Tarriff*,
    584 F.3d 1088 (D.C. Cir. 2009) ...........................................................................19

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
    485 U.S. 271 (1988) ..............................................................................................36

*Harris v. Bessent*,
    No. 25-cv-412, 2025 WL 521027 (D.D.C. Feb. 18, 2025) ...................................37

*Humphrey's Executor v. United States*,
    295 U.S. 602 (1935) .........................................................2, 17, 18, 24, 26, 27, 29

*Keim v. United States*,
    177 U.S. 290 (1900) ..............................................................................................31

*Leachco, Inc. v. Consumer Prod. Safety Comm'n*,
    103 F.4th 748 (10th Cir. 2024) ............................................................................32

*Lucia v. SEC*,
    585 U.S. 237 (2018) ..............................................................................................36

*Marbury v. Madison*,
    5 U.S. (1 Cranch.) 137 (1803) ....................................................................33, 35, 37

*Mistretta v. United States*,
    488 U.S. 361 (1989) ..............................................................................................25

*Morrison v. Olson*,
    487 U.S. 654 (1988) ..............................................................................................32

*Muscogee (Creek) Nation v. Hodel*,
    851 F.2d 1439 (D.C. Cir. 1988) ...........................................................................21

*Myers v. United States*,
    272 U.S. 52 (1926) ................................................................................................20

*NLRB v. SW Gen., Inc.*,
 580 U.S. 288 (2017).................................................................................21

*Parsons v. United States*,
 167 U.S. 324 (1897).................................................................................20

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
 547 U.S. 47 (2006)...................................................................................21

*Sampson v. Murray*,
 415 U.S. 61 (1974)...................................................................................34

*In re Sawyer*,
 124 U.S. 200 (1888)............................................................................34, 35

*\*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020).............................2, 17, 18, 22, 23, 25, 27, 32

*\*Severino v. Biden*,
 71 F.4th 1038 (D.C. Cir. 2023)..................17, 18, 20, 23, 24, 25, 26, 29, 34, 35, 36

*Stone v. INS*,
 514 U.S. 386 (1995).................................................................................21

*Swan v. Clinton*,
 100 F.3d 973 (D.C. Cir. 1996)................................................................34

*United States v. Wilson*,
 290 F.3d 347 (D.C. Cir. 2002)................................................................23

*Vitarelli v. Seaton*,
 359 U.S. 535 (1959).................................................................................34

*Webster v. Doe*,
 486 U.S. 592 (1988).................................................................................34

*Wiener v. United States*,
 357 U.S. 349 (1958)........................................................................18, 25, 26

*Wikimedia Found. v. Nat'l Sec. Agency*,
 857 F. 3d 193 (4th Cir. 2017) ..........................................................13, 29

*Wilcox v. Trump*,
 No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) .............35, 37, 38

*U.S. ex rel. Williams v. NEC Corp.*,
 931 F.2d 1493 (11th Cir. 1991) .............................................................21

*Ysleta Del Sur Pueblo v. Texas*,
   596 U.S. 685 (2022) ................................................................................................31

**Statutes**

5 U.S.C.
   § 706 .........................................................................................................................35

28 U.S.C.
   § 1361 .......................................................................................................................35

42 U.S.C.
   § 2000(e)(2)(B) ..........................................................................................................9
   § 2000(h)(2) .............................................................................................................30
   § 2000e(i)(1)(B) .......................................................................................................16
   § 2000e(h)(1) ...........................................................................................................16
   § 2000ee(i)(1) .............................................................................................................6
   § 2000ee(a) .................................................................................................19, 22, 23
   § 2000ee(c) ..........................................................................................................8, 39
   § 2000ee(d)(1) ...................................................................................................7, 8, 30
   § 2000ee(d)(1)(A) ................................................................................................7, 28
   § 2000ee(d)(1)(B) ................................................................................................7, 28
   § 2000ee(d)(1)(D) ..............................................................................................28, 38
   § 2000ee(d)(2) ..............................................................................................8, 27, 30
   § 2000ee(d)(3) ...........................................................................................................9
   § 2000ee(d)(4) ......................................................................................................7, 9
   § 2000ee(e) ...............................................................................................................27
   § 2000ee(e)(1) ......................................................................................................7, 9
   § 2000ee(e)(1)(B) .....................................................................................................28
   § 2000ee(e)(2) ...........................................................................................................7
   § 2000ee(e)(2)(B) .....................................................................................................28
   § 2000ee(e)(2)(C) .................................................................................................9, 28
   § 2000ee(e)(2)(D) .................................................................................................7, 29
   § 2000ee(f) ...............................................................................................................27
   § 2000ee(g) ..........................................................................................................8, 36
   § 2000ee(h) ..............................................................................................................36
   § 2000ee(h)(1) .........................................................................................................32
   § 2000ee(h)(2) ...........................................................................................6, 19, 24, 32
   § 2000ee(h)(3) ...............................................................................................6, 24, 30
   § 2000ee(h)(4) ...........................................................................................6, 19, 20, 23
   § 2000ee(h)(4)(A) ....................................................................................................37
   § 2000ee(h)(4)(D) ................................................................................................6, 37
   § 2000ee(h)(5) ....................................................................................................16, 38

Implementing Recommendations of the 9/11 Commission Act of 2007,
   Pub. L. No. 110-53, 121 Stat. 266 ...............................................................5, 6, 18

Intelligence Authorization Act for Fiscal Year 2022,
Pub. L. No. 117-103, 136 Stat. 963 .................................................................11

Intelligence Reform and Terrorism Prevention Act of 2004,
Pub. L. No. 108-458, 118 Stat. 3638 ....................................3, 4, 5, 7, 18, 20, 30, 38

Reforming Intelligence and Securing America Act of 2024,
Pub. L. No. 118-49, 138 Stat. 862 ...................................................................38

**Regulations**

Exec. Order No. 14086, 87 Fed. Reg. 62,283 (Oct. 14, 2022) .....................................13

**Rules**

Fed. R. Civ. P. 56................................................................................................16

**Legislative Materials**

153 Cong. Rec. 20900 (2007) ..................................................................................5

All Actions, H.R. 1-110th Congress, https://www.congress.gov/bill/110th-
congress/house-bill/1/all-actions?overview= ...............................................5

H.R. Rep. No. 110-259 (2007)...................................................................................7

*Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight
Board and the Privacy Officer for the U.S. Department of Homeland Security,
Hearing Before the Subcomm. on Com. and Admin. Law of the H. Comm. on
the Judiciary*, 110 Cong. 101-144 (July 24, 2007) .............................................4, 5

Sen. Susan Collins, Concurrent Resolution on the Budget FY 2008, S. Con. Res.
21 (2007).............................................................................................................4

**Other Authorities**

Black's Law Dictionary 838 (9th ed. 2009)...............................................................22

Cong. Rsch. Serv., *Privacy and Civil Liberties Oversight Board: Congressional
Refinements* 5 (Dec. 5, 2007)...........................................................................5

FISC, Transcript of Proceedings Before the Thomas F. Hogan (Oct. 20, 2025),
https://www.dni.gov/files/documents/icotr/51117/
Doc%2010%20%E2%80%93%20Oct.%202015%20FISC%20Hearing%20Tr
anscript.pdf......................................................................................................13

John Solomon and Ellen Nakashima, *White House Edits to Privacy Board's
Report Spur Resignation*, The Washington Post (May 15, 2007)...............................4

Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000)................................................19

Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 395 (2004).......................................................................................................................3

PCLOB, *Assessments and Recommendations: Authorities Addressing Foreign Racially Motivated Extremism & Privacy and Civil Liberties Impacts* (Jan. 21, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/2810538d-331d-4316-af48-435aa88a631b/PCLOB%20Assessment%20and%20Recommendations%201.17.25%20-%20Completed%20508%20-%20Feb%206%202025.pdf......................................11

PCLOB, *Current Oversight Projects*, https://www.pclob.gov/OversightProjects .......................12

PCLOB, *Member Travis LeBlanc's Statement on the Board's Report and Recommendations on CIA Counterterrorism Activities Conducted Pursuant to E.O. 12333* (Feb. 11, 2022), https://documents.pclob.gov/prod/Documents/OversightReport/6fe39e51-86ab-482b-b4b9-56b2d6a01588/LeBlanc%20Separate%20Statement%202022.02.11,%20508%20Mar%2010,%202022%201358.pdf.......................................................................10

PCLOB, *Recommendations Assessment Report* (Feb. 5, 2016), https://documents.pclob.gov/prod/Documents/OversightReport/8ab510df-738f-44b5-a73a-08d1336d544d/Recommendations_Assessment_Report_20160205%20-%20Completed%20508%20-%2010252022.pdf.......................................10

PCLOB, *Recommendations Assessments Report* (Jan. 29, 2015), https://documents.pclob.gov/prod/Documents/OversightReport/a97a9918-775d-42eb-b426-2ae01838c2a3/Recommendations_Assessment-Report_2015%20-%20Complete%20-%20Nov%202%202022%201544.pdf.........................9

PCLOB, *Report and Recommendations on CIA Activities Conducted Pursuant to E.O. 12333*, https://www.pclob.gov/Oversight.......................................................11

PCLOB, *Report on CIA Financial Data Activities in Support of ISIL-Related Counterterrorism Efforts* (Feb. 12, 2022), https://documents.pclob.gov/prod/Documents/OversightReport/d735db57-ab33-4aa0-a4ec-b66638e834b1/PCLOB%20Report%20on%20CIA%20Activities%20-%20FINAL.pdf.............................................................................................10

PCLOB, *Report on The National Counterterrorism Center* (Dec. 10, 2024),
https://documents.pclob.gov/prod/Documents/OversightReport/4ce093a4-
d28d-4996-a35b-
c11d18e19018/PCLOB%20FY2024%20NCTC%20REPORT%20-
%20Completed%20508%20-%20Dec%2017%202024.pdf....................................................11

PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702
of the Foreign Intelligence Surveillance Act* (July 2, 2014),
https://documents.pclob.gov/prod/Documents/OversightReport/ba65702c-
3541-4125-a67d-92a7f974fc4c/702-Report-2%20-%20Complete%20-
%20Nov%2014%202022%201548.pdf ...................................................................................9

PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702
of the Foreign Intelligence Surveillance Act* (Sept. 28, 2023),
https://documents.pclob.gov/prod/Documents/OversightReport/d21d1c6b-
6de3-4bc4-b018-
6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20Completed,
%20Dec%203,%202024.pdf ...........................................................................................12, 29

PCLOB, *Report on the Telephone Records Program Conducted Under Section
215 of the USA PATRIOT Act and on the Operations of the Foreign
Intelligence Surveillance Court* (Jan. 23, 2014),
https://documents.pclob.gov/prod/Documents/OversightReport/cf0ce183-
7935-4b06-bb41-007d1f437412/215-
Report_on_the_Telephone_Records_Program%20-
%20Completed%20508%20-%2011292022.pdf ....................................................................9

PCLOB, *Report on The Terrorist Watchlist* (Jan. 23, 2025),
https://documents.pclob.gov/prod/Documents/OversightReport/94cd55e0-
4df0-464d-b731-
2b467c2f2fd8/PCLOB%20Terrorist%20Watchlist%20Report%20Unclassified
%20-%20Completed%20508%20-%20Feb%205,%202025.pdf.............................................11

PCLOB, *Semi-Annual Reports*, https://www.pclob.gov/SemiAnnual ..........................................12

PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086*
(Nov. 5, 2024),
https://documents.pclob.gov/prod/Documents/EventsAndPress/6e6c7a7b-
6036-4d6d-b635-
ffb53f68e4f4/Statement%20on%20PCLOB%20Review%20Under%20Section
%203%
20of%20EO%2014086,%20Completed%20508,%20Nov%207%202024.pdf.................13, 29

Remarks by the President of Review of Signals Intelligence (January 17, 2014),
https://obamawhitehouse.archives.gov/the-press-office/2014/01/17/remarks-
president-review-signals-intelligence ...................................................................................10

# INTRODUCTION

Expansive, unchecked government surveillance powers present a significant risk to the privacy and civil liberties of all Americans. History—from the FBI's operations against the civil rights movement in the 1950s and 1960s to the NSA's warrantless wiretapping efforts in the 2000s—shows that these risks are not hypothetical. Congress has concluded that the American people deserve an agency with the independence and expertise to provide meaningful, long-term oversight of surveillance and anti-terrorism authorities. And so at the recommendation of the 9/11 Commission, Congress created the Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), which has produced a series of groundbreaking reports on highly classified executive branch programs. The Board's work has been a basis for legislation, has informed judicial decisions, and is critical to enabling Congress to exercise its own constitutionally mandated oversight duties. This case is about whether the President may—by removing Board members without cause—unilaterally nullify the sole agency that acts as an independent check on secret national security activities.

The answer is no. Congress created the PCLOB as a multimember, nonpartisan expert agency to "continually review" how the executive branch balances its national security powers with privacy and civil liberties protections. In 2007, precisely to prevent executive branch interference, Congress revised the PCLOB's organic statute to secure the Board's independence and insulate its oversight and advice functions from Presidential control. The revised statute established the Board as an "independent agency," eliminated the President's power to remove Board members at his "pleasure," removed language placing the Board "under the general supervision of the President," guaranteed a six-year term of service, and prohibited the President from selecting the Board on the basis of political affiliation. Congress thus unambiguously acted

to prevent the President from stacking the Board with members from only his political party and removing PCLOB members without cause.

In defiance of the statute and Congress's legislative authority, President Trump has now purported to fire all three of PCLOB's Democratic members without cause. Two of those members—plaintiffs Travis LeBlanc and Edward Felten—bring this current suit. (The third member had only two days remaining in her term, which has now expired.) President Trump did not fire the plaintiffs in any effort to supervise or direct the officials who wield executive power on his behalf. Indeed, the PCLOB exercises no executive power—it cannot regulate, impose penalties, or compel anyone to do anything. Rather, the purpose and result of the terminations will be to deny the Board a quorum, prevent Congress and the public from learning about how the government respects privacy and civil liberties, and starve Congress of the information it needs to execute its constitutional powers to legislate and oversee the executive branch.

The Constitution does not authorize the President's unlawful efforts to destroy the PCLOB by firing its members without cause. Under *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), the PCLOB is precisely the kind of nonpartisan, multi-member, expert agency that Congress can constitutionally insulate from at-will removal.

Plaintiffs accordingly seek a declaration that their removals were unlawful and an order requiring their immediate reinstatement so that the Board may resume its critical functions enabling Congress to protect civil liberties. Because the President's actions have deprived the PCLOB of a quorum and it is currently unable to perform its congressionally mandated activities, including completion of a time-sensitive report on Section 702 of the Foreign Intelligence

Surveillance Act (FISA), plaintiffs also ask the Court to expedite their motion for summary judgment.

## BACKGROUND

### A.    Congress Creates the Privacy and Civil Liberties Oversight Board

Following the September 11, 2001, terrorist attacks, Congress conferred expansive new national-security powers on the executive branch.  In 2004, to help ensure that those powers would be exercised consistent with Americans' civil liberties, Congress created the PCLOB, which was initially an advisory body charged with ensuring that privacy and civil liberties are appropriately considered in the creation and implementation of the nation's counterterrorism policies and practices.  *See* Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) § 1061, Pub. L. No. 108-458, 118 Stat. 3638, 3684-88.

Congress created the PCLOB at the recommendation of the 9/11 Commission, which urged creation of "a board within the executive branch to oversee adherence to the guidelines [the Commission] recommend[ed] and the commitment the government makes to defend our civil liberties."  Nat'l Comm'n on Terrorist Attacks Upon the United States, *The 9/11 Commission Report* 395 (2004).  As Congress found in implementing that recommendation, the "potential shift of power and authority to the Federal Government" after September 11 "calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life." IRTPA § 1061(a)(2), 118 Stat. at 3684.

As initially constituted, the Board was subject to the President's direct control.  IRTPA established the Board "within the Executive Office of the President," giving the Executive the ability to superintend the Board's operations. *Id.* § 1061(b), 118 Stat. at 3684.  The statute contained a subsection entitled "Presidential Responsibility" that provided that "[t]he Board shall perform its functions within the executive branch and under the general supervision of the

President." *Id.* § 1061(k), 118 Stat. at 3688.  Only two of the Board's five members (the chair and vice-chair) were appointed with the Senate's advice and consent; the remaining three were appointed directly by the President, meaning that the President could exercise full control over the Board at any time.  *Id.* § 1061(e), 118 Stat. at 3686-87.  There was no requirement of partisan balance among Board members; no requirement that members be appointed on the basis of any privacy and civil liberties expertise; and no requirement that all members be confirmed by the Senate or be made available to appear before Congress.  *Id.*  And all of the Board's members, by statute, "serve[d] at the pleasure of the President."  *Id.* § 1061(e)(1)(E), 118 Stat. at 3687.  The statute did not establish any defined tenure of office.

The results were predictable: the Board was "too dependent upon the goodwill of the White House to exercise its advisory and oversight roles in an impartial manner."  Sen. Susan Collins, Concurrent Resolution on the Budget FY 2008, S. Con. Res. 21 at 156 (2007).  In the Board's first annual report to Congress, "the Bush administration made more than 200 revisions," "including the deletion of a passage on anti-terrorism programs that intelligence officials deemed 'potentially problematic' intrusions on civil liberties."[1] *See Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight Board and the Privacy Officer for the U.S. Department of Homeland Security*, *Hearing Before the Subcomm. on Com. and Admin. Law of the H. Comm. on the Judiciary*, 110 Cong. 101-144 (July 24, 2007) (attaching the redlined report).  Rather than provide candid reporting to Congress, the Board was essentially operating as the President's mouthpiece, which a White House spokesperson claimed "was appropriate because the board remains legally

---

[1] John Solomon and Ellen Nakashima, *White House Edits to Privacy Board's Report Spur Resignation*, The Washington Post (May 15, 2007), https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/.

under the supervision of the Executive Office of the President."[2]  As one of the Board's members testified to Congress after resigning in protest, "it simply was not possible to have independent oversight while being treated as if [the Board Members] were a part of the White House staff." *Privacy in the Hands of Government*, 110 Cong. 33 (testimony of Lanny J. Davis).  Members of Congress expressed concern that "the [B]oard has not been an effective check on [the] administration" because it did not have sufficient "independence and authority."  Sen. Dick Durbin, 153 Cong. Rec. 20900, 20981 (2007).

### B.    Congress Reconstitutes the PCLOB as an Independent Agency and Removes It from Presidential Supervision

Congress acted swiftly to reform the Board, guarantee its independence, and refocus its purpose and functions.  As early as 2005, Representative Carolyn Maloney had proposed reconstituting the PCLOB as an independent agency.  *See* Cong. Rsch. Serv., *Privacy and Civil Liberties Oversight Board: Congressional Refinements* 5 (Dec. 5, 2007).  On July 27, 2007—three days after Mr. Davis's congressional testimony—Congress acted.  Both chambers passed a bill removing the Board from the Executive Office of the President and establishing it "as an independent agency."  Implementing Recommendations of the 9/11 Commission Act of 2007 ("9/11 Commission Act") § 801(a), Pub. L. No. 110-53, 121 Stat. 266, 352 (codified as amended at 42 U.S.C. § 2000ee).  The bill passed by broad bipartisan margins: 85-8 in the Senate and 371-40 in the House.[3]  The President signed it on August 3, 2007.  *Id.*

In keeping with the need to ensure the Board's independence, the 9/11 Commission Act revised the PCLOB's organic act in multiple ways to insulate Board members from presidential

---

[2] *Id.*

[3] *See* All Actions, H.R. 1—110th Congress, https://www.congress.gov/bill/110th-congress/house-bill/1/all-actions?overview=.

control.  The revised legislation deleted the language from the prior statute stating that members served at the President's "pleasure" and that "[t]he Board shall perform its functions within the executive branch and under the general supervision of the President."  *Compare* IRTPA § 1061(e), (k), 118 Stat. at 3687-88 *with* 9/11 Commission Act § 801(a), Pub. L. No. 110-53, 121 Stat. at 356. It required Senate confirmation for all members of the Board, and added a guaranteed tenure provision, instructing that Board members "*shall* serve a term of 6 years," thereby ensuring continuity across Presidential terms.  9/11 Commission Act § 801(a), 121 Stat. at 356 (emphasis added); *see* 42 U.S.C. § 2000ee(h)(4).  And it further provided that, after the expiration of a member's term of office, the member "may continue to serve for up to one year after the date of expiration, at the election of the member," until appointment of a successor.  42 U.S.C. § 2000ee(h)(4)(D).

