# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TRAVIS LEBLANC, *et al.*,

        Plaintiffs,

    v.

UNITED STATES PRIVACY AND CIVIL
LIBERTIES OVERSIGHT BOARD, *et al.*,

        Defendants.

No. 25-cv-542-RBW

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS.................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................... ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.      Plaintiffs' Removals Were Unlawful.................................................................... 3

        A.      Text, History, Structure, and Function Demonstrate that the President Lacks
                Authority to Remove PCLOB Members Without Cause........................................ 3

        B.      At Minimum, the 9/11 Commission Act Prevents the President From
                Removing Board Members Based on their Political Affiliation........................... 21

        C.      Constitutional Avoidance Provides No Basis to Depart from the 9/11
                Commission Act's Text, History, and Structure.................................................... 21

        D.      The Plaintiffs' Removals Violated Due Process.................................................... 25

II.     Plaintiffs are Entitled To Reinstatement .............................................................. 25

        A.      This Court has Authority to Order Reinstatement ............................................... 25

        B.      Permanent Injunctive Relief is Warranted ........................................................... 30

        C.      The Plaintiffs Are Entitled to Legal Relief Requiring Their Reinstatement
                Under the APA and in Mandamus ........................................................................ 36

CONCLUSION................................................................................................................ 40

CERTIFICATE OF SERVICE ...................................................................................... 42

## <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

<u>Cases</u>

*13th Reg'l Corp. v. Dep't of Interior*,
    654 F.2d 758 (D.C. Cir. 1980) ....................................................................37, 38

*Am. Cetacean Soc. v. Baldrige*,
    768 F.2d 426 (D.C. Cir. 1985) ..............................................................................38

*Baker v. Carr*,
    369 U.S. 186 (1962) ..............................................................................................29

*Berry v. Reagan*,
    No. 83-3182, 1983 WL 538 (D.D.C. Nov. 14, 1983) ................................31, 34, 35

*Borders v. Reagan*,
    518 F. Supp. 250 (D.D.C. 1981) ..........................................................................13

*Boumediene v. Bush*,
    553 U.S. 723 (2008) ..............................................................................................25

*Chambers v. District of Columbia*,
    35 F.4th 870 (D.C. Cir. 2022) ..............................................................................31

*Clark v. Martinez*,
    543 U.S. 371 (2005) ..................................................................................22, 23, 25

*Collins v. Yellen*,
    594 U.S. 220 (2021) ..............................................................................................14

*Consumers' Rsch. v. Consumer Prod. Safety Comm'n.*,
    91 F.4th 342 (5th Cir. 2024) ................................................................................20

*Davis v. Billington*,
    76 F. Supp. 3d 59 (D.D.C. 2014) ....................................................................30, 31

*Diaz v. United States*,
    602 U.S. 526 (2024) ..............................................................................................11

*FEC v. NRA Pol. Victory Fund*,
    6 F.3d 821 (D.C. Cir. 1993) ............................................................................12, 16

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
    537 F.3d 667 (D.C. Cir. 2008) ..............................................................................13

ii

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)........................................................................................8, 13

*Griffin v. HM Fla.-ORL, LLC*,
  144 S. Ct. 1 (2023).............................................................................................37

*Gulfstream Aerospace Corp. v. Mayacamas Corp.*,
  485 U.S. 271 (1988)............................................................................................29

*Harkrader v. Wadley*,
  172 U.S. 148 (1898)......................................................................................28, 29

*Harris v. Bessent*,
  No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025)...............................26, 35

*Harris v. Bessent*,
  No. 25-5037, 2025 WL 980278 (D.C. Cir. Mar. 28, 2025)..................................40

*Harris v. Bessent*,
  No. 25-cv-412, 2025 WL 679303 (D.D.C. Mar. 4, 2025).....................................31

*Humphrey's Executor v. United States*,
  295 U.S. 602 (1935)...........................................................................3, 18, 22, 23, 35

*In re Parsons*,
  150 U.S. 150 (1893).............................................................................................27

*In re Sawyer*,
  124 U.S. 200 (1888)...............................................................26, 28, 29, 36, 37

*Intel Corp. v. Advanced Micro Devices, Inc.*,
  542 U.S. 241 (2004)..............................................................................................6

*Jarkesy v. SEC*,
  34 F.4th 446, 464 (5th Cir. 2022).........................................................................13

*Jennings v. Rodriguez*,
  583 U.S. 281 (2018)..............................................................................................22

*Jones v. United States*,
  527 U.S. 373 (1999)..............................................................................................11

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
  543 U.S. 50 (2004)................................................................................................4

*Leachco, Inc. v. Consumer Prod. Safety Comm'n.*,
  103 F.4th 748 (10th Cir. 2024)..............................................................................20

*Marbury v. Madison,*
  5 U.S. (1 Cranch) 137 (1803).................................................................26, 27, 28, 32, 37, 39

*MFS Sec. Corp. v. SEC,*
  380 F.3d 611 (2d Cir. 2004).............................................................................................12, 13

*Morrison v. Olson,*
  487 U.S. 654 (1988)................................................................................................................20

*Muscogee (Creek) Nation v. Hodel,*
  851 F.2d 1439 (D.C. Cir. 1988)..............................................................................................4

*Pardo-Kronemann v. Donovan,*
  601 F.3d 599 (D.C. Cir. 2010)..............................................................................................31

*Parsons v. United States,*
  167 U.S. 324 (1897)...................................................................................................8, 9, 11, 27

*Rodriguez v. United States,*
  480 U.S. 522 (1987)................................................................................................................16

*Ross v. Blake,*
  578 U.S. 632 (2016)..................................................................................................................6

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
  547 U.S. 47 (2006)....................................................................................................................5

*Sampson v. Murray,*
  415 U.S. 61 (1974)....................................................................................................25, 28, 30

*SEC v. Bilzerian,*
  750 F. Supp. 14 (D.D.C. 1990).............................................................................................13

*SEC v. Blinder, Robinson & Co.,*
  855 F.2d 677 (10th Cir. 1988)...............................................................................................13

*Seila Law LLC v. CFPB,*
  591 U.S. 197 (2020).....................................................................2, 8, 14, 16, 17, 22, 23, 25

*Severino v. Biden,*
  71 F.4th 1038 (D.C. Cir. 2023).............................1, 5, 10, 15, 16, 17, 18, 19, 22, 26, 29, 30, 35, 38

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996).....................................................................................26, 30, 38

*Taggart v. Lorenzen,*
  587 U.S. 554 (2019)................................................................................................................17

*Twin Rivers Paper Co. LLC v. SEC*,
    934 F.3d 607 (D.C. Cir. 2019) .................................................................................37

*United States v. SunSetter Prods. LP*,
    2024 WL 1116062 (D. Mass. Mar. 14, 2024) ..........................................................20

*Vitarelli v. Seaton*,
    359 U.S. 535 (1959) ...................................................................................25, 28, 29

*Walton v. House of Representatives*,
    265 U.S. 487 (1924) ..............................................................................................28, 29

*Wannall v. Honeywell Int'l, Inc.*,
    292 F.R.D. 26 (D.D.C. 2013) ................................................................................37

*Webster v. Doe*,
    486 U.S. 592 (1988) ...................................................................................25, 28, 29

*White v. Berry*,
    171 U.S. 366 (1898) .................................................................................26, 28, 36, 37

*Wiener v. United States*,
    357 U.S. 349 (1958) ...................................................................................15, 22, 27

*Wilcox v. Trump*,
    No. 25-cv-334, 2025 WL 720914 (D.D.C. Mar. 6, 2025) ......................................31

## **Constitutional Provisions**

U.S. Const. art. II, § 2, cl. 2 .......................................................................................2, 21, 23

U.S. Const. art. II, § 4 .................................................................................................13

## **Statutes**

2 U.S.C.
    § 437c(a)(1) (1993) .................................................................................................16
    § 437c(a)(2)(A) (1993) ...........................................................................................16
    § 601(d) ...................................................................................................................24

5 U.S.C.
    § 594 .......................................................................................................................21
    § 706 .......................................................................................................................36

12 U.S.C.
    § 5491(a) .................................................................................................................14

15 U.S.C.
    § 78d(a) ...................................................................................................................12

28 U.S.C.
§ 1361 ...................................................................................................................36, 37
§ 1782 ..........................................................................................................................6

29 U.S.C.
§ 671(b) ......................................................................................................................13
§ 1302(c) ....................................................................................................................13

42 U.S.C.
§ 1864(a) .....................................................................................................................13
§ 2000ee(i)(1)(B) ...................................................................................................30, 39
§ 2000ee(a) .................................................................................................................14
§ 2000ee(b)(2) ......................................................................................................35, 40
§ 2000ee(c)(1) ............................................................................................................40
§ 2000ee(d) ......................................................................................................7, 18, 20
§ 2000ee(d)(1) ..............................................................................................................7
§ 2000ee(d)(1)(A) ...................................................................................................7, 20
§ 2000ee(d)(1)(B) .......................................................................................................20
§ 2000ee(d)(1)(C) .......................................................................................................19
§ 2000ee(d)(1)(D) .................................................................................................20, 33
§ 2000ee(d)(2) ............................................................................................................17
§ 2000ee(d)(4) ............................................................................................................18
§ 2000ee(e)(1) ............................................................................................................18
§ 2000ee(e)(2) ............................................................................................................32
§ 2000ee(e)(2)(C) .......................................................................................................17
§ 2000ee(e)(2)(D) .................................................................................................18, 20
§ 2000ee(g)(1)(A) .......................................................................................................24
§ 2000ee(g)(1)(D) .......................................................................................................24
§ 2000ee(g)(2)(A) .......................................................................................................24
§ 2000ee(g)(3) ............................................................................................................24
§ 2000ee(h)(2) ......................................................................................................32, 37
§ 2000ee(h)(4) ........................................................................................................4, 10
§ 2000ee(h)(4)(D) .......................................................................................................12
§ 2000ee(h)(5) ............................................................................................................32

52 U.S.C.
§ 30106(a)(1) ..............................................................................................................12
§ 30106(a)(2) ..............................................................................................................12

Act of Feb. 27, 1801,
Pub. L. No. 6-15, 2 Stat. 103 ......................................................................................27

Act of Oct. 3, 1964,
Pub. L. 88-619, 78 Stat. 995 .........................................................................................6

D.C. Code § 16-3501 .........................................................................................................37

Intelligence Reform and Terrorism Prevention Act of 2004 § 1061(e)(1)(E), Pub.
    L. No. 108-458, 118 Stat. 3638, 3687 ....................................................................4

IRTPA
    § 1061(c) ...............................................................................................................7
    § 1061(c)(1) ..........................................................................................................7
    § 1061(c)(1)(A) .....................................................................................................7
    § 1061(k) ..........................................................................................................8, 14
    § 1601(c)(1) ........................................................................................................20
    § 1601(k) .............................................................................................................19