In addition to insulating the Board from presidential control, the 9/11 Commission Act also added substantive requirements to ensure that the Board would be nonpartisan and that its members would be independent experts selected on nonpolitical grounds.  Members "shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation," with "no more than 3 members" belonging "to the same political party."  42 U.S.C. § 2000ee(h)(2).  And the President "shall, before appointing an individual who is not a member of the same political party as the President, consult with the leadership of that party, if any, in the Senate and House of Representatives."  *Id.*  The Act further insulates Board members from presidential control by prohibiting the President from appointing any existing "elected official, officer, or employee of the Federal Government," to the Board, and by forbidding Board members from taking on those

roles while serving on the Board.  *Id.* § 2000ee(h)(3).  Congress provided that all Board members are entitled to compensation for their service.  *Id.* § 2000ee(i)(1).

The 9/11 Commission Act also refocused the Board's purpose and obligations to include a far more substantial role advising Congress itself.  For example, Congress deleted statutory language stating that the Board should carry out various advisory functions "[f]or the purpose of providing advice to the President or to the head of any department or agency of the executive branch."  *Compare* IRTPA § 1061(c)(1), 118 Stat. at 3684, *with* 42 U.S.C. § 2000ee(d)(1). Congress replaced language directing the Board to "review proposed regulations and executive branch policies related to efforts to protect the Nation from terrorism" with language directing the Board to "review proposed *legislation*, regulations, and policies related to efforts to protect the Nation from terrorism"—expanding the Board's remit well beyond executive branch policies. *Compare* IRTPA § 1061(c)(1)(A), 118 Stat. at 3684, *with* 42 U.S.C. § 2000ee(d)(1)(A) (emphasis added).

Congress likewise replaced language directing the Board to "review the implementation of laws, regulations, and executive branch policies" with language directing the Board to "review the implementation of *new and existing legislation*, regulations, and policies."  *Compare* IRTPA § 1061(c)(1)(B), 118 Stat. at 3684-85, *with* 42 U.S.C. § 2000ee(d)(1)(B) (emphasis added).  And Congress expanded the Board's reporting obligations to require semi-annual reports to congressional committees each year detailing the Board's activities and oversight-related conclusions, to require those reports to contain "minority views," and to require Board members to appear and testify before Congress.  42 U.S.C. § 2000ee(d)(4), (e)(1), (e)(2).  Finally, the Board must notify Congress when the President refuses to implement its recommendations.  *Id.* § 2000ee(e)(2)(D).

Notably, Congress did not authorize the Board to exercise any power of the executive branch. It cannot fine or punish anyone. It does not exercise any enforcement power, any power to prescribe regulations, or any power for compulsory process. Although the initial House bill proposed that the Board have independent subpoena power, *see* H.R. Rep. No. 110-259, at 321 (2007) (Conf. Rep.), that aspect of the bill was eliminated before passage. To obtain information by subpoena, the Board must submit a request to the Attorney General, which the Attorney General has authority to issue or deny in her discretion. 42 U.S.C. § 2000ee(g).

### C. The PCLOB Plays a Vital Role Advising Congress and the Public about How the Nation's Intelligence Programs Impact Privacy and Civil Liberties

Pursuant to its organic statute, the Board now serves two purposes: to "(1) analyze and review actions the executive branch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties; and (2) ensure that liberty concerns are appropriately considered in the development and implementation of laws, regulations, and policies related to efforts to protect the Nation against terrorism." *Id.* § 2000ee(c). To fulfill those purposes, the Board by statute performs four principal functions, each designed to provide an independent voice ensuring that Congress and the public are aware of the extent to which the executive branch protects civil liberties and operates consistent with legal requirements. Beyond these four core functions, the Board also performs a number of other vitally important tasks.

First, the Board reviews proposed and existing legislation, regulations, and policies relating to counterterrorism—as well as their implementation—to provide advice to Congress, the executive branch, and the courts on compliance with privacy and civil liberties protections and on proposals to retain or enhance government counterterrorism powers. *Id.* § 2000ee(d)(1). Second, the Board performs an "oversight" function: it is charged to "continually review" executive branch

counterterrorism policies, practices, and activities to "determine whether such actions (i) appropriately protect privacy and civil liberties; and (ii) are consistent with governing laws, regulations, and policies regarding privacy and civil liberties." 42 U.S.C. § 2000ee(d)(2). Third, the Board reviews reports from executive branch privacy officers and civil liberties officers, making recommendations as appropriate. *Id.* § 2000ee(d)(3). Fourth, "[t]he members of the Board shall appear and testify before Congress upon request." *Id.* § 2000ee(d)(4).

To carry out these functions, the Board must "periodically submit, not less than semiannually, reports" to Congress and the President—reports eventually made public so far as classification authorities permit. *Id.* § 2000ee(e)(1). Those reports, which are directed to the Intelligence, Judiciary, and Homeland Security Committees, must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight" of the executive branch. *Id.* § 2000(e)(2)(B). These reports are required to include "the minority views on any findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions." *Id.* § 2000ee(e)(2)(C).

For example, after the Edward Snowden leaks in 2013, Congress asked the Board to investigate and report on the operation of two large-scale NSA surveillance programs detailed in those leaks.[4] The Board issued two reports[5] about those programs and about the operation of the Foreign Intelligence Surveillance Court (FISC), ultimately offering 22 recommendations to

---

[4] PCLOB, *Report on the Telephone Records Program Conducted Under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* at 1-2 (Jan. 23, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/cf0ce183-7935-4b06-bb41-007d1f437412/215-Report_on_the_Telephone_Records_Program%20-%20Completed%20508%20-%2011292022.pdf.

[5] *See id.*; *see also* PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* (July 2, 2014), https://documents.pclob.gov/prod/Documents/OversightReport/ba65702c-3541-4125-a67d-92a7f974fc4c/702-Report-2%20-%20Complete%20-%20Nov%2014%202022%201548.pdf.

Congress, the Executive Branch, and the FISC.[6]  Every single one of these recommendations was ultimately implemented in full or in part—and most notably, consistent with the PCLOB's recommendations, Congress passed legislation to end the NSA's bulk telephone records program.[7] President Obama cited his consultation with the PCLOB in announcing his agreement that the program should end.[8]  The Second Circuit also relied on the PCLOB's public explanation and analysis of the program in holding that it exceeded the executive branch's statutory authority.  *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 798-99, 815-18 (2d Cir. 2015).

As an example of the Board's independent oversight function, the Board announced in 2014 that it would investigate and report on certain activities of the CIA pursuant to the President's Executive Order 12333.[9]  The government relies on E.O. 12333 to conduct what it claims are "FISA-exempt human and technical surveillance programs."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013).  The Board determined, among other things, that the CIA had given only limited formal training to employees that did not cover "the collection or handling of [U.S. Person] information that is incidentally collected outside of the United States," and that its policies on

---

[6]  *See* PCLOB, *Recommendations Assessments Report* at 1 (Jan. 29, 2015), https://documents.pclob.gov/prod/Documents/OversightReport/a97a9918-775d-42eb-b426-2ae01838c2a3/Recommendations_Assessment-Report_2015%20-%20Complete%20-%20Nov%202%202022%201544.pdf.

[7]  *See* PCLOB, *Recommendations Assessment Report* at 1-2 (Feb. 5, 2016), https://documents.pclob.gov/prod/Documents/OversightReport/8ab510df-738f-44b5-a73a-08d1336d544d/Recommendations_Assessment_Report_20160205%20-%20Completed%20508%20-%2010252022.pdf.

[8]  Remarks by the President on Review of Signals Intelligence (January 17, 2014), https://obamawhitehouse.archives.gov/the-press-office/2014/01/17/remarks-president-review-signals-intelligence.

[9]  *See* PCLOB, *Report on CIA Financial Data Activities in Support of ISIL-Related Counterterrorism Efforts* at 4 (Feb. 12, 2022), https://documents.pclob.gov/prod/Documents/OversightReport/d735db57-ab33-4aa0-a4ec-b66638e834b1/PCLOB%20Report%20on%20CIA%20Activities%20-%20FINAL.pdf.

protecting financial information about U.S. persons were "ambigu[ous]."[10]    Plaintiff LeBlanc wrote separately on the report's release to express "serious reservations about how our Intelligence Community handles U.S. person information."[11]    While much of the report was classified, it was provided to Congress; without the PCLOB's independent oversight work, Congress would have had little if any insight into this CIA program under E.O. 12333 and its privacy implications.  This report took eight years to complete,[12] reflecting the Board's unique ability to conduct long-running studies of highly classified and complex programs.

Other examples of the Board's advice and oversight work include the Board's most recent reports from December and January, examining the standards and procedures for adding and removing individuals on the Terrorist Watchlist, a database which affects approximately 1.1 million people;[13] an oversight report on the National Counterterrorism Center that recommended Center personnel be required to document justifications for any query seeking information about U.S. citizens;[14] and a congressionally-required report on recommendations to mitigate privacy and

---

[10] *Id.* at 20-21, 67.

[11] PCLOB, *Member Travis LeBlanc's Statement on the Board's Report and Recommendations on CIA Counterterrorism Activities Conducted Pursuant to E.O. 12333* (Feb. 11, 2022), https://documents.pclob.gov/prod/Documents/OversightReport/6fe39e51-86ab-482b-b4b9-56b2d6a01588/LeBlanc%20Separate%20Statement%202022.02.11,%20508%20Mar%2010,%202022%201358.pdf.