Implementing Recommendations of the 9/11 Commission Act of 2007,
    Pub. L. No. 110-53, 121 Stat. 266 .......................................................................5

Reforming Intelligence and Securing America Act of 2024,
    Pub. L. No. 118-49, 138 Stat. 862 .....................................................................33

**Rules**

Fed. R. Civ. P. 56(e)(2) .............................................................................................26

Fed. R. Evid. 801(d) .................................................................................................26

Fed. R. Evid. 801(d)(2) ............................................................................................26

**Legislative Materials**

H.R. Rep. No. 110-259 (2007).....................................................................................8

*Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight
    Board and the Privacy Officer for the U.S. Department of Homeland Security,
    Hearing Before the Subcomm. on Commercial and Administrative Law of the
    H. Comm. on the Judiciary*, 110 Cong. 33 (July 24, 2007) ...................................35

**Other Authorities**

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal
    Texts* 256-60 (2012) .............................................................................................4

Dep't of Commerce, *Data Privacy Framework Program Launches New Website
    Enabling U.S. Companies to Participate in Cross-Boarder Data Transfers*,
    https://www.commerce.gov/news/press-releases/2023/07/data-privacy-
    framework-program-launches-new-website-enabling-us .......................................34

John Solomon & Ellen Nakashima, *White House Edits to Privacy Board's Report
    Spur Resignation*, The Washington Post (May 15, 2007) ......................................35

PCLOB, *Congressional Budget Justification: Fiscal Year 2023*,
   https://documents.pclob.gov/prod/Documents/FinancialReport/40/PCLOB%2
   0FY%202023%20Congressional%20Budget%20Justification%20-
   %20508,%20Mar%2016,%202022%200940.pdf ....................................................................32

PCLOB, *Current Projects*, https://www.pclob.gov/OversightProjects ........................................33

PCLOB, *Oversight Reports*, https://www.pclob.gov/Oversight ....................................................32

Sanford Levinson & Jack M. Balkin, *What Are the Facts of Marbury v. Madison*,
   20 Const. Comment. 255 (2003) ...............................................................................................27

**INTRODUCTION**

The defendants ask this Court to read back into the statute language Congress deliberately deleted.  The old version of the Privacy and Civil Liberties Oversight Board statute provided that members "serve at the pleasure of the President," but Congress took that out.  No matter, the defendants say.  Those changes accomplished nothing.  Board members still serve at the pleasure of the President, they claim, and he was free to fire them without cause.  That approach to statutory interpretation conflicts with binding precedent, and it is plainly incorrect.

Defying more binding precedent, the defendants ask this Court to replace the traditional tools of statutory interpretation with a magic-words requirement. In their view, no matter how clearly Congress indicated that officers were intended to be independent from presidential supervision and removal, the President may remove them at will unless the statute explicitly references for-cause removal.  That is exactly the rule the D.C. Circuit rejected in *Severino*, which held that Congress may "clearly indicate its intent to restrict removals" via the plain text of a statute or via the statutory structure and function of an office.  *Severino v. Biden*, 71 F.4th 1038, 1044 (D.C. Cir. 2023).  If the PCLOB does not satisfy that test, nothing does.  Just weeks after the White House caused public controversy by strong-arming the PCLOB into pulling punches with hundreds of revisions to the Board's first annual report, Congress amended the Board's organic statute in myriad ways to mandate the Board's independence from presidential control.  It (1) eliminated historical language stating that members "serve at the pleasure of the President" at the same time as it mandated that members "shall serve" for 6 years; (2) eliminated language stating that members served "under the general supervision of the President"; (3) removed the Board from the Executive Office of the President and established it as an "independent" agency; (4) imposed a requirement that Board members serve staggered terms and be politically balanced, precisely

mirroring the structure of existing multi-member commissions that are understood to be protected from removal; (5) directed the Board to provide independent oversight of the executive branch's approach to protecting privacy and civil liberties; and (6) mandated that the Board's reports to Congress include minority views.

What more could Congress possibly have done, other than using the magic words that *Severino* says it did not have to use, to indicate that it wanted to ensure PCLOB members could act independently of Presidential supervision and removal? The defendants do not say. Their principal arguments are that Congress eliminated the "serve at the pleasure of the President" language simply because it wasn't paying attention; that *Severino* held that a different statute lacking critical mandatory language conferred no tenure protection; and that because the Board provides advice to the executive branch alongside its oversight functions, Congress must have intended the Board to operate under total presidential control. The first two arguments are self-refuting. And the third is refuted by, among other things, the Constitution itself, which requires the Senate to provide "advice" to the President. Art. II, sec. 2, cl. 2. This is not an agency, like the one in *Severino*, whose *only* role is to fulfill an internal advice function within the executive branch. Rather—as the word "Oversight" in its name reflects—the PCLOB's foundational role is to assist Congress by providing independent oversight, which it cannot do under the defendants' interpretation of the statute. The defendants do not deny that oversight is the Board's most important function or contend that independent oversight is compatible with removal at will. Instead, they just ignore this argument.

The defendants' other arguments are insubstantial. *Humphrey's Executor* held and *Seila Law* reiterated that Congress may permissibly restrict the President's removal authority in the context of "multimember expert agencies that do not wield substantial executive power." *Seila*

*Law LLC v. CFPB*, 591 U.S. 197, 216, 218 (2020) (citing *Humphrey's Executor v. United States*, 295 U.S. 602, 628 (1935)).  The defendants nowhere contend that PCLOB wields substantial executive power, and they appropriately do not argue that interpreting the statute to confer tenure protection would actually violate the Constitution.  Their attempts to invoke the canon of constitutional avoidance go nowhere.  That canon requires the existence of serious constitutional doubts—but there can't be serious constitutional doubts about the plaintiffs' interpretation when the Supreme Court has resolved the constitutional issue in the plaintiffs' favor.

Finally, this Court's ability to order reinstatement, in equity or by legal writ, has been recognized in case after case, including binding D.C. Circuit precedent.

The Court should grant summary judgment and order defendants to reinstate plaintiffs to their positions as Board members.

## ARGUMENT

### I.    Plaintiffs' Removals Were Unlawful

#### A.    Text, History, Structure, and Function Demonstrate that the President Lacks Authority to Remove PCLOB Members Without Cause

Multiple key features of the PCLOB's organic statute, independently and taken together, confirm that Congress intended to confer tenure protections.  Most notably, Congress acted in 2007 to delete a provision that conferred on the President precisely the authority defendants say he still holds—removal at will.  It paired that deletion with the addition of a tenure provision using mandatory "shall serve" language.  It restructured the PCLOB precisely to mirror the types of agencies that the Supreme Court and other courts had previously held to enjoy removal protections—multi-member agencies that are composed of subject matter experts and have partisan balance requirements.  And it reworked the PCLOB's functions to confirm that its principal function was not advising the President but performing independent oversight and

3

enabling Congress to exercise its own oversight role. Congress could not and would not have made all of those changes while simultaneously intending to permit the President to unilaterally prevent the PCLOB from doing its job.

The defendants respond by ignoring (or asking the Court to ignore) the aspects of the statute to which they have no response, such as the deletion of the "serve at the pleasure" language and the Board's oversight function. They then argue that certain remaining aspects of the statute, taken in isolation, do not necessarily mandate removal protection. But "[s]tatutory construction is a 'holistic endeavor.'" *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 60 (2004) (citation omitted). Here, both the text of the provisions the defendants ignore, and the statutory scheme as a whole, are incompatible with at-will removal.

> **1.    The Court Cannot Presume that Congress Secretly Meant to Preserve the "Serve at the Pleasure" and Presidential "Supervision" Language It Specifically Deleted**

As the plaintiffs explained in their opening brief, and the defendants do not contest, Congress made extensive changes to the PCLOB's organic statute in 2007 to ensure that the Board could provide independent oversight of the executive branch. Plfs. Br. 4-8, 19-23. One of those amendments reflected Congress's unambiguous intent to eliminate the President's ability to remove Board members at his pleasure: Congress deleted the language stating the Board members "shall each serve at the pleasure of the President." Compare Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA) § 1061(e)(1)(E), Pub. L. No. 108-458, 118 Stat. 3638, 3687 with 42 U.S.C. § 2000ee(h)(4). This "significant change in language is presumed to entail a change in meaning." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256-60 (2012). The rule is that "[w]here the words of a later statute differ from those of a previous one on the same or related subject, the Congress *must* have intended them to have a different meaning." *Muscogee (Creek) Nation v. Hodel*, 851 F.2d 1439, 1444 (D.C. Cir. 1988) (emphasis

added); *see also* Plfs. Br. 21-23 (citing multiple binding cases requiring courts to give effect Congress's choice to eliminate statutory text).

The defendants do not dispute that, if deliberate, deletion of the "serve at the pleasure" language would "clearly express[] a congressional intent to trim the President's removal power." *Severino*, 71 F.4th at 1044. And they do not deny that their reading of the statute fails to "give effect" to, and in fact "negates," this aspect of the revision. *See* Plfs. Br. 22 (citing *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57-58 (2006)). Nor could they, because they ask the Court to read right back into the statute the words Congress deleted. Under their reading of the statute, Board members *still* "serve at the pleasure of the President." That is reason enough to reject their reading and conclude that the plain text of the statute unambiguously protects Board members from removal at will.

Ignoring every indication to the contrary, the defendants' sole response is that Court should presume that Congress's deletion of the "serve at the pleasure" language was inadvertent and decline to give it any effect, because Congress made a lot of changes in the 2007 revision. Defs. Br. 7-10. The defendants contend that "Congress replaced Section 1061 wholesale," Defs. Br. 7, apparently on the theory that the 9/11 Commission Act (like many statutory revisions) states that "Section 1061 … is amended to read as follows," Pub. L. 110-53, § 801(a), 121 Stat. at 352, rather than amending particular lines one by one. And defendants contend that if Congress "overhaul[s]" a provision, Defs. Br. 10, courts should not read meaning into Congress's "new choice of words," *id.*, and may instead conclude that Congress secretly intended to preserve language it specifically deleted.

This is an utterly lawless and backwards approach to statutory interpretation even in a vacuum. And considering the context of Congress's 2007 amendments, enacted following

hearings on White House interference in the Board's oversight activities, it is fanciful.  On defendants' theory, the *more* changes Congress makes, the less we should presume Congress intends to change.  The defendants offer no account of how one should determine whether a statute has been "overhauled" so much that one should presume Congress meant to preserve language that it deleted, or how to determine which of Congress's changes should be ignored.  Nor do they attempt to square their request to ignore Congress's deletion of the at-will removal language with the unambiguous rule requiring courts to give effect to such deletions.