[12] *See* PCLOB, *Report and Recommendations on CIA Activities Conducted Pursuant to E.O. 12333*, https://www.pclob.gov/Oversight (reflecting filed date for CIA reports of February 12, 2022).

[13] PCLOB, *Report on The Terrorist Watchlist* at 2 (Jan. 23, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/94cd55e0-4df0-464d-b731-2b467c2f2fd8/PCLOB%20Terrorist%20Watchlist%20Report%20Unclassified%20-%20Completed%20508%20-%20Feb%205,%202025.pdf.

[14] PCLOB, *Report on The National Counterterrorism Center* at 21 (Dec. 10, 2024), https://documents.pclob.gov/prod/Documents/OversightReport/4ce093a4-d28d-4996-a35b-c11d18e19018/PCLOB%20FY2024%20NCTC%20REPORT%20-%20Completed%20508%20-%20Dec%2017%202024.pdf.

civil liberties impacts associated with the government's effort to counter foreign racially motivated violent extremism. *See* Intelligence Authorization Act for Fiscal Year 2022, § 824(b)(3), Pub. L. No. 117-103, 136 Stat. 963, 1022, 1025.[15]

In addition, the Board is often called upon to provide recommendations to Congress when particular authorities are approaching their statutory sunset. In 2023, in the lead-up to Congress's consideration of the re-authorization of the Section 702 surveillance program, the PCLOB issued a comprehensive report about that program, closing with 19 recommendations—7 of which were for Congress, 11 of which were for executive agencies, and 1 of which was for all of government.[16] Congress considers these reports in determining whether and on what terms to reauthorize surveillance authorities. Congress invited two PCLOB Board members to testify in advance of its reauthorization of Section 702. *See Fixing FISA: How a Law Designed to Protect Americans Has Been Weaponized Against Them*, *Hearing Before the Subcomm. on Fed. Govt. Surveillance of the H. Comm. on the Judiciary*, 118 Cong. (April 27, 2023). And multiple members of Congress referenced the PCLOB's Section 702 report during the reauthorization debate. *See* 170 Cong. Rec. H2329, H2332, H2346 (April 12, 2024).

Pursuant to the Board's advice and oversight functions, the Board at the time of the plaintiffs' terminations was working on a number of issues which impact Americans' privacy and

---

[15] The Board's recommendations included imposing additional obligations on the Director of National Intelligence. *See* PCLOB, *Assessments and Recommendations: Authorities Addressing Foreign Racially Motivated Extremism & Privacy and Civil Liberties Impacts* at 4 (Jan. 21, 2025), https://documents.pclob.gov/prod/Documents/OversightReport/2810538d-331d-4316-af48-435aa88a631b/PCLOB%20Assessment%20and%20Recommendations%201.17.25%20-%20Completed%20508%20-%20Feb%206%202025.pdf.

[16] PCLOB, *Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act* at 12-16 (Sept. 28, 2023) ("2023 FISA 702 Report"), https://documents.pclob.gov/prod/Documents/OversightReport/d21d1c6b-6de3-4bc4-b018-6c9151a0497d/2023%20PCLOB%20702%20Report,%20508%20Completed,%20Dec%203,%202024.pdf.

civil liberties, including reports that will educate Congress and the American public on the use of facial recognition in aviation security; the FBI's use of open-source information; potential First Amendment violations in executive branch efforts to counter domestic terrorism; and the role of tactical terrorism response teams ("TTRTs") at the U.S. border.[17]    The Board was also working on drafting another report to Congress concerning Section 702 of FISA, which authorizes the government to engage in warrantless surveillance involving the incidental collection of emails and other communications from Americans on American soil.    *Id.*    This report will be critical to Congress's decision whether or how to re-authorize the program early next year, and must be delivered within the next several months.    SUMF ¶¶ 39-41.    In addition, the Board was working on its statutorily mandated semi-annual report to Congress covering July 2024-December 2024.[18]

In addition to executive advice and congressional oversight, the Board fulfills a number of important roles with several courts.    Recognizing the Board's independence from executive control, the President "encouraged" the Board to oversee and certify the procedures of the Data Protection Review Court, Exec. Order No. 14086, 87 Fed. Reg. 62,283 (Oct. 14, 2022), a judicial oversight function the Board has accepted.[19]    The Board also issues recommendations to the Foreign Intelligence Surveillance Court,[20] and the FISC and the Foreign Intelligence Surveillance Court of Review have relied upon the Board's findings in assessing whether the executive branch

---

[17] PCLOB, *Current Oversight Projects*, https://www.pclob.gov/OversightProjects (last visited Mar. 6, 2025).

[18] *See* PCLOB, *Semi-Annual Reports*, https://www.pclob.gov/SemiAnnual (last visited Mar. 6, 2015).

[19] *See* PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086* (Nov. 5, 2024), https://documents.pclob.gov/prod/Documents/EventsAndPress/6e6c7a7b-6036-4d6d-b635-ffb53f68e4f4/Statement%20on%20PCLOB%20Review%20Under%20Section%203%20of%20EO%2014086,%20Completed%20508,%20Nov%207%202024.pdf.

[20] PCLOB, *Recommendations Assessments Report* at 1, *supra* note 6.

is complying with the law.  *See, e.g.*, *In re DNI/AG 702(h) Certifications 2018*, 941 F.3d 547, 551 n.10, 552 n.24, 553 n.27 (Foreign Int. Surv. Ct. Rev. 2019); FISC, Transcript of Proceedings Before the Thomas F. Hogan (Oct. 20, 2025), at 15-16.[21]  In addition, other Article III courts frequently rely on the Board's independent reports in their own work assessing the legality of government surveillance programs.  *E.g.*, *Am. Civil Liberties Union*, 785 F.3d at 798-99, 815, 817-18; *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F. 3d 193, 201-04, 211, 218 (4th Cir. 2017).

### D.    Factual Background

The Senate confirmed plaintiff Travis LeBlanc as a Board member of the PCLOB on September 14, 2022, to serve a six-year term ending on January 29, 2028.  Statement of Undisputed Material Facts ("SUMF") ¶ 2.  The Senate confirmed plaintiff Edward Felten as a Board member of the PCLOB on June 27, 2019, to serve a six-year term ending January 29, 2025, and—unless a successor is confirmed—he is entitled by statute to serve one additional year at his election, until January 29, 2026.  SUMF ¶¶ 4-5.  This is the second term for both plaintiffs.  SUMF ¶¶ 1-4.  Mr. LeBlanc was nominated originally by President Trump and for his current term by President Biden; Mr. Felten was nominated by President Trump for both of his terms.  SUMF ¶¶ 1-4.

At the time President Trump took office in January 2025, four of the Board's five seats were filled.  One seat was filled with an appointee who is a Republican—defendant Beth Williams.  SUMF ¶¶ 8, 11, 13. Three seats were filled with appointees who are Democrats—plaintiffs LeBlanc and Felten, as well as chair Sharon Bradford Franklin, whose term would have fully expired on January 29, 2025.  SUMF ¶¶ 11-13.  The Board, including plaintiffs, were working on

---

[21] *Available              at*              https://www.dni.gov/files/documents/icotr/51117/ Doc%2010%20%E2%80%93%20Oct.%202015%20FISC%20Hearing%20Transcript.pdf.

several of the projects described above, especially the time-sensitive Section 702 report to Congress.  SUMF ¶ 35.

On Tuesday, January 21, 2025, at 6:54 p.m., the plaintiffs each separately received an email from defendant Morse, sent from a White House email address, with the subject line "Privacy and Civil Liberties Oversight Board."  SUMF ¶ 14.  Defendant Morse wrote:

> On behalf of President Donald J. Trump, I am writing to request your resignation as a Member of the Privacy and Civil Liberties Oversight Board. Please submit your resignation to me by the close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.

> SUMF ¶ 14.

Defendant Morse did not identify any cause or offer any explanation for the requested resignation or for the threatened termination.  SUMF ¶¶ 14-16.  The plaintiffs did not resign.  SUMF ¶ 18.

Defendant Williams ordered PCLOB staff to stay past the close of business on the night of Thursday, January 23, 2025, to effectuate the anticipated removals of her fellow Board members, including having them removed from the PCLOB website.  SUMF ¶ 20.  But the plaintiffs did not receive notice of any termination by the President on Thursday, January 23.  SUMF ¶ 21.  Nor did they receive any notice of termination on Friday, January 24; Saturday, January 25; or Sunday, January 26.  *Id.*

On Monday, January 27, 2025, defendant Morse notified defendant Williams to terminate the plaintiffs (as well as Ms. Bradford Franklin).  SUMF ¶¶ 23, 30.  Defendant Williams then directed PCLOB staff to cut off the plaintiffs' access to their PCLOB email accounts and to the PCLOB's offices, to eliminate them from the listing on the website of active Board members, and to terminate them from the agency.  SUMF ¶ 24.

Under defendant Williams's direction and without prior communication to the plaintiffs, the plaintiffs received notifications on Monday, January 27 via Microsoft Outlook that they had been locked out of their PCLOB email accounts. SUMF ¶¶ 24-26. Later that day, the plaintiffs received, via their non-government email addresses, identically-worded "termination" emails from defendant Morse. SUMF ¶ 26. Those emails stated in their entirety:

> Hello,
>
> This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025 at 17:01.
>
> SUMF ¶ 26.

Defendant Morse's one-sentence emails did not identify any cause or offer any explanation for either plaintiff's termination. SUMF ¶¶ 26. 31. Both plaintiffs requested a copy of the official Presidential action terminating them. SUMF ¶ 27. Defendant Morse did not respond to plaintiff Felten. SUMF ¶ 28. He responded to plaintiff LeBlanc: "This email serves as the Presidential action." SUMF ¶ 29.

President Trump also terminated the Board's third Democratic member and Chair, Sharon Bradford Franklin, on January 27, 2025—even though her term was set to expire two days later, on January 29, 2025, and she was not entitled to hold over for any additional period. SUMF ¶¶ 12, 30.