The defendants' implicit theory that this rule does not apply to statutory "overhauls" is directly foreclosed by Supreme Court precedent.  In *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241 (2004), the Court interpreted 28 U.S.C. § 1782, a statute governing authorization of discovery to assist proceedings in foreign tribunals.  The statute had undergone what the Court termed a "complete revision" in 1964.  *Id.* at 248; *see also* Act of Oct. 3, 1964 § 9(a), Pub. L. 88–619, 78 Stat. 995, 997 ("Section 1782 of title 28 … is amended to read:").  The Court held that, because the 1964 revision "deleted the requirement that a proceeding be 'pending,'" it was bound to interpret the word "proceeding" to include proceedings at the investigative, pre-litigation stage. 542 U.S. at 248-49, 258-59.  Similarly, in *Ross v. Blake*, 578 U.S. 632 (2016), the Court held that the Prison Litigation Reform Act (PLRA) exhaustion requirement was mandatory in light of Congress's deletion of language in a predecessor act with an entirely different name that "differ[ed] markedly" from the PLRA.  *Id.* at 640-41.  The Court explained that it could not adopt an interpretation that "reintroduces [the predecessor law's deleted] requirement."  *Id.* at 641.  Nor can this Court do so here.

Moreover, the defendants misconstrue the statutory history when they call the 2007 version of the PCLOB statute "in effect, an entirely new statutory provision."  Defs. Br. 7.  It is the same

statutory provision as before, codified in the same place, establishing the same Board—just with a revised membership structure and responsibilities. Comparing the 2004 and 2007 versions reflects that Congress started with the 2004 version, kept what it liked, and deleted or changed what it didn't. For example, IRTPA § 1061(c) described the Board's "Functions." The "Functions" subsection of the revised statute retains significant verbatim portions of the text of the old statute, but deletes or adds specific language consistent with Congress's goal of establishing the PCLOB as a quasi-legislative entity. 42 U.S.C. § 2000ee(d). New subsection (d)(1)(A), for example, deleted IRTPA § 1061(c)'s prefatory language stating that the Board carried out its advice functions "for the purpose of providing advice to the President," but retained other language nearly verbatim:

> (~~e~~d) FUNCTIONS.—
> (1) ADVICE AND COUNSEL ON <u>POLICY</u> DEVELOPMENT AND IMPLEMENTATION~~OF POLICY.  For the purpose of providing advice to the President or to the head of any department or agency  of the executive  branch, the~~<u>.—The</u> Board shall—(A) review proposed <u>legislation,</u> regulations<u>,</u> and ~~executive branch~~ policies related to efforts to protect the Nation from terrorism, including the development and adoption of information sharing guidelines under subsections (d) and (f) of [section 485 of Title 6];

*Compare* IRTPA § 1061(c)(1), (c)(1)(A) *with* 42 U.S.C. § 2000ee(d)(1), (d)(1)(A). As this reflects, while Congress made many changes, it retained the language it wanted to retain. It blinks reality to suggest that Congress was not acting purposefully when it deleted the "serve at the pleasure of the President" language, in the context of a revision aimed at insulating Board members from White House control.

That is especially so because defendants' theory requires this Court *also* to ignore Congress's decision to insulate the Board from presidential control in numerous other ways, including by deleting the prior statute's section entitled "Presidential Responsibility," which stated that "[t]he Board shall perform its functions within the executive branch and under the general

supervision of the President."  IRTPA § 1061(k); *see also* H.R. Rep. No. 110-259, at 321 (2007) (Conf. Rep.) (discussing various changes implemented in 9/11 Commission Act to "strengthen[] the Board[]").  As the plaintiffs explained in their opening brief, the removal of that language necessarily eliminates at-will removal because at-will removal is the President's method of effectuating his ability to supervise.  Plfs. Br. 22-23.  That is what the Supreme Court held in *Seila Law*, 591 U.S. at 204, 225, and *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 499 (2010).  The defendants do not respond to the substance of this argument at all.  Instead, they assert that the removal of the "supervision" language is not "remotely the same thing as a prohibition" on removal authority.  Defs. Br. 9.  But that is just ipse dixit.  They offer no account for *why* Congress would want to permit at-will removal while simultaneously removing the Board from the President's supervision, or how those two concepts can co-exist in light of the Supreme Court's precedent in *Seila Law* and *PCAOB* that the essence of at-will removal *is* the ability to supervise and control.

> ### 2.    *Parsons* Requires this Court to Give Effect to Congress's Decision to Delete At-Will Removal Language

The defendants rely extensively on *Parsons v. United States*, 167 U.S. 324 (1897), which held that United States Attorneys were removable at will.  *See* Defs. Br. 5-6.  But *Parsons* strongly supports plaintiffs' reading of the PCLOB statute, because it relied on statutory history—specifically Congress's decision to delete a provision limiting at-will removal—to determine that the amended statute necessarily permitted at-will removal.  The defendants ignore this aspect of *Parsons*, which establishes that the inverse history here—Congress's decision to delete a provision authorizing at-will removal—means that the amended statute necessarily prohibited at-will removal.

The statute the Supreme Court construed in *Parsons* provided that United States Attorneys overseeing particular districts "shall be appointed for a term of four years and their commissions shall cease and expire at the expiration of four years from their respective dates." 167 U.S. at 327-28. Originally, however, that language was followed by provisions from the "tenure of office act," which had stated that "every person holding any civil office to which he had been appointed by and with the advice and consent of the Senate … shall be entitled to hold such office until a successor shall have been in like manner appointed and duly qualified." 167 U.S. at 339-40. In other words, the original statute contained an explicit anti-removal provision: the President could not replace U.S. Attorneys at will, but only upon nomination and confirmation of a successor.

In 1887, ten years before *Parsons* was decided, the "tenure in office act" portion of the statute was repealed. *Id.* at 342. The avowed purpose of the repeal was to expand the President's removal powers, which previously depended on securing Congress's agreement to confirm a replacement. *Id.* at 342-43. Congress's "intention in the repeal of the tenure of office sections … was again to concede to the President the power of removal … taken from him by the original tenure of office act." *Id.* at 343. The *Parsons* Court thus explained that it could not interpret the non-repealed provisions in *Parsons* to grant an entitlement to hold office, because that result would nullify the 1887 repeal. *See id.* at 342. The Court concluded that it could not adopt a construction that "turns a statute meant to enlarge the [removal] power of the President"—i.e., the repeal statute—"into one circumscribing and limiting it more than it was under the law which was repealed for the very purpose of enlarging it." *Id.* at 343. In other words, the Court could not interpret the remaining portions of the *Parsons* statute to limit removals where doing so would nullify Congress's 1887 decision to repeal language limiting the President's removal authority.

Just as the deletion in *Parsons* of language *limiting* the President's removal power compelled the Supreme Court to interpret the amended statute to permit at-will removal, the deletion in the PCLOB of language *authorizing* at-will removal compels this Court to interpret the amended statute to prohibit at-will removal.

### 3.    The Text Congress Added to the PCLOB Statute, Including the "Shall Serve" Provision, Confirms that At-Will Removal is Prohibited

Even if Congress had started with a blank slate when it enacted the 9/11 Commission Act, the statute's text would protect PCLOB members from removal at will. The defendants have no persuasive response to the PCLOB's plain text mandating that members "shall serve a term of 6 years." 42 U.S.C. § 2000ee(h)(4). They do not dispute that "serve" in this context means "to hold an office," Plfs. Br. 20, and that "shall" means "must" or "will," *id.* They do not offer any competing interpretation of the *full phrase* "shall serve a term of 6 years" other than the one plaintiffs advance: PCLOB members are entitled to serve for six years. They do not dispute that, under their interpretation, members often will *not* serve a term of six years. Nor do they have any account of what the phrase "shall serve" accomplishes in the statute if not to mandate that Board members shall in fact hold their office for six years.

Instead of engaging with the sentence Congress actually wrote, Defendants fixate on one word—term—and read the phrase "shall serve" out of § 2000ee(h)(4). They argue that the word "term" is a "ceiling, not a floor, on the length of service" and that "the word 'term'" in federal appointment statutes does not "invest[] the person with a guaranteed minimum period of service." Defs. Br. 4 (quoting *Severino*, 71 F.4th at 1045). But plaintiffs do not argue that the word "term" does that work. It is the phrase "shall serve" that invests members with a definite period of service.

The dissimilar provisions at issue in *Severino* and *Parsons*, neither of which contains the "shall serve" language, accordingly do not bolster defendants' interpretation. It is a cardinal

principle of statutory interpretation that "a word's meaning is informed by its surrounding context." *Diaz v. United States*, 602 U.S. 526, 536 (2024). "A crucial part of that context is the other words in the sentence." *Id.*; *see Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase 'gathers meaning from the words around it.'"). Neither *Severino* nor *Parsons* involved any comparable language. Defendants note that the *Parsons* statute stated that "commissions shall cease and expire at the expiration of four years from their respective dates." 167 U.S. 328. But their unreasoned assertion that those words are "indistinguishable" from "shall serve a term of 6 years," Defs. Br. 6, does not make it so. Stating that a commission expires after 4 years is another way of saying that a term is 4 years. "Cease" and "expire" are classic words of limitation; unlike mandatory language like "shall serve," those words do not affirmatively confer rights or tenure protections.[1]

Moreover, *Parsons* read its "term" provision in light of interpretive principles that cut in the opposite direction here. One is the repeal of the explicit removal protections described above, *supra* § I.A.2; as explained, here the statutory repeal history establishes Congress's intent to repeal a grant of removal authority. The second is statutory context: as the defendants note, *Parsons* also reasoned that a provision for removal at pleasure was "not necessary for the exercise of that power by the President" because he was at the time of enactment "regarded as being clothed with such power in any event." Defs. Br. 6 (quoting 167 U.S. at 339). But that reasoning warrants the opposite outcome here. *Parsons* involved a single principal officer who exercised substantial executive power; the PCLOB is a multi-member expert board that exercises no executive power.

---

[1] The defendants also argue that the word "is" in the *Severino* statute ("the term of each member … is 3 years") is the equivalent of the word "shall" in the PCLOB statute. Defs. Br. 5. This argument is hard to follow. The word "is" in the *Severino* statute simply connected the word "term" to a specific number of years. Similarly, if Congress had said that "a term shall be 6 years," the plaintiffs would not be arguing that that text alone conferred a tenure protection. The crucial point is the combination of "shall" with "serve."

At the time the Board's authorizing statute was amended in 2007, as now, *Humphrey's Executor* was the law and the President was *not* "regarded as being clothed with [removal] power in any event."

Multiple other textual and contextual clues confirm removal protections here. The statutory holdover provision states that upon the expiration of the term, a member "may continue to serve for up to one year after the date of expiration, *at the election of the member* … until the member's successor has been appointed and qualified." 42 U.S.C. § 2000ee(h)(4)(D) (emphasis added). The only way a President can effectuate a removal during this one-year period is to confirm a replacement. The defendants make no effort to explain how the President's removal of Dr. Felten is consistent with this language, given that no successor has been confirmed. Under their theory, service is at the election of the President, not "at the election of the member." And the language reflecting that Congress conferred removal protection during the one-year holdover service period is further evidence that Congress intended "shall serve" to confer removal protection during the initial service period.