President Trump's actions left in place a single Republican member, Defendant Williams, who works part-time at the agency. SUMF ¶ 35; *see* 42 U.S.C. § 2000e(h)(1), (i)(1)(B). The Board now lacks the quorum necessary to perform its statutorily-mandated functions. 42 U.S.C. § 2000ee(h)(5).

Promptly after the plaintiffs received emails from defendant Morse on Monday, January 27, defendant Williams ordered Board staff to issue a press release stating that "the White House

16

terminated Chair Sharon Bradford Franklin, and Members Ed Felten and Travis LeBlanc from their positions as of 5 p.m. last Thursday."  SUMF ¶ 36.

On February 24, the plaintiffs brought this suit, and now move for expedited summary judgment.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.

## ARGUMENT

### I.    Plaintiffs' Removals Were Unlawful

There is no dispute that the President removed the plaintiffs from their positions as PCLOB Board members without cause.  He did not identify any malfeasance, neglect of duty, or other cause for removal at any time.  To the contrary, he removed the plaintiffs based on their political affiliation—he terminated all three Democrats, but left the single Republican member in place, and directed that Board member (defendant Williams) to effectuate the terminations.  SUMF ¶¶ 13, 19-26, 30, 35.

These actions were plainly unlawful, because the PCLOB's organic statute prohibits the President from removing Board members without cause.  The statute makes clear that Board members are entitled to serve six-year terms; that they do not serve at the "pleasure" of the President; and that the Board is a nonpartisan expert agency that does not wield any executive power and is not subject to presidential supervision.   The Board's entire function—to candidly advise and inform Congress and the public about whether and how the executive branch respects privacy and civil liberties—is incompatible with removal at will.

17

Nor is there any reasonable question that the removal restrictions are constitutional. The Supreme Court held in *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), and recently reiterated in *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), that Congress may constrain presidential removal authority in the context of multi-member expert boards like the PCLOB. This Court should grant summary judgment.

### A.  Text, History, Structure, and Function Demonstrate that the President Lacks Authority to Remove PCLOB Members Without Cause

To determine whether PCLOB members may be removed without cause, the D.C. Circuit has instructed courts to apply the traditional tools of statutory construction to ascertain whether Congress has sought to impose removal restrictions. *See Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023). Congress may manifest its intent to do so in one of two ways. "First, Congress may impose a removal restriction in the plain text of a statute. Second, Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office." *Id.* (citation omitted). The D.C. Circuit has made clear that a "presumption of removability d[oes] not apply to members of" an agency like the PCLOB that "exercises 'no part of the executive power.'" *Id.* at 1047 (quoting *Humphrey's Executor*, 295 U.S. at 628); *cf. Seila Law*, 591 U.S. at 204 (describing the President's "power to remove—and thus supervise—*those who wield executive power on his behalf*") (emphasis added). Rather, the question is simply whether "Congress may fairly be said to have conferred" the "power of removal." *Wiener v. United States*, 357 U.S. 349, 353 (1958). In *Wiener*, the Supreme Court thus analyzed the "nature of the function that Congress vested in the War Claims Commission" as well as the "history of [the] legislation" to conclude that Congress had precluded the President from removing commissioners without cause, even though the text of the relevant statute contained no explicit limitation on removal authority. *Id.* at 353-54.

All relevant tools of statutory interpretation confirm that the PCLOB's organic statute prohibits the President from removing PCLOB members without cause.

### 1.    Text and History

Congress's 2007 amendments to the PCLOB's organic statute demonstrate that Board members may not be removed at will. As initially enacted in 2004, IRTPA established the Board "within the Executive Office of the President," declared that the "Board shall perform its functions within the executive branch and under the general supervision of the President," and stated that all Board members "serve[d] at the pleasure of the President," with no defined tenure of office. IRTPA § 1061(b), (e)(1)(E), (k), 118 Stat. at 3684, 3687-88. In 2007, in response to White House efforts to edit the Board's first annual report to Congress and to delete passages that the White House disliked, *supra* at 4-5, Congress substantially amended the Board's organic statute. Congress removed the Board from the Executive Office of the President, deleted the language stating that Board members "serve[d] at the pleasure of the President," deleted the language stating that the "Board shall perform its functions within the executive branch and under the general supervision of the President," added a requirement of partisan balance, and gave Board members fixed terms of office. 9/11 Commission Act, § 801(a), Pub. L. No. 110-53, 121 Stat. at 352, 355-56.

Today, the Board's organic statute declares the Board to be "independent" and states that "[e]ach member of the Board shall serve a term of 6 years." 42 U.S.C. § 2000ee(a), (h)(4). It also imposes substantive restrictions on the President's ability to select and appoint Board members: they shall be "selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation, but in no event shall more than 3 members of the Board be members of the same political party." *Id*. § 2000ee(h)(2). The President is required to consult with leaders of the opposing party in Congress on appointments. *Id.*

19

These textual provisions, along with the text Congress deleted when it amended the statute in 2007, make it unambiguously clear that Congress intended to impose removal restrictions. First, the requirement that "[e]ach member of the Board *shall serve* a term of 6 years," *id.* § 2000ee(h)(4) (emphasis added), is inconsistent with removal at will. "It is . . . fixed usage that 'shall' means something on the order of 'must' or 'will.'" *FTC v. Tarriff*, 584 F.3d 1088, 1090 (D.C. Cir. 2009). The most relevant definition of "serve" is "to hold an office." *See* Merriam-Webster's Collegiate Dictionary 1067 (10th ed. 2000). The plain statutory text mandates that members will hold office for a fixed six-year term, not only so long as the President chooses to keep them.

A court in this district recognized as much in *Borders v. Reagan*, 518 F. Supp. 250, 254-55 (D.D.C. 1981), *vacated as moot,* 732 F.2d 181 (D.C. Cir. 1982). The court there explained that similar "shall serve" language in the statute creating the District of Columbia Judicial Nomination Commission "makes clear that Congress did not intend that a member of the Commission serve only at the pleasure of the appointing authority or that he be removable at will; rather, once an appointment is made it is anticipated that the member will serve a complete term." *Id.*

In *Severino*, the D.C. Circuit held that statutory language providing that the "term of each member [of the Council of the Administrative Conference of the United States] is 3 years" did not, in and of itself, install a floor for service. *Severino*, 71 F.4th at 1044-45. But the provision at issue there lacked the crucial "shall serve" language present in the PCLOB statute. *Severino* merely held that the word "term," in and of itself, did not create removal protection—including because one definition of "term" was a "stipulated length of time that a person *may* hold office." *Id.* at 1045 (internal quotation marks omitted) (emphasis in original). And the Supreme Court's decision in *Parsons*, on which *Severino* relied, involved materially different language providing that officers "shall be appointed for a term of four years." *Severino*, 71 F.4th at 1045 (quoting *Parsons*

*v. United States*, 167 U.S. 324, 327-28 (1897)); *see also Myers v. United States*, 272 U.S. 52, 146-47 (1926). That language is satisfied once the office-holder is appointed, in contrast to language that mandates an office-holder "shall serve" for a defined tenure.

Indeed, the dispositive point in *Severino* was the very absence of language about service similar to that present in the PCLOB statute. The D.C. Circuit held that "the word 'term'" did not "invest[] the person with a guaranteed minimum period of *service*." 71 F.4th at 1045 (emphasis added). The PCLOB statute does just that by mandating that members "shall serve" for six years.

In any event, even if the "shall serve" language "standing alone [did] not curtail the President's removal power," *cf. Severino*, 71 F.4th 1047, here it does not stand alone. Congress added the phrase "shall serve a term of 6 years" at the same time it *removed* statutory language declaring that Board members would "serve at the pleasure of the President," eliminating any doubt that the plain text of the 9/11 Commission Act confers removal protections. *Compare* IRTPA § 1061(e)(1)(E), 118 Stat. at 3687, *with* 42 U.S.C. § 2000ee(h)(4). Congress's choice to "remove[] language that expressly" authorized removal without cause would be inexplicable and meaningless if the statute still authorized removal without cause. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 306 (2017). "[W]hen the legislature deletes certain language as it amends a statute, it generally indicates an intent to change the meaning of the statute." *U.S. ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1502 (11th Cir. 1991) (cleaned up).

This statutory history—reflecting changes to the text of the PCLOB's organic statute—is itself "textual evidence" of meaning. As Justice Gorsuch, joined by Justice Thomas, has noted, unlike "legislative history," the "record of *enacted* changes Congress made to the relevant statutory text over time" constitutes "the sort of textual evidence everyone agrees can sometimes shed light

on meaning." *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (emphasis in original).

Indeed, the Supreme Court has repeatedly held that courts must "give effect" to statutory revisions when interpreting statutory text, and may not adopt an interpretation that renders a "legislative change" a nullity. *See Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57-58 (2006) (refusing to interpret statute "in a way that negates its recent revision"); *see also Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect."); *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) ("Where the words of a later statute differ from those of a previous one on the same or related subject, the Congress must have intended them to have a different meaning"). These principles compel the conclusion that Congress intended to restrict the President's removal authority. "Had Congress intended" the President to retain unrestricted removal authority, "there would have been no reason for Congress" to have deleted the provision expressly conferring that authority. *Stone*, 514 U.S. at 397.

Congress's deletion in the 9/11 Commission Act of language stating that Board members perform their functions "under the general supervision of the President" is a further unambiguous textual indication that Congress intended to forbid at-will removal. Supervision and removal are inextricably linked. The "most direct method of presidential control" is "removal at will," and the whole point of removal is to enable supervision. *Seila Law*, 591 U.S. at 225; *see id. at* 204 (referencing "[t]he President's power to remove—and thus supervise—those who wield executive power on his behalf"); *id.* at 238 (similar); *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010) (emphasizing the "importance of removal as a tool of supervision"). Reading

the statute to authorize at-will removal would nullify Congress's decision to remove PCLOB members from the President's "general supervision."