In addition, courts have repeatedly held that appointment statutes using "shall serve" language or its equivalent can confer tenure protections, despite the lack of any explicit language referencing removal. Congress is presumed to have drawn on that background understanding when it added the language in 2007. For example, FEC commissioners "shall serve for a single term of 6 years," 52 U.S.C. § 30106(a)(1), (2), and the D.C. Circuit has long assumed that they enjoy for-cause removal protection. *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993). Likewise, SEC commissioners "shall hold office for a term of five years," 15 U.S.C. § 78d(a), and it is "commonly understood" that they may only be removed for cause. *MFS Sec. Corp. v. SEC*, 380 F.3d 611, 619 (2d Cir. 2004). Indeed, the United States has concluded that SEC

commissioners have tenure protection, *Free Enter. Fund*, 561 U.S. at 487, the Supreme Court has assumed as much, *id.*, and multiple lower courts have so held, *see, e.g.*, *Jarkesy v. SEC*, 34 F.4th 446, 464 (5th Cir. 2022), *aff'd and remanded,* 603 U.S. 109 (2024); *SEC v. Bilzerian*, 750 F. Supp. 14, 17 (D.D.C. 1990); *MFS Sec. Corp.*, 380 F.3d at 619; *SEC v. Blinder, Robinson & Co.*, 855 F.2d 677, 681 (10th Cir. 1988); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 537 F.3d 667, 680 (D.C. Cir. 2008), *aff'd in part*, 561 U.S. 477 (2010) (President can remove SEC commissioners "for cause").  The same understanding was reflected in *Borders v. Reagan*, 518 F. Supp. 250, 255 (D.D.C. 1981), which—while later vacated on non-merits grounds—held that "shall serve" unambiguously conferred tenure protections. The defendants argue that *Borders* was "unpersuasive," Defs. Br. 6, but they do not engage with any of the court's reasoning.[2]

By contrast, Congress has repeatedly paired "shall serve" language with explicit removal carveouts in other appointment statutes, confirming that Congress understands the phrase standing alone to confer tenure protections.  *See, e.g.*, 42 U.S.C. § 1864(a) (director of the National Science Foundation "shall serve for a term of six years unless sooner removed by the President"); 29 U.S.C. § 1302(c) (director of Pension Benefit Guaranty Corporation "shall serve for a term of 5 years unless removed by the President or the board of directors before the expiration of such 5-year term"); 29 U.S.C. § 671(b) (National Institute for Occupational Safety and Health official "shall serve for a term of six years unless previously removed by the Secretary of Health and Human

---

[2] These statutes also show that the plaintiffs' interpretation does not require the court to conclude that PCLOB members are protected from for-cause termination.  *Contra* Defs. Br. 4.  Just as courts have done in the FEC and SEC context, a court could reasonably interpret the PCLOB removal protection to extend only to removals without cause, because Congress legislated against a background understanding that, when it confers tenure protection, that protection usually permits removal for cause.  Indeed, that was the extent of the protection permitted in *Humphrey's Executor*. In any event, the Court need not reach this issue since the defendants concede that the plaintiffs were fired without cause.  Nor would an alternative result be "absurd."  Defs. Br. 4.  If board members do not wield any executive power, it is not absurd to conclude that the President may not unilaterally remove them on the basis of a unilateral assessment of misconduct, and that members who engage in malfeasance may instead be removed pursuant to the impeachment process that applies to all officers of the United States, such as federal judges.  U.S. Const. art. II, § 4.

Services"). If the language "shall serve" standing alone permitted at-will removal, Congress's express removal authorization in each of these statutes would be pure surplusage. Instead, that Congress has specified that many officers "shall serve" a defined term "unless removed by the President" reflects that the ordinary meaning of "shall serve" precludes at-will removal.

Finally, Congress's inclusion of language requiring the Board to be "independent" confirms that it did not intend to allow at-will removal. 42 U.S.C. § 2000ee(a). Relying on *Collins v. Yellen*, defendants contend that the term "independent" does "not necessarily mean that the Agency is 'independent' of the President," and "may mean instead that the Agency is … independent of any other unit of the Federal Government." 594 U.S. 220, 248 (2021). In *Seila Law*, however, the Supreme Court held that Congress's use of the phrase "independent bureau" to describe the CFPB meant that its head could not be removed based on policy disagreements, because CFPB could not "be 'independent' if its head were required to implement the President's policies upon pain of removal." 591 U.S. at 230; *see* 12 U.S.C. § 5491(a) (describing the CFPB as an "independent bureau" and an "executive agency").

Thus, while the term "independent" does not invariably signal intent to confer independence from the President, it can and it does here. Congress added the word "independent" while simultaneously *removing* the Board from the Executive Office of the President and deleting language stating that Board members operated under the "general supervision of the President." The 2004 version of the statute stated that the "Board shall perform its functions within the executive branch and under the general supervision of the President." IRTPA § 1061(k), 118 Stat. at 3688. The successor language in the 2007 version stated that the Board was "an independent agency within the executive branch." 42 U.S.C. § 2000ee(a). Deleting "under the general supervision of the President" and adding the word "independent" signals Congress's intent to

confer independence from presidential control. And that is particularly so given that Congress amended the PCLOB's organic statute in response to the White House's assertion of supervisory authority over the Board. *See* Plfs. Br. 3-5.

### 4. Congress Has Clearly Indicated Its Intent to Restrict Removals of Board Members Through the Board's Oversight Function and Accompanying Statutory Structure

Congress also "clearly indicate[d] its intent to restrict removals through the statutory structure and function" of the PCLOB. *Severino*, 71 F.4th at 1044. The defendants contend that relying on these traditional tools of statutory construction is not "the proper exercise of the judicial function." Defs. Br. 10. But the D.C. Circuit said otherwise in *Severino*, and the Supreme Court has said otherwise too. *Wiener v. United States*, 357 U.S. 349, 353 (1958) ("the most reliable factor for drawing an inference regarding the President's power of removal . . . is the nature of the function that Congress vested in the [agency]"). Here, structure and function reinforce what the plain text and history show: Congress intended to confer removal protections.

**Structure.** Board members' six-year staggered terms, the qualification provisions, and the requirement of partisan balance all indicate that Congress intended to confer removal protections. *See* Plfs. Br. 24-26. The defendants' responses do not persuade.

First, the defendants contend that Board members' staggered 6-year terms do not suggest an independence requirement because, they say, *Severino* held that "the mere existence of staggered terms 'gives no indication that Congress intended to take the unusual and potentially constitutionally troublesome step of tying the President's hands when it comes to at-will removal.'" Defs. Br. 11 (quoting *Severino*, 71 F.4th at 1049). That is literally the opposite of what *Severino* said. *Severino* emphasized that "staggered terms promote 'the independence, autonomy, and non-partisan nature' of an agency." 71 F.4th at 1049. The problem in *Severino* was that the statute creating the Administrative Conference and Council did *not* provide for staggered terms

15

beyond the "initial batch of members." *Id.* When *Severino* said that "the statute, in other words, gives no indication that Congress intended to" restrict at-will removals, it was describing a statute that had not required staggered terms for 60 years—since 1964, when the Conference was created. *Id.* at 1040, 1049.

Second, the defendants contend that a six-year term cannot reflect an intent to confer insulation from presidential control because a President might be re-elected, and would have the opportunity to choose all PCLOB members by his seventh year in office. But "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987). Congress could reasonably decide, as it has in many statutes, that it wants to pick a middle-ground term length that would give the President an opportunity to appoint some Board members, but not to use removal to wholly pack the Board with his own candidates. The FTC statute in *Humphrey's Executor*, for example, created staggered 7-year terms. *See Seila Law*, 591 U.S. at 216. Congress was not required to create 9-year terms to signal that it wanted PCLOB members to be independent from presidential removal. The D.C. Circuit has specifically held that the FEC "commissioners' terms," which are staggered six-year terms, likely "implied" a prohibition on at-will removal. *NRA Pol. Victory Fund*, 6 F.3d at 826; *see* 2 U.S.C. § 437c(a)(1), (a)(2)(A) (1993).

Third, defendants discount the statute's requirement that Board members be selected on the basis of expertise rather than political affiliation and must belong to different political parties. In the defendants' view, firing members of one party might not invariably alter the Board's partisanship composition, because the President could replace them. Defs. Br. 11-12. Of course, the more likely scenario is that a President who fires members of the opposing political party will *not* appoint new members from that party—indeed, in the three months since the plaintiffs' removals, the President has nominated no replacement. The statute makes clear that Congress

wanted to prevent that result, because it specifically requires the Board to report "minority views on any findings, conclusions, and recommendations of the Board." 42 U.S.C. § 2000ee(e)(2)(C). A nonpartisan Board with representation from both parties and a requirement that minority views be included in all reports is incompatible with a regime in which the President can unilaterally prevent minority views from reaching Congress by firing all Board members who come from the minority party or hold minority views. The President's unilateral ability to remove would render these requirements meaningless. *See* Plfs. Br. 24-25.

When Congress revised the Board's organic statute in 2007, it followed the same tried-and-true structure recognized in *Seila Law*, 591 U.S. at 216, as supporting for-cause removal restrictions: a multi-member non-partisan expert Board, with staggered terms that outlast a President. This structure governs numerous agencies whose members have removal protections, and Congress brought the "old soil" with it when it amended the PCLOB statute. *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019).

**Function.** A key aspect of the Board's statutory mission is to conduct oversight of the President's counterterrorism activities and to report to Congress and the public on the extent to which those activities comport with privacy and civil liberties. Plfs. Br. 26-31. "[W]hen Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect." *Severino*, 71 F.4th at 1047. That is what Congress did here, by assigning the PCLOB a function that is operationally incompatible with at-will removal: "Oversight" of the executive branch on behalf of Congress. 42 U.S.C. § 2000ee(d)(2).

The plaintiffs explained at length in their opening brief why PCLOB's oversight role and role advising Congress confirmed that Congress intended to confer tenure protections.  Plfs. Br. 26-31.  But the defendants completely ignore this enumerated statutory function.  In fact, other than when spelling out agency names, the word "oversight" doesn't appear *once* in the defendants' brief.  It is no wonder that they attempt to write this function out of the statute—Board members obviously can't conduct oversight if the subject of that oversight can get rid of them whenever he wants.  *See Humphrey's Executor*, 295 U.S. at 629 ("one who holds his office only during the pleasure of another, cannot be depended upon to maintain an attitude of independence against the latter's will").  Oversight is a quintessential example of a statutory function that is "operationally incompatible with at-will Presidential removal."  *See Severino*, 71 F.4th at 1047.