For similar reasons, Congress's decision in 2007 to establish the Board as an "independent agency" also shows that the statute does not allow at-will removal. 42 U.S.C. § 2000ee(a). The Board cannot function "independent[ly]" if its members serve at the President's pleasure or if he may fire them based on policy disagreement or partisan affiliation. As the Supreme Court explained in *Seila Law*, Congress's choice to establish an agency as an "independent bureau" foreclosed any conclusion that Congress intends at-will removal, because an agency "would [not] be 'independent' if its head were required to implement the President's policies upon pain of removal." 591 U.S. at 230. Especially in the context of Congress's other revisions to the PCLOB's organic statute, the word "independent"—which means "not subject to the control or influence of another"—is inconsistent with presidential control through discretionary removal. *Id.* (quoting Black's Law Dictionary 838 (9th ed. 2009)).

In short, numerous provisions in the "text of the statute creating the [PCLOB] clearly express[] a congressional intent to trim the President's removal power." *Severino*, 71 F.4th at 1044.

## 2.    Structure and Function

Although the Court need not reach the issue in light of the unambiguous text, Congress has also "clearly indicate[d] its intent to restrict removals through the statutory structure and function" of the PCLOB. *Severino*, 71 F.4th at 1044. As *Severino* explained, "[u]nder *Humphrey's Executor*'s and *Wiener*'s binding precedent, when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will presidential removal, that can be a relevant signal that Congress meant for members of that agency

23

to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Id.* at 1047.  The structure and function of the PCLOB are inconsistent with at-will removal.

    ***Structure.***  The Board's composition, requirements for the appointment of members, and the structure of members' terms each reflect Congress's design to insulate members from presidential control and removal.  In 2007, Congress removed the PCLOB from the Executive Office of the President and made it an "independent agency." 42 U.S.C. § 2000ee(a).  The Board's five members have staggered six-year terms that deliberately outlast individual Presidential terms. 42 U.S.C. § 2000ee(h)(4).  "[S]taggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency . . . ." *Severino*, 71 F.4th at 1049 (quoting *United States v. Wilson*, 290 F.3d 347, 359 (D.C. Cir. 2002)).  They also reflect Congress's opposition to permitting a "complete change in leadership at any one time," *see Seila Law*, 591 U.S. at 216 (internal quotation marks omitted)—a goal that would be impossible if the statute permitted removal at will.  The prohibition on Board members serving as an official, officer, or employee of the federal government in any other capacity further serves to insulate members from presidential control.  42 U.S.C. § 2000ee(h)(3).

    In addition, Board members must be selected "solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation, but in no event shall more than 3 members of the Board be members of the same political party."  *Id.* § 2000ee(h)(2).  Those appointment criteria are fundamentally incompatible with at-will removal, because they ensure that Board members are selected based on expertise rather than the President's policy preferences.  Because Board members must be "selected" "solely" based on expertise and qualifications, it would make no sense to allow them to be fired based on policy or political disagreements that have nothing to

do with their expertise, qualifications, or the quality of their service. The maxim that "the power of removal from office is incident to the power of appointment," *Severino*, 71 F.4th at 1044 (quoting *Carlucci v. Doe*, 488 U.S. 93, 99 (1988)), here weighs decidedly against at-will removal. Removing someone from office is not "incident" to the power of appointment if the removal is based on considerations that are prohibited in the context of appointment.

Likewise, the Board's statutory partisan balance requirement—which mirrors the FTC's partisan balance requirement considered in *Humphrey's Executor*, 295 U.S. at 620—would be nugatory if the President could simply fire all the Board members for political reasons. The statutory requirement that no more than 3 members of the Board may be members of the same political party serves to ensure that the Board reflects the views of both parties, and not simply a single party (or President's) views. But little would be left of that requirement if a President could simply fire all members who belonged to the opposing political party. Reading the statute to permit removal without cause would thus fundamentally undermine the scheme of non-partisan agency independence that Congress deliberately designed.

The Board also exhibits all the "organizational features" the Supreme Court identified in *Seila Law* as indicating that an agency is "non-executive" and supporting for-cause removal restrictions. 591 U.S. at 216. It is "[c]omposed of five members—no more than three from the same political party." *Id.* Its "duties [are] 'neither political nor executive,' but instead call[] for 'the trained judgment of a body of experts' 'informed by experience.'" *Id.* "And the [Board members'] staggered, [six]-year terms enable[] the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time.'" *Id.*

These structural features fully distinguish the PCLOB from the Administrative Conference of the United States at issue in *Severino*. There, conference members served three-year terms,

meaning that none could "outlast a President," 71 F.4th at 1049; about half were required to be employees of the executive branch in other capacities and were "subject to at-will removal in their day jobs," *id.*; only the conference's "initial batch of members … served staggered terms," *id.*; there was no statutory requirement of partisan balance; and there were no limitations on the qualities and considerations that the President could take into account when appointing members. For all those reasons, the D.C. Circuit held in *Severino*, the "design" of the Administrative Conference reflected that there was no need for "absolute Freedom from Executive interference" and that the Conference was instead pervasively integrated within the executive branch. *Id.* The PCLOB's structure differs from that of the Administrative Conference in every material respect.

**Function.**  "[T]he most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in" the body to which the removed officials belong. *Wiener*, 357 U.S. at 353; *see also Mistretta v. United States*, 488 U.S. 361, 411 (1989).  If the functions of a particular agency are incompatible with presidential "influenc[e]," "*a fortiori* must it be inferred that Congress did not wish to have hang over the [agency] the Damocles' sword of removal by the President for no reason other than that he preferred to have on that [agency] men of his own choosing."  *Wiener*, 357 U.S. at 356.  The PCLOB's functions make clear that independence from presidential influence is critical and that Congress thus could not have sought to allow removal at will.

As the D.C. Circuit held in *Severino*, "under *Humphrey's Executor's* and *Wiener*'s binding precedent, when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Severino*, 71 F.4th at 1047.

Courts thus look for an adjudicatory or legislative feature that would "signal a need for some measure of independence from Presidential control." *Severino*, 71 F.4th at 1049.

For example, in *Humphrey's Executor*, because the FTC made "investigations and reports thereon for the information of Congress," it performed "specified duties as a legislative or as a judicial aid" and, therefore, required insulation from Presidential interference in the form of removal protections. 295 U.S. at 628. And in *Wiener*, Congress required the War Claims Commission to "adjudicate according to law." 375 U.S. at 355-56. Even though the Commission was housed in the executive branch, it could not perform its quasi-judicial function if its decisions on individual claims were subject to the President's influence. *See id.* That meant that a for-cause removal restriction "must … be inferred." *Id.* As the Supreme Court has long recognized, "one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will." *Humphrey's Executor*, 295 U.S. at 269.

The PCLOB's functions likewise require independence. As an initial matter, the PCLOB exercises no executive power whatsoever. As discussed, the Board has no authority to impose penalties or fines, promulgate regulations, undertake enforcement actions, or bind members of the executive branch or the public in any way. Instead, its function is to provide Congress with information about the executive branch's consideration and respect for privacy and civil liberties in conducting counterterrorism activities, and to report findings to Congress and the public. 42 U.S.C. § 2000ee(d)(2), (e), (f). That oversight function involves no executive authority—to the contrary, it demands autonomy from executive authority without which meaningful oversight would be impossible—and raises no presumption of presidential control. *Cf. Seila Law*, 591 U.S. at 214. As Congress recognized in reforming the Board's structure in response to White House interference with those oversight functions, the Board cannot operate effectively without

27

independence.  *Supra* at 3-8.  If the President could edit the Board's reports before they go to Congress or fire members who took positions the Administration disliked, the Board would simply be an arm of the executive branch unable to perform its key functions, including oversight of the executive branch.  And Congress's goal of making information about the executive branch's treatment of privacy and civil liberties "available to the public to the greatest extent that is consistent with the protection of classified information," 42 U.S.C. § 2000ee(f), would also be subverted.  A President with at-will removal power could entirely prevent the Board from informing the public about executive branch abuses.

The Board's functions, like those at issue in *Humphrey's Executor*, also qualify as quasi-legislative: it serves as a "legislative . . . aid."  295 U.S. at 628.  The Board commences oversight investigations at the express request of Congress, *supra* at 9 & nn.4-5, and Congress relies on the Board's reports in considering whether and how to authorize or reauthorize surveillance and other counterterrorism powers, including in particular the executive branch's expansive surveillance powers under Section 702, *supra* at 12.  For example, the Board is charged by statute with "review[ing] proposed legislation" and the "implementation of new and existing legislation," 42 U.S.C. § 2000ee(d)(1)(A)-(B), and advising Congress on "proposals to retain or enhance a particular governmental power," *see id.* § 2000ee(d)(1)(D).  In performing the latter function, the Board is required to "consider whether … the executive branch has established (i) that the need for the power is balanced with the need to protect privacy and civil liberties; (ii) that there is adequate supervision of the use by the executive branch of the power to ensure protection of privacy and civil liberties; and (iii) that there are adequate guidelines and oversight to properly confine [the power's] use."  *Id.* § 2000ee(d)(1)(D).  In other words, the Board serves as a legislative aid by providing Congress its unvarnished and independent views on whether the executive branch

has justified a "proposal[] to retain or enhance a particular governmental power," a function that would be meaningless if the President who was proposing the retention or enhancement of the power could also control whether the Board opines that such authority is justified. Indeed, if the Board were subject to Presidential control and members served at the President's pleasure, it would duplicate the President's Intelligence Oversight Board, which exists within the White House to advise the President on intelligence oversight matters.

In further support of its legislative aid function, the Board must also submit reports, "not less than semiannually," to a long list of congressional committees, the contents of which must include "information on the findings, conclusions, and recommendations of the Board resulting from its advice [including to the President] and oversight functions," as well as any minority views. 42 U.S.C. §§ 2000ee(e)(1)(B); (e)(2)(B)-(C). The requirement to include both majority and minority views reflects that Congress intended the Board to operate independently of the President and offer a range of perspectives on counterterrorism activities, not merely regurgitate the executive branch's position. The importance of the Board's legislative aid function is emphasized by the additional requirement that it inform Congress if the executive branch implements a counterterrorism proposal over the Board's objection. *Id.* § 2000ee(e)(2)(D).