Furthermore, the Board has "quasi-legislative" and "quasi-judicial" functions because it performs "specified duties as a legislative or as a judicial aid," such as conducting "investigations and [preparing] reports thereon for the information of Congress."  *Humphrey's Executor*, 295 U.S. at 628.  The Board's other functions include advising on proposed legislation; reviewing the implementation of legislation as well as executive branch policies, practices, and activities; and reporting to Congress on whether those activities comport with civil liberties.  42 U.S.C. § 2000ee(d).  Moreover, the Board is required to submit reports to Congress twice a year, *id.* § 2000ee(e)(1), is required to inform Congress when the President declines to implement its recommendations, *id.* § 2000ee(e)(2)(D), and must appear and testify before Congress on request, *id.* § 2000ee(d)(4).  And as the plaintiffs explained at length, the Board performs similar duties for various federal courts.  *See* Plfs. Br. 13-14.  The defendants likewise ignore these arguments and the PCLOB's role as a judicial aid to the Foreign Intelligence Surveillance Court and the Data Protection Review Court.

Instead, the defendants argue that the Board has no quasi-legislative or quasi-judicial functions because it "serves to advise personnel in and components of the Executive Branch." Defs. Br. 14 (quoting *Severino*, 71 F.4th at 1048).  It is true that, after first describing the Board's role in advising Congress on legislation, the statute also directs the Board to provide advice to elements of the executive branch.  42 U.S.C. § 2000ee(d)(1)(C).  But that does not alter the quasi-legislative nature of the Board's foundational oversight function.  And the defendants' analogy to *Severino* falls flat.  *Severino* held that no removal protection is implied when an agency's *only* function is to "advise personnel in and components of the Executive Branch," the agency's role is "wholly advisory," the agency has no "quasi-legislative or quasi-judicial duties," "[p]roducing advice for the Executive Branch" is its "raison d'etre," the "Executive Branch is the planet around which all of [its] responsibilities revolve," "[t]he occasional assistance it provides to the other Branches is a by-product of that [Executive-focused] mission," and "Congress designed the [agency] to be a forum inside the Executive Branch for shop talk and collaboration with external experts." 71 F.4th at 1048-49.

None of that describes the PCLOB.  Oversight and advice to Congress is the planet around which the Board revolves; advice to the President is a byproduct.  The word "Oversight" is in the Board's very name.  And the 2007 revisions made pellucidly clear that the PCLOB was not designed to be a "forum inside the Executive Branch" or to perform executive functions—by deleting language that could have been read to suggest otherwise.  Congress deleted language stating that "The Board shall perform its *functions* within the executive branch," *see* IRTPA § 1601(k) (emphasis added), meaning the current Board performs functions outside the executive branch.  Similarly, all of PCLOB's "advice" functions in the 2004 version of the statute contained a prefatory sentence stating that the Board should engage in various activities "[f]or the purpose

of providing advice to the President or to the head of any department or agency of the executive branch." *Compare* IRTPA § 1601(c)(1) *with* 42 U.S.C. § 2000ee(d).  That language was deleted outright, and Congress added multiple references to reviewing and advising on proposed, new, and existing "legislation"—textbook functions of a legislative aid.  *Compare* IRTPA § 1601(c)(1) *with* 42 U.S.C. § 2000ee(d)(1)(A), (B).

The Board's remaining "advice to the President" function—reflected in a single sentence in the Board's organic statute—is plainly subordinate to its oversight functions and its role advising Congress.  Unlike in other statutes, moreover, even the presidential advice function serves the Board's broader statutory mission to advise Congress concerning its legislative role.  The Board advises the executive branch, for example, "to ensure that privacy and civil liberties are appropriately considered in the development and implementation of … *legislation*" that Congress has enacted or considers.  42 U.S.C. § 2000ee(d)(1)(D) (emphasis added).  When the PCLOB offers advice, the executive branch is free to disregard it, but the Board must inform Congress if the executive branch takes actions affecting privacy and civil liberties "notwithstanding such advice."  *Id.* § 2000ee(e)(2)(D).

When Congress assigns an agency a significant oversight or other quasi-legislative role that requires independence, courts have routinely concluded that removal protections apply even if the agency might have some minor function that could be labeled executive.  *See Morrison v. Olson*, 487 U.S. 654, 691-92 (1988); *Consumers' Rsch. v. Consumer Prod. Safety Comm'n.*, 91 F.4th 342, 353-54 (5th Cir. 2024); *United States v. SunSetter Prods. LP*, 2024 WL 1116062, at *3-4 (D. Mass. Mar. 14, 2024); *Leachco, Inc. v. Consumer Prod. Safety Comm'n.*, 103 F.4th 748, 761-62 (10th Cir. 2024).  *Severino*, by contrast, concerned an agency whose "raison d'etre" was to advise the President; that was not described as "independent" in its organic statute; and that had

20

no oversight, quasi-legislative, or quasi-judicial functions.  *See* 5 U.S.C. § 594.  Neither *Severino* nor any other case has held that the presence of *any* advice function signals that an agency is "purely executive," as the defendants contend, Defs. Br. 14, or signals that at-will removal is compatible with the agency's functions.  The Constitution itself refutes that view, given that it assigns the Senate the duty of advising the President.  U.S. Const. art. II, § 2, cl. 2.

Here, the statutory functions combine with text, history, and structure to compel the conclusion that Congress intended to confer removal protections.

**B.    At Minimum, the 9/11 Commission Act Prevents the President From Removing Board Members Based on their Political Affiliation**

As the plaintiffs explained in the opening brief, the only way to give effect to the statute's partisan balance provisions is to conclude that the statute prohibits the President from firing PCLOB members on the basis of political affiliation.  Plfs. Br. 31-32.  As an initial matter, the defendants do not dispute that is what the President has done here.  They dispute only that such an action is prohibited.  Defs. Br. 12-13.

But they fail to grapple with the plaintiffs' principal argument: Congress's carefully crafted partisan balance requirement would be functionally meaningless if the President could fire on the basis of political affiliation.  The point of the provision is to ensure that Congress receives a variety of views, including minority views, and including views that do not reflect the President or the President's political party. On the defendants' theory, the President could unilaterally deprive Congress of that variety of views through terminations without cause and fail to nominate new members from the opposing political party, and Congress would have no recourse.

**C.    Constitutional Avoidance Provides No Basis to Depart from the 9/11 Commission Act's Text, History, and Structure**

The defendants do not argue that, if the PCLOB's organic statute contains removal protections, those removal protections would be unconstitutional.  They intentionally decline to

make that argument, and it is accordingly waived.  Defs. Br. 16 (defendants explaining that they are not asking the Court to "rule definitively on whether Plaintiffs' interpretation of the statute would indeed be unconstitutional").  Instead, they exclusively argue that the Court should apply the canon of constitutional avoidance to interpret the statute to allow at-will removal.  Under that canon, if a statute "is found to be susceptible of more than one construction" "after the application of ordinary textual analysis," and one of the constructions would raise "serious constitutional doubts," a court may choose the other construction.  *Clark v. Martinez*, 543 U.S. 371, 381, 385 (2005).

The constitutional avoidance argument fails for three reasons.

First, *Severino* instructs courts how to account for "the background presumption that the President may remove anyone he appoints," and a statute that satisfies *Severino*'s test does not implicate constitutional avoidance.  *Severino*, 71 F.4th at 1044.  As the D.C. Circuit held, "Congress may clearly indicate its intent to restrict removals through the statutory structure and function of an office."  *Id.*; *see, e.g.*, *Seila Law*, 591 U.S. at 229-30; *Humphrey's Executor*, 295 U.S. at 625-26; *Wiener*, 357 U.S. at 353-54.  When Congress does so, it has "ma[de] [its] intent … apparent," and constitutional avoidance imposes no further obstacle to giving effect to the statute Congress enacted.  *Severino*, 71 F.4th at 1044.  That is, *Severino*'s standard already reflects the D.C. Circuit's *application* of constitutional avoidance.  *See id.* (citing *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)).  The defendants' assertion (Defs. Br. 16-17) that this Court should first apply *Severino*, and then reject the result that case mandates on constitutional-avoidance grounds, directly defies binding precedent.

Second, the plaintiffs' interpretation of the statute raises no serious constitutional doubts.  *Humphrey's Executor* held that Congress may restrict the President's power to remove members

of multi-member commissions that do not wield substantial executive power.  While a court need not rule definitively on a constitutional argument before invoking constitutional avoidance, Defs. Br. 16, it would be unprecedented to apply that canon where the constitutional argument has been *rejected* in binding precedent.  Indeed, "one of the canon's chief justifications is that it allows courts to *avoid* the decision of constitutional questions."  *Clark*, 543 U.S. at 381.  The canon has no application to a question the Supreme Court has decided.

The defendants argue that removal protection raises serious constitutional doubts because PCLOB members are "principal officers who lead a freestanding component within the executive branch and perform an executive function by advising the President and other executive agencies on questions of national security and counterterrorism."  Defs. Br. 17.  But even if the PCLOB's role advising the president constituted an "executive function," *but see* Art. II, sec. 2, cl. 2 (requiring the Senate to provide "advice" to the President), that would not create serious constitutional doubts.    Congress may constitutionally restrict removals of officers from "multimember expert agencies that do not wield substantial executive power." *Seila Law*, 591 U.S. at 216, 218.  The defendants never actually assert that PCLOB members exercise any "executive *power* in the constitutional sense"—just a so-called executive "function" of advice.  *Id.* at 217 (emphasis in the original) (quoting *Humphrey's Executor*, 295 U.S. at 628).  Nor are they willing to say that PCLOB members exercise *substantial* executive power—because no one could make that argument with a straight face.  Providing advice to the President that he is free to ignore is not an exercise of substantial executive power.

The hodgepodge of other statutory provisions the defendants cite underscore the weakness of their position.  None of those provisions involve the exercise of any executive power at all, and even the defendants themselves do not argue that these provisions involve *substantial* executive

power.  To start, the defendants contend that the Board "possesses authority to enforce subpoenas," Defs. Br. 19, but that is a truly absurd reading of the statute.  The statute makes clear that the Board possesses no authority even to *issue* subpoenas, much less enforce them, and must instead apply to the Attorney General, who may issue or decline to issue the subpoena in her discretion.  42 U.S.C. § 2000ee(g)(1)(D), (2)(A).  The defendants rely (Defs. Br. 19) on a subsection that gives a "United States district court" the ability to enforce a subpoena issued by the Attorney General.  *Id.* § 2000ee(g)(3).  But that subsection does not mention the Board at all and does not remotely authorize the Board to independently litigate on behalf of the United States to enforce a subpoena that it lacks authority to issue on its own behalf.

Next, the defendants cite a vague reference to "coordinat[ing]" privacy officers, but do not argue that this provision confers substantial executive power on the Board.  Defs. Br. 19.  Finally, they cite § 2000ee(g)(1)(A), which states that the Board is "authorized" to "have access" to various executive branch documents.  But the authority to review executive branch documents is part and parcel of the Board's oversight function, not an indication that the Board holds power to execute the law on the President's behalf.  For example, Congress has not only authorized legislative-branch agencies like the Congressional Budget Office "to secure information, data, estimates, and statistics directly from the various departments, agencies, and establishments of the executive branch," but has also directed that the Executive "shall furnish" the CBO "any available material which [the CBO] determines to be necessary."  2 U.S.C. § 601(d).  As the CBO statute reflects, obtaining access to information from the executive branch data is a legislative function that enables meaningful oversight, not a hallmark of substantial executive power.