In addition to its oversight and quasi-legislative functions, the PCLOB also serves as a "judicial aid." *Humphrey's Executor*, 295 U.S. at 268. It supplies advice and recommendations to the Foreign Intelligence Surveillance Court—an Article III court—and holds responsibility for certifying the procedures of the Data Protection Review Court—an administrative body that serves adjudicative functions. *See, e.g.*, PCLOB, *Recommendations Assessments Report* at 1, *supra* n.6; 2023 FISA 702 Report, *supra* n.15; PCLOB, *Statement on PCLOB Review Under Section 3 of Executive Order 14086*, *supra* n.19; *see generally supra* at 13-14. And its reports often provide

29

key information for other Article III courts that must evaluate operations of executive branch agencies conducted largely in secret.  *See, e.g.*, *Am. Civil Liberties Union*, 785 F.3d at 798-99, 815-18; *Wikimedia Found.*, 857 F. 3d at 202-04, 211.  In the *American Civil Liberties Union v. Clapper* case, for example, the Second Circuit relied on the PCLOB's specific descriptions of the government's "practice[s]" in creating applications under the Section 215 telephone metadata program to conclude that the program was not operating consistent with the statute's "relevance" requirement.  785 F.3d at 815.

These functional roles—like the PCLOB's structural features—again easily distinguish the PCLOB from the Administrative Conference of the United States that was at issue in *Severino*. The *sole* purpose of the Administrative Conference was to provide advice to the President: "a quintessential example of a purely executive function."  71 F.4th at 1048 (internal quotation omitted).  The agency had no "adjudicatory or legislative features that would clearly signal a need for some measure of independence from Presidential control."  *Id.* at 1049.

The PCLOB, conversely, has a significant legislative role and conducts oversight of the executive branch—clearly signaling the need for independence from presidential control. 42 U.S.C. § 2000ee(d)(1), (2).  Unlike with the Administrative Conference, PCLOB members cannot simultaneously serve as executive branch officials who would be beholden to the President.  *Id.* § 2000ee(h)(3).  And in the 9/11 Commission Act amendments, Congress specifically *removed* language that had been present in the prior version of the PCLOB's organic statute stating that the Board should carry out various advisory functions "[f]or the purpose of providing advice to the President or to the head of any department or agency of the executive branch."  *Compare* IRTPA § 1061(c)(1), 118 Stat. at 3684, *with* 42 U.S.C. § 2000ee(d)(1).  The current statute reflects the PCLOB's purpose to provide advice to Congress and enable oversight and public accountability—

including about whether the executive branch complies with privacy and civil liberties protections Congress or the courts have prescribed. It would be impossible for the Board to discharge these functions and to provide candid advice to Congress if the President could fire members for providing advice he disapproves.

### B.    At Minimum, the 9/11 Commission Act Prevents the President From Removing Board Members Based on their Political Affiliation

Even if the Court were to conclude that the 9/11 Commission Act generally permits at-will removal, the plaintiffs' removals would still be unlawful. At minimum, the statute prohibits the President from terminating Board members on the basis of political affiliation. The statute specifically states that members "shall be selected … without regard to political affiliation," except that no more than 3 members of the Board may be of the same political party. 42 U.S.C. 2000(h)(2). And if political affiliation is an impermissible substantive criterion for Board membership, it is also an impermissible ground for termination. The "without regard to political affiliation" provision would be functionally meaningless if, upon a change of administration, members could be immediately fired, at the President's whim, on the basis of that affiliation. As the Supreme Court has repeatedly held, courts "must normally seek to construe Congress's work 'so that effect is given to all provisions, so that no part will be inoperative or superfluous, void or insignificant.'" *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698-99 (2022) (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

Moreover, the Supreme Court "has held, as a matter of statutory interpretation, that absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" *See Carlucci v. Doe*, 488 U.S. 93, 99 (1988) (quoting *Keim v. United States*, 177 U.S. 290, 293 (1900)). Under that principle, if a substantive limitation on the consideration of a particular criterion applies to the power of appointment, the same limitation should also apply to

the power of removal. Removal is not "incident" to appointment if the power to remove is greater than the power to appoint.

There is no genuine dispute that plaintiffs were fired on the basis of their political affiliation. All Democratic Board members were fired, SUMF ¶¶ 13, 35; the only Republican Board member was retained, SUMF ¶ 35, and the White House channeled the firings through the Republican Board member, SUMF ¶¶ 23-24. The President did not identify any other explanation for the firings, and he notably fired the Board's chair even though she was set to leave two days later upon the expiration of her term. SUMF ¶¶ 12, 30-35.

## C. For-Cause Removal Restrictions for PCLOB Members Comport with the Separation of Powers

There is no question that congressional restrictions on the President's ability to remove members of the PCLOB are constitutional under binding Supreme Court precedent. "Since the Supreme Court's decision in *Humphrey's Executor,* the constitutionality of independent agencies, whose officials possess some degree of removal protection that insulates them from unlimited and instantaneous political control, has been uncontroversial." *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 760 (10th Cir. 2024), *cert. denied* 2025 WL 76435 (U.S. Jan. 13, 2025).

In *Humphrey's Executor*, the Supreme Court held that Congress may constitutionally restrict the President's ability to remove officers from "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 216, 218. The PCLOB is such an agency, and it wields no executive power at all; it certainly does not wield substantial executive power. Indeed, *Seila Law*'s description of the agency at issue in *Humphrey's Executor* fits the PCLOB to a tee—like the 1935 FTC, the PCLOB is a "multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [can be] said not to exercise any executive power." *Id.* at 216; *see* 42 U.S.C. § 2000ee(h)(1)-(2); *supra* § I.A. As in

*Humphrey's Executor*, "the staggered terms of the [PCLOB members] prevent[] complete turnovers in agency leadership and guarantee[] that there w[ill] always be some [Board members] who ha[ve] accrued significant expertise." *Seila Law*, 591 U.S. at 218.  And like the "1935 FTC," the Board "mak[es] reports and recommendations to Congress." *Id.* at 218-19.  The PCLOB has no authority to issue rules or other decisions that bind private parties. *Cf. id.*

The removal restriction here accordingly is not "of such a nature that it impedes the President's ability to perform his constitutional duty," and it therefore comports with the separation of powers. *Seila Law*, 591 U.S. at 217 (cleaned up) (quoting *Morrison v. Olson*, 487 U.S. 654, 691 (1988)).

### D.    The Plaintiffs' Removals Violated Due Process

Because PCLOB members may not be removed without cause, the plaintiffs have a protected property interest in their employment as PCLOB members.  "[A]n employee has a property interest if the government has fostered rules and understandings which entitle the employee to believe that she would lose her job only for a job-related reason.  Put another way, a property interest exists if the employee can be removed only for cause." *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (cleaned up).

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Id.* at 40 (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)).  Here, however, the plaintiffs were not given any process at all, much less constitutionally adequate process.  "To have proper notice and a meaningful opportunity to respond, an employee must at least 'know the factual basis for the action.'" *Id.*  But the plaintiffs received no notice at all before the decision to terminate them was made—they simply received Mr. Morse's January 21 email advising that they would be terminated on January 23 unless they resigned first.  When the plaintiffs asked for the written

documentation to support the removal decision, plaintiff LeBlanc was informed that the January 27 email from Defendant Morse was the "Presidential action." SUMF ¶ 29. The plaintiffs received no opportunity for a hearing. And neither the January 21 email, the January 27 email, nor any other communication ever provided the plaintiffs the basis for their removals or suggested that there was any "job-related reason" or cause for those removals. This violation of due process is an independent and sufficient reason to declare the plaintiffs' removals unlawful and order their reinstatement.

## II.    Plaintiffs are Entitled To Reinstatement

The Court should declare the purported terminations of the plaintiffs to be unlawful, and issue an injunction and writ of mandamus requiring the immediate reinstatement of plaintiffs to their position as Board members and forbidding any actions that would deprive the plaintiffs of their ability to carry out their duties as Board members.

### A.    This Court has Authority to Order Reinstatement

Since the advent of federal judicial review, the Supreme Court has recognized the federal courts' authority to order the instatement of federal officials to positions they lawfully hold. *Marbury v. Madison*, 5 U.S. (1 Cranch.) 137, 172-73 (1803). When a claimant "has a right to [an] office," mandamus lies to order officials to take steps necessary to permit the claimant to "obtain the office." *Id.* at 173. In the two centuries following *Marbury*, the Supreme Court has repeatedly reaffirmed the authority of federal courts to order reinstatement, whether via mandamus, quo warranto, or equitable remedies. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-05 (1988) (rejecting position that courts lacked authority to "order respondent's reinstatement" under "traditional equitable principles"); *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974) (recognizing that courts have "injunctive power" to order reinstatement); *Vitarelli v. Seaton*, 359 U.S. 535, 537, 546 (1959) (holding that official was "entitled to the reinstatement" and reversing denial of "an injunction

34

requiring his reinstatement"); *In re Sawyer*, 124 U.S. 200, 212 (1888) (holding that mandamus and quo warranto permit a court to "determine the title to a public office").