Third, constitutional avoidance does not apply here because the plaintiffs' interpretation of the PCLOB statute is the only plausible interpretation. The canon of constitutional avoidance "does

not supplant traditional modes of statutory interpretation," *Boumediene v. Bush*, 553 U.S. 723, 787 (2008), and does not permit courts to "ignore the text and purpose of a statute," *id.* Here, the ordinary tools of statutory interpretation—including in particular Congress's deletion of the "serve at the pleasure" language the defendants invite the Court to pencil back into the statute—confirm that the statute is not "susceptible of more than one construction." *Clark*, 543 U.S. at 385; *see also Seila Law*, 591 U.S. at 229-30 (rejecting constitutional avoidance where "the Dodd-Frank Act as a whole … ma[de] plain that the CFPB [was] an 'independent bureau'").

In short, the statute here clearly forbids removal at will under the framework the D.C. Circuit set forth in *Severino*. Because there is no non-frivolous argument that the Board exercises substantial executive power—and because the defendants cannot even bring themselves to say that it does—the canon of constitutional avoidance has no role to play.

### D.     The Plaintiffs' Removals Violated Due Process

The defendants do not dispute that, if the PCLOB statute confers removal protections, the plaintiffs' removals violated the Due Process Clause.

## II.     Plaintiffs are Entitled To Reinstatement

Extensive, binding precedent holds that the proper remedy for a wrongfully removed officer is reinstatement, and that this remedy lies squarely within the power of the federal courts on final judgment. To ensure that the PCLOB can continue to perform its critical oversight role, and to provide the plaintiffs the only meaningful remedy available, the Court should order their reinstatement.

### A.     This Court has Authority to Order Reinstatement

For more than two centuries, the Supreme Court has recognized federal courts' authority to order the reinstatement of officials wrongfully denied their office. *See, e.g.*, *Webster v. Doe*, 486 U.S. 592, 604-05 (1988); *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974); *Vitarelli v. Seaton*,

359 U.S. 535, 537, 546 (1959); *White v. Berry*, 171 U.S. 366, 377 (1898); *In re Sawyer*, 124 U.S. 200, 212 (1888); *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 172-73 (1803). And recent, binding precedent confirms that the Court may do so here. *See* Plfs. Br. 35. In *Severino* and *Swan*, the D.C. Circuit unambiguously held that courts "can enjoin 'subordinate executive officials' to reinstate a wrongly terminated official '*de facto*,' even without a formal presidential reappointment." *Severino*, 71 F.4th at 1042-43 (quoting *Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996)); *see also Harris v. Bessent*, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025) (en banc) (denying stay pending appeal of decision ordering reinstatement). That holding squarely resolves the question here.[3]

Contending that this Court lacks a power that courts have exercised since the Republic's early years, the defendants do not so much as mention the D.C. Circuit's controlling decisions in

---

[3] The defendants do not dispute that the plaintiffs have sued officials who could effectuate reinstatement by treating the plaintiffs as Board members, including at minimum defendant Fitzpatrick and defendant Williams; defendants' arguments are instead purely legal. Although they do not rely on the point in their brief, the defendants contend in their response to the plaintiffs' statement of undisputed facts that the plaintiffs have failed to substantiate their statements in SUMF ¶¶ 19, 20, 23, and 24 that defendant Williams effectuated the terminations, including by ordering PCLOB staff to stay late on Thursday January 23, 2025 for the purpose of effectuating the anticipated removals; that Mr. Morse notified defendant Williams of the terminations on January 27 before notifying the plaintiffs and that defendant Williams then directed agency staff to carry out the terminations, including by cutting off the plaintiffs' email access, revoking their access to PCLOB's offices, and removing them from the PCLOB website as active Board members. Defs. Response to SUMF, ECF 12-2, ¶¶ 19, 20, 23, 24. The defendants do not offer any evidence or declarations disputing these facts, or even assert that they are incorrect, but instead purport to dispute them solely on the theory that the plaintiffs "fail[ed] to support [them] with admissible evidence" because the declarations are purportedly based on "inadmissible hearsay," namely statements made to the plaintiffs by PCLOB staff. Defs. Response to SUMF 19, 20, 23, 24.

This dispute reflects a basic misunderstanding of the rules of evidence. The PCLOB is a defendant in this action; statements by its staff members on matters related to their agency employment are "not hearsay." Fed. R. Evid. 801(d), (d)(2). The fact that PCLOB staff made these statements is within the plaintiffs' "personal knowledge," *cf.* Defs.' Response to SUMF ¶¶ 19, 20, 23, 24, and those statements are admissible for their truth—namely, defendant Williams' role in carrying out the terminations—because they are statements of party-opponents. The defendants also bizarrely contend that the plaintiffs have not adduced admissible evidence that defendant Williams ordered PCLOB staff to stay late for the "purpose of effectuating Plaintiffs' anticipated removals" because "Plaintiffs cannot testify as to Defendant Williams's state of mind." Response to SUMF 20. But the plaintiffs offered evidence that defendant Williams ordered agency staff to stay late so that they could remove the plaintiffs from the PCLOB website. In other words, she stated her purpose.

Because the defendants have "fail[ed] to properly address [plaintiffs'] assertion[s] of fact as required by Rule 56(c)," the court should "consider the fact[s] undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2).

*Severino* and *Swan*. *See* Defs. Br. 21-24. That stunning omission should tell the Court all it needs to know. Rather than grapple with the precedents on point, the defendants instead seek to derive a "rule" that reinstatement lies beyond the judicial power from the fact that officers (some deceased) have sometimes pursued claims for backpay instead. *Id.* at 21. For one thing, the officers in several of the cases defendants cite *did* seek reinstatement.[4] For another, the D.C. Circuit's holdings, not historical happenstance or the litigation decisions of *Humphrey*'s heirs, binds this Court. In any event, a long line of Supreme Court precedent says that the defendants are wrong.

Start with *Marbury*, where the Court held that a federal officer had a "plain case for mandamus" to "obtain [his] office." *Marbury*, 5 U.S. at 173. The defendants' only response to the most significant case in the American canon is that "*Marbury v. Madison* is inapposite" because it "concerned the separation of powers and President Madison's intrusion on the judiciary." Defs. Br. 23 (reporter citation omitted). But that assertion badly misconstrues the Court's holding. William Marbury was appointed as justice of the peace—not an Article III judge—a "relatively trivial" municipal office, whose holders served only a five-year term and could resolve only local personal disputes seeking no more than twenty dollars. Sanford Levinson & Jack M. Balkin, *What Are the Facts of Marbury v. Madison*, 20 Const. Comment. 255, 258 (2003); *see* Act of Feb. 27, 1801 § 11, Pub. L. No. 6-15, 2 Stat. 103, 107 (providing for appointment of justices of the peace for each county of the District of Columbia); *cf. id.* § 3, 2 Stat. at 105 (separately providing for the appointment of Article III judges to the circuit court for the District of Columbia who "shall have

---

[4] Wiener himself had originally brought suit to oust his replacement and reinstate himself in office, but that case was dismissed as moot. His only remaining claims were for backpay because the War Crimes Commission had been abolished by the time his case got to the Court. *Wiener*, 357 U.S. at 350-51 & n.*. And Parsons specifically sought reinstatement, but the Court did not reach the merits of that issue. *In re Parsons*, 150 U.S. 150, 150 (1893); *see also Parsons*, 167 U.S. at 326.

all the powers by law vested in the circuit courts and the judges of the circuit courts of the United States"). More important still, the nature of the office to which Marbury sought instatement played no role whatsoever in the Supreme Court's reasoning. Because he "ha[d] been appointed to *an office*," he "ha[d] a right to [his] commission" enforceable by mandamus. *Marbury*, 5 U.S. at 172-73 (emphasis added). The Court's discussion of the judicial power, which the defendants quote out of context, appears in a different section of the opinion explaining why Marbury's "plain case for a mandamus" must be presented to the proper court. *Id.* at 173.

Since then, the Supreme Court has repeatedly reaffirmed that federal courts may "order [a federal official's] reinstatement," including under "traditional equitable principles." *Webster*, 486 U.S. at 604-05; *see, e.g.*, *Sampson*, 415 U.S. at 92 n.68 (confirming courts' "injunctive power" to order reinstatement); *Vitarelli*, 359 U.S. at 537, 546 (holding that official was "entitled to the reinstatement" sought and reversing denial of "an injunction requiring his reinstatement"). Although raised in the plaintiff's opening brief, *see* Plfs. Br. 34-35, the defendants do not so much as mention these cases in their discussion of the issue. *See* Defs. Br. 21-24.

The handful of decisions stating that "courts of law" rather than "courts of equity" are the proper venue for disputes over title to an office undercut, rather than support, the defendants' position. *Sawyer*, 124 U.S. at 212; *see* Defs. Br. 23. For one, those cases confirm that federal courts *have* "jurisdiction over the appointment and removal of public officers" through legal remedies including "mandamus, prohibition, [and] quo warranto." *White*, 171 U.S. at 377 (quoting *Sawyer*, 124 U.S. at 212); *see also Walton v. House of Representatives*, 265 U.S. 487, 490 (1924) (addressing power of courts "sitting as courts of equity"); *Harkrader v. Wadley*, 172 U.S. 148, 165 (1898) (explaining that jurisdiction over such disputes by "courts of equity" would "invade the

domain of the courts of common law").[5]  Such legal remedies, under both the Administrative Procedure Act and the federal mandamus statute, are available here.  *See* Plfs. Br. 36; First Amended Complaint (FAC), ECF 8, at 26 (seeking such relief); *infra* § II.C.

Further, the defendants' position that the Court lacks power to issue an *injunction* requiring reinstatement significantly overreads the cases they rely on and conflicts with more recent controlling authority.  *Sawyer*, *White*, *Harkrader*, and *Walton* all predated "the merger of law and equity, which was accomplished by the Federal Rules of Civil Procedure."  *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 283 (1988).  Those decisions imposed no limit on the *substance* of the relief within the federal judicial power; they merely delineated "the domain of the courts of common law" and that of courts of equity, *Harkrader*, 172 U.S. at 165—a distinction that has "lost all connection with the reality of the federal courts' procedural system."  *See Gulfstream Aerospace*, 485 U.S. at 283.  And most involved requests to enjoin state-court proceedings, which implicate significant concerns about judicial federalism irrelevant to this case.  *See Walton*, 265 U.S. at 489 (bill to enjoin state impeachment proceeding); *Harkrader*, 172 U.S. at 163 (bill to enjoin state criminal prosecution); *Sawyer*, 124 U.S. at 202-09 (same).  If there were any doubt about the proper reading of those cases, more recent precedent resolves it.  Since then, the Supreme Court has repeatedly approved the reinstatement of wrongfully removed officials in equity.  *See Webster*, 486 U.S. at 604-05; *Vitarelli*, 359 U.S. at 546.  And the D.C. Circuit has expressly held that courts may do so in circumstances indistinguishable from those here.  *See Severino*, 71 F.4th at 1042-43.