Binding D.C. Circuit precedent prescribes the appropriate remedy when a federal official is unlawfully removed from office: the Court should "enjoin 'subordinate executive officials' to reinstate [the] wrongly terminated official 'de facto,' even without a formal presidential reappointment." *Severino*, 71 F.4th at 1042-43 (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)); *see, e.g.*, *Berry v. Reagan*, No. 83-cv-3182, 1983 WL 538, at *6 (D.D.C. Nov. 14, 1983) (entering preliminary injunction requiring reinstatement of wrongfully removed member of the Commission on Civil Rights), *vacated as moot*, 732 F.2d 949 (D.C. Cir. 1983). Such a remedy is available even when an official is removed directly by the President, and does not implicate the difficult questions posed by entering an injunction against the President himself. *See Severino*, 71 F.4th at 1042-43; *Swan*, 100 F.3d at 978-81; *cf. Franklin v. Massachusetts*, 505 U.S. 788, 802 (1992) (plurality opinion) (holding that injunction may be available against the President to compel performance of a "purely 'ministerial' duty"); *id.* at 811 (Scalia, J., concurring in the judgment) (recognizing that the President's duties include functions that are "wholly ministerial"). Indeed, an order directed to lower federal officials was precisely the remedy the Supreme Court held in *Marbury* would be appropriate from a court of proper jurisdiction—withholding a commission that would allow Marbury to exercise the powers of his office presented "a plain case for a mandamus." *Marbury*, 5 U.S. at 173. And in recent cases, courts in this district have uniformly held that reinstatement is available and appropriate in cases of an officer's wrongful removal by the President. *E.g.*, *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *16 (D.D.C. Mar. 6, 2025); *Dellinger v. Bessent*, No. 25-cv-385, 2025 WL 665041, at *31 (D.D.C. Mar. 1, 2025).

To the extent some jurists have raised doubts about courts' authority to order reinstatement of *principal officers* when sitting *in equity*, those concerns have no application here. *See, e.g.*, *Dellinger v. Bessent*, Order at 3-5, No. 24A790 (U.S. Feb. 21, 2025) (Gorsuch, J., dissenting); *Dellinger v. Bessent*, No. 25-5028, 2025 WL 559669, at *14 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting).

First, even if the Court's equitable authority were so limited—*but see Severino*, 71 F.4th at 1042-43—there is no question that *legal* remedies are available to order the plaintiffs' reinstatement. "The jurisdiction to determine the title to a public office" may be "exercised either by *certiorari*, error, or appeal, or by *mandamus*, prohibition, *quo warranto*," or other legal writs. *Sawyer*, 124 U.S. at 212. In the absence of other effective remedies, administrative mandamus is available to compel the defendants to treat the purported terminations here as ineffective and provide the plaintiffs all the benefits of their office. 28 U.S.C. § 1361; *see, e.g.*, *Marbury*, 5 U.S. at 173. And apart from legal writs dating back to before the founding, the Administrative Procedure Act independently authorizes specific legal relief. Under that statute, the Court must "hold unlawful and set aside" unlawful agency action and "compel" any action unlawfully withheld. 5 U.S.C. § 706. This Court thus has full authority to enter legal relief directing the plaintiffs' reinstatement regardless of the limits of its equitable powers. The *Dellinger* dissenters' concerns about equitable authority to enter preliminary relief simply are not implicated here, where equivalent legal remedies are available upon the entry of final judgment. *See Dellinger*, Order at 3-5, No. 24A790 (Gorsuch, J., dissenting) *see also Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 283 (1988) (observing that there is "little justification" for distinguishing between legal and equitable remedies when a court would have jurisdiction to enter either).

36

Second, specific relief here would not "prevent[] the President from firing an agency head," *Dellinger*, 2025 WL 559669, at *14 (Katsas, J., dissenting), or require him "to recognize and work with someone whom [he] sought to remove from office," *Dellinger*, Order at 3, No. 24A790 (Gorsuch, J., dissenting). PCLOB members exercise no executive power whatsoever, much less "significant authority" to make decisions for the government or bind private parties. *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)). Even when it comes to subpoenas, all the PCLOB can do is ask the Attorney General to issue one in her discretion. *See* 42 U.S.C. § 2000ee(g). Nor are PCLOB members charged with implementing presidential policy. To the contrary, Congress has painstakingly designed the PCLOB to perform its oversight and advisory functions at a distance from the White House, insulated from political forces by its multimember structure, its bipartisan composition, and members' staggered six-year terms. *See id.* § 2000ee(h). Reinstatement would "not impair [the President's] ability to remove— and therefore supervise—subordinates wielding his power to faithfully execute federal law," *Dellinger*, 2025 WL 559669, at *14 (Katsas, J., dissenting), because PCLOB members wield no such power and are subject to no such supervision in the first place.

In any event, tentative views expressed by dissenters in decisions on applications for emergency relief cannot displace the binding rule in this circuit or the centuries of Supreme Court precedent that underly it. It is plain that this Court "can enjoin subordinate executive officials to reinstate a wrongly terminated official." *Severino*, 71 F.4th at 1042-43 (citation and quotation marks omitted). Whether in equity or by mandamus, because the plaintiffs "ha[ve] a right to [their] office," they are "entitled to" that remedy. *Marbury*, 5 U.S. at 173.

### B.    Permanent Injunctive Relief is Warranted

As courts in this district have repeatedly found, equitable factors favor reinstatement of a federal official wrongfully removed from office. *See, e.g.*, *Wilcox*, 2025 WL 720914, at *15-17

(permanent injunction); *Dellinger*, 2025 WL 665041, at *31-35 (permanent injunction)[22]; *Harris v. Bessent*, No. 25-cv-412, 2025 WL 521027, at *6-10 (D.D.C. Feb. 18, 2025) (temporary restraining order); *Berry*, 1983 WL 538, at *5-6 (preliminary injunction); *see also Dellinger*, 2025 WL 559669, at *9 (per curiam) (declining to disturb temporary restraining order against removal). That is particularly true here, where because of the plaintiffs' unlawful removal, the PCLOB has been "left without a quorum" and unable to perform its statutory advisory and oversight functions. *Berry*, 1983 WL 538, at *5.

First, the plaintiffs face irreparable injury that money damages cannot remedy. As PCLOB members, they enjoy a "statutory right to function in [their] office, which could not be remedied by a post-judgment award of damages." *Dellinger*, 2025 WL 665041, at *32 (citation and quotation marks omitted); *see* 42 U.S.C. § 2000ee(h)(4)(A) (members "shall serve a term of 6 years); *id.* § 2000ee(h)(4)(D) (members have right to elect to "continue to serve for up to one year after the date of expiration" of their term). The "value of a public office … is incapable of being ascertained," and the plaintiffs "ha[ve] a right to the office itself," not merely money in compensation for its loss. *Marbury*, 5 U.S. at 173 (holding that detinue—under which Marbury could have obtained money in compensation for his office's "value"—provided an inadequate remedy). "Courts have recognized as irreparable harms the 'unlawful removal from office by the President' and 'the obviously disruptive effect' that such removal has on the organization's functioning." *Wilcox*, 2025 WL 720914, at *15 (quoting *Berry*, 1983 WL 538, at *5). The plaintiffs' "purported removal without cause renders [them] unable to fulfill [their statutory] duty, a loss that can never be restored, and therefore it gives rise to irreparable harm." *Dellinger*, 2025

---

[22] The D.C. Circuit stayed this injunction pending appeal, but on grounds that are not applicable here, including that the relevant agency had a single top officer. Order and Opinion at 3, No. 25-5052 (D.C. Cir. Mar. 10, 2025).

WL 665041, at *32. Because the plaintiffs serve fixed terms, each additional day they cannot serve is a day they cannot get back; the opportunity to serve will be lost forever.

Second, the balance of equities and public interest decisively favor permanent injunctive relief. The plaintiffs' purported terminations have "left [PCLOB] without a quorum," and thus thwarted its ability to "fulfill its mandate" that Congress has prescribed. *Wilcox*, 2025 WL 720914, at *15 (quoting *Berry*, 1983 WL 538, at *5); *see* 42 U.S.C. § 2000ee(h)(5) ("Three members of the Board shall constitute a quorum."). In particular, with FISA § 702's sunset rapidly approaching, the clock is ticking for the Board to fulfill its statutory duty to "provid[e] advice on proposals to retain or enhance a particular governmental power." 42 U.S.C. § 2000ee(d)(1)(D); *see* Reforming Intelligence and Securing America Act of 2024 § 19, Pub. L. No. 118-49, 138 Stat. 862, 891. National security officials regard Section 702 "as one of the most critical tools the Intelligence Community has at its disposal"[23]—meaning that it is equally critical that Congress has the comprehensive advice it needs in the leadup to reauthorization.

And because the President has declined even to nominate additional Board members, much less obtain the Senate's advice and consent for such appointments, the Board will remain unable to perform its duties indefinitely absent specific relief here. It is difficult to imagine what legitimate interest the public could possibly have in an inquorate board unable to perform its statutorily mandated functions. Indeed, that result would directly frustrate Congress's design that the PCLOB serve as part of the "checks and balances" on executive-branch counterterrorism activities, IRTPA § 1061(a)(2), 118 Stat. at 3684, and "ensur[e] that the need for such actions is balanced with the need to protect privacy and civil liberties," 42 U.S.C. § 2000ee(c). And it is the

---

[23] *See, e.g.*, Additional Prehearing Questions for John L. Ratcliffe Upon his Nomination to Be Director of the Central Intelligence Agency at 17, Select Committee on Intelligence, United States Senate, https://www.intelligence.senate.gov/sites/default/files/aphq-jratcliffe-011525.pdf.

precise circumstance the court held in *Berry* justified even the extraordinary remedy of *preliminary* injunctive relief. *See Berry*, 1983 WL 538, at *5-6. As in *Berry*, *Dellinger*, and *Wilcox*, an injunction against subordinate federal officials is warranted here. The plaintiffs should immediately be reinstated to their Board positions.

## CONCLUSION

For the foregoing reasons, the Court should grant the plaintiffs' motion for expedited summary judgment and enter judgment in their favor, including the permanent injunction, mandamus, and declaratory relief proposed in the contemporaneously filed proposed order.

Dated: March 12, 2025                         Respectfully submitted,

<div style="margin-left:40%">

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore (D.C. Bar No. 1021029)
Daniel Yablon (D.C. Bar. No. 90022490)
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
elisabeth.theodore@arnoldporter.com
daniel.yablon@arnoldporter.com

Caleb Thompson*
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
Tel: (212) 836-8000

*Counsel for Plaintiffs Travis LeBlanc and Edward Felten*

*application for admission pending

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2025, the foregoing memorandum of law in support of motion to for summary judgment was served via ECF to all counsel of record.

*/s/  Elisabeth S. Theodore*

Elisabeth S. Theodore
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000