---

[5] *Baker v. Carr*, 369 U.S. 186, 231 (1962), merely recited *Sawyer*'s result to explain why the case had no bearing on disputes over state apportionment rules.

**B.    Permanent Injunctive Relief is Warranted**

Upon entry of final judgment in their favor, the plaintiffs are entitled to an injunction ordering "'subordinate executive officials' to reinstate [them] 'de facto.'" *Severino*, 71 F.4th at 1042-43 (quoting *Swan*, 100 F.3d at 980). The permanent injunction factors decisively favor that relief. *See* Plfs. Br. 36-40. That is so because money damages would be unavailable and inadequate even if available—put simply, part-time Board membership is not about the money. And it is so because the public interest weighs heavily in favor of preserving the PCLOB's independence and ability to perform its oversight role.

Relying overwhelmingly on out-of-circuit cases involving *preliminary* injunctions, the defendants take the position that there can be no effectual relief here, even upon final judgment. Defs. Br. 24-26. But as this Court has explained, fired federal employees face a high bar for preliminary injunctive relief precisely because "the Court still has the equitable power to reinstate the plaintiff … if he prevails on the merits." *Davis v. Billington*, 76 F. Supp. 3d 59, 65 (D.D.C. 2014) (Walton, J.); *see also Sampson*, 415 U.S. at 88-90 (denying preliminary injunction where plaintiff put on no evidence of harm). Consistent with both precedent and the bedrock principle that remedy should follow right, the plaintiffs are entitled to a permanent injunction.

First, money damages are not available, and if available would be a patently inadequate remedy. Unlike federal career employees, PCLOB members earn no salary. *See* 42 U.S.C. § 2000ee(i)(1)(B). Instead, Board members, who typically serve part-time while maintaining nongovernmental employment, receive compensation only "for each day during which that member is engaged in the *actual* performance of the duties of the Board." *Id.* (emphasis added). Because the plaintiffs have performed no Board duties following their purported termination, backpay is not, as the defendants assert, "available to them." Defs. Br. 24, 32. For the same reason—that the plaintiffs cannot engage in the actual performance of Board duties unless restored

to their office—frontpay is not available without reinstatement.  That suffices to establish irreparable harm in the absence of reinstatement.

Nor is the modest compensation Board members receive the reason why they serve.  Felten Decl. ¶¶ 19-21; LeBlanc Decl. ¶¶ 20-22; Felten Supp. Decl. ¶ 9; LeBlanc Supp. Decl. ¶ 9.  The "plaintiff[s] ha[ve] been deprived of a presidentially appointed and congressionally confirmed position of high importance" to their careers, their sense of civic duty, and the PCLOB's ability to function—harms that "cannot be retroactively cured by monetary damages."  *Wilcox v. Trump*, No. 25-cv-334, 2025 WL 720914, at *15 (D.D.C. Mar. 6, 2025), *stay lifted*, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025).[6]  Federal employment law has long recognized that these sorts of injuries are judicially cognizable, even when an employee suffers no diminution in pay.  *See Chambers v. District of Columbia*, 35 F.4th 870, 874 (D.C. Cir. 2022) (en banc); *see, e.g.*, *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (holding jury could find adverse employment action where a plaintiff was reassigned to a position with "significantly different responsibilities" (citation omitted)).  This is not a case whether *either* backpay or reinstatement will make the plaintiffs whole, or where they might find a comparable position elsewhere.  *Cf. Davis*, 76 F. Supp. 3d at 65.  Denying them reinstatement leaves them with nothing.

Second, the plaintiffs "additionally suffer[] irreparable harm because [they] ha[ve] been 'depriv[ed] of [their] statutory right to function' as a member of the [PCLOB]," which carries profound consequences for the Board.  *Harris v. Bessent*, No. 25-cv-412, 2025 WL 679303, at *13 (D.D.C. Mar. 4, 2025) (fourth alteration in original) (quoting *Berry v. Reagan*, No. 83-3182, 1983 WL 538, at *5 (D.D.C. Nov. 14, 1983)), *stay lifted*, No. 25-5037, 2025 WL 1021435 (D.C. Cir.

---

[6] The Supreme Court has issued an administrative stay while it considers the Government's motion to stay the reinstatement orders in the *Harris* and *Wilcox* cases pending appeal.

Apr. 7, 2025); *see also Marbury*, 5 U.S. at 162 (holding that commission to public office "vest[s] in the officer legal rights" to that office).  By law, the Board requires a quorum of three members to perform its statutory functions. 42 U.S.C. § 2000ee(h)(5).  It now has only one.  True, the sole remaining Board member can perform certain tasks "in the sub-quorum period, such as providing advice to agencies *in [her] individual capacit[y]*."[7]  But the plaintiffs cannot, directly frustrating Congress's directive that the Board's oversight reports "shall include … minority views," including those of Board members "who [are] not a member of the same political party as the President."  42 U.S.C. § 2000ee(e)(2), (h)(2).

As the budget justification that the defendants rely on makes clear, the inquorate Board is unable to perform its core statutory functions.  "Some of the Board's authorities are limited while in sub-quorum, and the Board will not initiate new oversight projects, nor formally finalize existing projects until a quorum of three members has been reestablished."[8]  In the past, lacking a quorum has caused the Board other problems too, including "staff attrition."[9]  These harms are particularly acute because there is no indication that the plaintiffs will promptly be replaced.  To the contrary, it has now been nearly three months since the plaintiffs' removal without a nomination to the Board.  In that time, neither the Board nor its sole remaining individual member has issued a single substantive report.[10]

Many of the Board's statutory duties are highly time sensitive.  *See* Plfs. Br. 39. For example, the Board must provide a report to Congress in advance of the 2026 statutory sunset of

---

[7]  Defs. Br. 28 (quoting PCLOB, *Congressional Budget Justification: Fiscal Year 2023*, at 3, https://documents.pclob.gov/prod/Documents/FinancialReport/40/PCLOB%20FY%202023%20Congressional%20B udget%20Justification%20-%20508,%20Mar%2016,%202022%200940.pdf) (emphasis added).

[8]  PCLOB, *2023 Budget Justification*, at 8.

[9]  *Id.* at 9.

[10]  *See* PCLOB, *Oversight Reports*, https://www.pclob.gov/Oversight.

the Foreign Intelligence Surveillance Act's § 702 surveillance authority. *See* Reforming Intelligence and Securing America Act of 2024 § 19, Pub. L. No. 118-49, 138 Stat. 862, 891; 42 U.S.C. § 2000ee(d)(1)(D). Apparently suggesting that preparation of the PCLOB's § 702 report should be trivial or that further reports are unnecessary, the defendants observe that "less than two years ago, the Board prepared a thorough report of approximately 300 pages regarding Section 702." Defs. Br. 29. That suggestion is deeply mistaken. When reauthorizing § 702 in 2024, Congress "imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications."[11] Congress "also expanded certain aspects of the program, including an expansion of the definition of 'electronic communications service provider;' an expansion of the definition of 'foreign intelligence information' to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country."[12]

To advise Congress effectively whether the program should be extended or further changes are necessary, the Board thus must "evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties."[13] The PCLOB's 2023 report—also not its first concerning § 702—took well over a year to complete, and the Board released it four months before the statutory sunset to allow time for Congress to consider it. *See* LeBlanc Supp. Decl. ¶¶ 7-8; Felten Supp. Decl. ¶¶ 7-8. A similar timeline here would require the Board to release the report in

---

[11] PCLOB, *Current Projects*, https://www.pclob.gov/OversightProjects.

[12] *Id.*

[13] *Id.*

January, four months before the April sunset.  Evidence unchallenged in the record shows that, unless the plaintiffs are promptly reinstated, the Board will be unable to provide Congress the information it needs before § 702's statutory sunset.  That is analogous to the harm in *Berry*, where the terminated commissioners "provide a quasilegislative service to Congress in the furtherance of civil rights in this country" and the Commission would be unable to fulfill a statutory mandate of reporting to Congress absent reinstatement.  *Berry*, 1983 WL 538, at *5.

The Board's sub-quorum status thwarts its ability to perform other urgent tasks within its statutory responsibilities.  Already, the Board has failed to issue a report on facial recognition technology specifically requested by members Congress and nearly completed before the plaintiffs' terminations.  *See* LeBlanc Supp. Decl. ¶ 3; Felten Supp. Decl. ¶ 3.  The Board's lack of quorum has also raised questions about the United States' ability to comply with the US–EU Data Privacy Framework.  In February, the Chair of the Committee on Civil Liberties, Justice, and Home Affairs of the European Parliament sent a public letter to the European Commission soliciting its views on whether, given that the PCLOB was "no longer operational" without a quorum, the United States still provided a mechanism for addressing data privacy concerns consistent with the Framework.  *See* LeBlanc Supp. Decl. ¶ 4 & Ex. A; Felten Supp. Decl. ¶ 4 & Ex. A.  Thus, leaving the Board without a quorum jeopardizes not only American's civil liberties but also the United States' ability to meet its international commitments that enable more than a trillion dollars in annual trade and investment.[14]

Third, the balance of equities and public interest strongly favor reinstatement, too.  *See* Plfs. Br. 39-40.  As Congress recognized in amending the PCLOB's organic statute to protect the

---

[14] *See* Dep't of Commerce, *Data Privacy Framework Program Launches New Website Enabling U.S. Companies to Participate in Cross-Boarder Data Transfers*, https://www.commerce.gov/news/press-releases/2023/07/data-privacy-framework-program-launches-new-website-enabling-us.

Board's independence, the public has a weighty interest in the Board's ability "to protect the precious liberties that are vital to our way of life and to ensure that the Government uses its powers for the purposes for which the powers were given."  42 U.S.C. § 2000ee(b)(2).  Permitting the plaintiffs' at-will removal without consequence tramples that interest in at least two ways.  It prevents the Board from exercising its statutory oversight functions, as discussed above.  *See Berry*, 1983 WL 538, at *5 (leaving commission without a quorum amounted to irreparable harm).  And it defeats Congress's expressed intent to ensure that the Board can provide an independent check on the Executive's counterterrorism powers, rather than operating, as it did before the 9/11 Commission Act, as a "part of the White House staff"[15] subject to the direct "supervision of the Executive Office of the President."[16]

The defendants offer only one argument that the public interest weighs in their favor: that the President should have absolute control over "the services of principal officers within the Executive."  Defs. Br. 30.  That position amounts to nothing more than the view that no removal restrictions comport with the separation of powers—a constitutional claim the defendants do not advance here and that the Supreme Court and D.C. Circuit have rejected in case after case.  *See, e.g.*, *Humphrey's Executor*, 295 U.S. at 628; *Harris*, 2025 WL 1021435, at *1-2.  And it has no relevance at all for members of an independent board that serves only an advisory oversight role and "exercises 'no part of the executive power' " on the President's behalf.  *Severino*, 71 F.4th at 1047 (quoting *Humphrey's Executor*, 295 U.S. at 628); *see* Plfs. Br. 27-31.  No public interest

---

[15] *Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight Board and the Privacy Officer for the U.S. Department of Homeland Security*, *Hearing Before the Subcomm. on Commercial and Administrative Law of the H. Comm. on the Judiciary*, 110 Cong. 33 (testimony of Lanny J. Davis)

[16] John Solomon & Ellen Nakashima, *White House Edits to Privacy Board's Report Spur Resignation*, The Washington Post (May 15, 2007), https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/ (quoting the White House's justification for editing PCLOB reports to omit discussion of controversial surveillance tactics).

favors an inquorate Board unable to perform the functions Congress has assigned it, or one beholden to the same executive-branch officials it is charged with overseeing.  The plaintiffs are entitled to a permanent injunction ensuring they can perform their lawful duties and that the Board can continue to provide an independent voice for civil liberties, as Congress has directed.

### C.    The Plaintiffs Are Entitled to Legal Relief Requiring Their Reinstatement Under the APA and in Mandamus

Even if injunctive relief were unwarranted, the Court can and should order reinstatement as a legal remedy under the APA and by mandamus.[17]  As even the cases the defendants rely on make clear, legal remedies like mandamus are appropriate in suits disputing title to an office and fall squarely within the remedial power of federal courts.  *See White*, 171 U.S. at 377; *Sawyer*, 124 U.S. at 212.  Both the APA and the federal mandamus statute authorize specific relief to restore the plaintiffs' to their lawfully held positions.  *See* 5 U.S.C. § 706; 28 U.S.C. § 1361.

At the outset, reinstatement is available as a legal remedy under the APA.  If the Court determines that the plaintiffs' terminations—as effectuated by defendant Williams and other agency staff—were "not in accordance with law," the APA requires the Court to "set aside" those terminations and "compel" agency staff to provide the plaintiffs the benefits of their office.  5 U.S.C. § 706.  Neither the scope of this Court's equitable power nor the permanent injunction factors have any bearing on this statutory remedy.  *See Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 & n.1 (2023) (Kavanaugh, J., statement respecting denial of stay application) (contrasting the "statutory power to 'set aside' agency action" under the APA with equitable remedies like injunctions (citation omitted)).  And despite the plaintiffs pressing this argument in their motion for summary judgment, *see* Plfs. Br. 36, the defendants offered no response to the plaintiffs' APA

---

[17] Although an injunction may well provide the plaintiffs complete relief, the plaintiffs respectfully request that the court rule on all of their claims—including their APA and mandamus claims—to streamline appellate review.

claim whatsoever, much less any argument why its statutory remedies should be unavailable here. *See* Defs. Br. 20-32. Accordingly, any such argument is forfeited. *See Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) ("arguments generally are forfeited if raised for the first time in reply"); *see, e.g.*, *Wannall v. Honeywell Int'l, Inc.*, 292 F.R.D. 26, 34 (D.D.C. 2013), *aff'd*, 775 F.3d 425 (D.C. Cir. 2014).

The plaintiffs are also entitled to a writ of mandamus directing their reinstatement. There is no dispute that mandamus is an appropriate remedy for wrongfully removed officers, as the Supreme Court has held for more than two hundred years. *See* Defs. Br. 31-32; *see White*, 171 U.S. at 377; *Sawyer*, 124 U.S. at 212; *Marbury*, 5 U.S. at 173.[18] A legal writ, mandamus lies to compel performance of a duty where "the duty to be performed is ministerial and the obligation to act peremptory, and clearly defined." *13th Reg'l Corp. v. Dep't of Interior*, 654 F.2d 758, 760 (D.C. Cir. 1980); *see* 28 U.S.C. § 1361. As discussed above, the 9/11 Commission Act's text, its history, and the PCLOB's structure and functions unmistakably bar Board members' at-will removal, which would thwart the Board's vital oversight role. And providing the plaintiffs the benefits of an office they lawfully hold is a quintessentially "ministerial" duty. *Marbury*, 5 U.S.. at 158.

While the relevant statutory text is clear, mandamus would be appropriate even if it contained some ambiguity. In *Swan*, the D.C. Circuit rejected the same argument the defendants'

---

[18] Amici's argument (ECF 14, at 10-13) that specific relief is available only in quo warranto, an argument the defendants never made, directly contravenes these binding Supreme Court precedents. *See White*, 171 U.S. at 377 ("jurisdiction to determine the title to a public office" may be exercised "by *mandamus*, prohibition, [or] quo warranto" (emphasis added) (quoting *Sawyer*, 124 U.S. at 212)); *Marbury*, 5 U.S. at 173 (holding that mandamus was the proper remedy to allow an officeholder to "obtain [his] office"). Moreover, because quo warranto lies only to oust a putative officer who "usurps, intrudes into, or unlawfully holds or exercises" an office, D.C. Code § 16-3501, it plainly provides no remedy—much less a comprehensive one—for an officer wrongly removed but not replaced. That is particularly true here, where the President has neither nominated any replacement nor even begun the statutory consultation process to do so. *See* 42 U.S.C. § 2000ee(h)(2).

make here, *see* Defs. Br. 31, that if a "statute nowhere *expressly* limits the President's removal power, the statute cannot impose a nonremoval duty of sufficient clarity to create a ministerial duty." *Swan*, 100 F.3d at 978 (emphasis added). Instead, the Court explained, "clarity" for mandamus purposes means that the relevant duties are ascertainable and nondiscretionary: "a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.' " *Id.* (quoting *13th Reg'l Corp.*, 654 F.2d at 760); *see also Am. Cetacean Soc. v. Baldrige*, 768 F.2d 426, 433 (D.C. Cir. 1985) ("If, after studying the statute and its legislative history, the court determines that the defendant official has failed to discharge a duty which Congress intended him to perform, the court should compel performance, thus effectuating the congressional purpose."), *rev'd on other grounds*, 478 U.S. 221 (1986).

The defendants contend that they owe the plaintiffs no ministerial duties because the President has discretion to fill PCLOB vacancies by "appointment" "with the advice and the consent of the Senate." Defs. Br. 31-32 (cleaned up). But that argument makes no sense. For one, the plaintiffs have not sought mandamus against the President. FAC 26; *see Severino*, 71 F.4th at 1042-43 (explaining that the Court "need not confront" whether order to the President "could qualify as ministerial in nature" because relief was available against subordinate officials). Nor do they seek an order requiring "a formal appointment." *Severino*, 71 F.4th at 1042. Instead, the plaintiffs request mandamus relief that would only "compel[] Defendants (other than the President) to treat [their] purported removals … as having no legal effect and to take no action to interfere with the exercise of Plaintiffs' duties," FAC 26—the same ministerial functions the D.C. Circuit held could be compelled in *Severino*. *See Severino*, 71 F.4th at 1042-43. Once the Court

determines that the plaintiffs' removals were legally ineffective, the duties that flow to defendant agency staff are clear, readily ascertainable, and nondiscretionary.

Specific relief is essential here—whether in equity, under the APA, or by mandamus—for all the reasons discussed with respect to the permanent injunction factors above. Fundamentally, money damages would do nothing to remedy the loss of the plaintiffs' office or the significant harms that would flow from denying the Board the quorum necessary to perform its oversight functions. That is particularly so where, as here, the compensation structure for Board members would preclude any monetary recovery. *See* 42 U.S.C. § 2000ee(i)(1)(B) (providing that, rather than a salary, part-time Board members receive compensation only "for each day during which that member is engaged in the actual performance of the duties of the Board"). And the Supreme Court has expressly held, in the context of mandamus, that money damages are an inadequate remedy because an officeholder "has a right to the office itself." *Marbury*, 5 U.S. at 173.

Indeed, every argument the defendants make on mandamus runs headlong into *Marbury*, a decision they bafflingly fail even to mention in that section of their brief. *See* Defs. Br. 31-32. That a statutory duty must be express in order to be clear—foreclosed. *Marbury*, 5 U.S. at 172 ("It is true that the mandamus, now moved for, is not for the performance of an act expressly enjoined by statute."). That providing a lawful officeholder the benefits of his office is discretionary—foreclosed. *Id.* at 158 (In sealing and recording commission, the Secretary of State acts "under the authority of law, and not by the instructions of the President. It is a ministerial act which the law enjoins on a particular officer for a particular purpose."). That money is an adequate remedy for a wrongfully ousted officeholder—foreclosed. *Id.* at 173 (Detinue is an inadequate remedy because "judgment in *detinue* is for the thing itself, *or* its value. The value of a public

office not to be sold, is incapable of being ascertained; and the applicant has a right to the office itself, or to nothing.").

Finally, mandamus would be an appropriate exercise of this Court's discretion. As discussed above, there is a profound public interest in a quorate PCLOB that can perform the vital oversight role that Congress has entrusted to it. Invoking an opinion the en banc D.C. Circuit has disapproved, the defendants contend that ordering the plaintiffs' reinstatement would "disenfranchise[] voters by hampering the President's ability to govern." Defs. Br. 32 (quoting *Harris v. Bessent*, No. 25-5037, 2025 WL 980278, at *20 (D.C. Cir. Mar. 28, 2025) (Walker, J., concurring), *vacated*, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025)). But voters vote for Congress, too—a Congress that painstakingly amended the PCLOB's organic statute to protect the Board from the undue presidential influence that had made it ineffectual in the past. As Congress recognized, only with some measure of independence can the Board "review actions the executive branch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties." 42 U.S.C. § 2000ee(c)(1). Some remedy must lie to preserve this key element of the "checks and balances" on the Executive's vast counterterrorism powers. *Id.* § 2000ee(b)(2).

## CONCLUSION

For the foregoing reasons, the Court should grant the plaintiffs' motion for summary judgment, deny the defendants' cross-motion for summary judgment, and enter judgment in the plaintiffs' favor, including the permanent injunction, mandamus, and declaratory relief proposed in the contemporaneously filed proposed order.

Dated: April 16, 2025

Respectfully submitted,

*/s/ Elisabeth S. Theodore*
Elisabeth S. Theodore (D.C. Bar No. 1021029)
Daniel Yablon (D.C. Bar. No. 90022490)
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000
elisabeth.theodore@arnoldporter.com
daniel.yablon@arnoldporter.com

Caleb Thompson (D.C. Bar No. 90007438)
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th St.
New York, NY 10019
Tel: (212) 836-8000
caleb.thompson@arnoldporter.com

*Counsel for Plaintiffs Travis LeBlanc and Edward Felten*

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2025, the foregoing reply in support of motion for summary judgment and opposition to cross-motion for summary judgment was served via ECF to all counsel of record.

_/s/  Elisabeth S. Theodore_

Elisabeth S. Theodore
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001-3743
Tel: (202) 942-5000