IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| TRAVIS LEBLANC, et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, et al., <br><br> *Defendants*. | Civil Action No. 25-542 (RBW) |

### SUPPLEMENTAL DECLARATION OF TRAVIS LEBLANC

I, Travis LeBlanc, declare as follows:

1. This declaration is based on my personal knowledge and belief. I am over eighteen years of age and competent to testify to the matters set forth herein. I submit this supplemental declaration in opposition to the defendants' motion for summary judgment in this matter and in further support of the plaintiffs' motion for summary judgment.

2. The Privacy and Civil Liberties Oversight Board does not have significant authority to operate in a sub-quorum status. Absent a quorum, the Board will be unable to carry out its most important statutorily-mandated tasks, including commencing any new projects or investigations and issuing reports in the Board's name. With or without a quorum, individual Board members may always seek to publish any document that they would like, but that would not be a Board document any more than one Senator issuing a report would make the report a document of the U.S. Senate. Absent a quorum, individual Board members lack authority to take actions for the Board (other than addressing personnel matters). In sub-quorum status, the Board also cannot produce its statutorily-required semi-annual reports. Those reports are the method that Congress

prescribed for the Board to convey the results of its advice and oversight functions to Congress. Without them, the Board cannot fulfill its statutory mandate to communicate the Board's views to Congress on proposed legislation and policies.

3. As a consequence of the President's purported terminations of me and my fellow Democratic Board members, the Board has not issued its report on facial recognition technology, a report that members of Congress have requested. That report was nearly finished at the time of our terminations and would have been issued by now if we had not been terminated, but it cannot be issued while the Board remains in sub-quorum status.

4. The Board's sub-quorum status also threatens the integrity of the Trans-Atlantic Data Privacy Framework, which provides the key mechanism supporting more than $1 trillion in trade and investment by approximately 3,000 businesses operating in the United States that must transfer personal data of Europeans to the United States to conduct their business. Under Executive Order 14086, the Board reviews intelligence agency policies relating to collection of that data and conducts an annual review of complaints brought by individuals who believe that their data has been handled in violation of U.S. law, but now the Board cannot conduct these reviews. The European Parliament has now asked the European Commission to reconsider whether U.S. protections for personal information are adequate to permit EU-US data transfers or whether the framework would no longer be consistent with European law. A copy of this letter is attached as Exhibit A.

5. In sub-quorum status, the Board also will not be able to report to Congress on the pending question of reauthorization of FISA § 702, a question of vital importance to national security and civil liberties. Nor will the Board be able to hold a public forum on Section 702, as it did in advance of issuing its report in 2023.

6.     The Board's upcoming Section 702 report will take a substantial amount of time to complete, notwithstanding that it is an "update" of the 2023 report. The 2023 report was also an "update" of a prior report on Section 702. And as the Board's description of the 702 report on its "Current Oversight Projects" page indicates (attached as Exhibit B), the 2024 re-authorization statute, the Reforming Intelligence and Securing America Act of 2024 (RISAA), made a series of material changes to the Section 702 authority that the Board's 2023 report did not and could not address:

> Notably, RISAA imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications. RISAA also expanded certain aspects of the program, including an expansion of the definition of "electronic communications service provider;" an expansion of the definition of "foreign intelligence information" to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country. The Board will evaluate Section 702 programmatic changes and compliance since 2023, including the impact on U.S. persons. In particular, the Board will evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties.

7.     These are changes to some of the most significant aspects of Section 702, such as the definition of what constitutes "foreign intelligence information," and our prior report did not address the intelligence community's implementation of any of these changes because they had not happened at the time of our prior report. The most critical part of our new report will be investigating and analyzing the implementation of these new requirements and authorities, whether they have had their intended effect, and whether they have had unintended effects on privacy and civil liberties, and making recommendations on whether Congress should walk back some of these changes or make additional changes. The report would also examine any intelligence community policy changes since the Board's 2023 report. I personally expect that investigating and analyzing

3

and reporting on these changes would take at least 6 months. Based on my lengthy experience at PCLOB, I further anticipate that, once the report is completed, it will take at minimum 2 months for the intelligence community to complete its accuracy and classification review.

8. As I explained in my original declaration, unless we are reinstated, it is highly unlikely that the 702 report will be completed in time to allow Congress to consider it in advance of April 2026, when the current Section 702 authorization expires. Our work on the Section 702 report in advance of the 2024 reauthorization began in the spring of 2022; we invited public comments in a Federal Register notice in September 2022; we held a public forum in January 2023 at which the director of the National Security Agency and the General Counsel of the Office of the Director of National Intelligence participated, among other officials; and we issued the declassified report on September 28, 2023, in advance of a December 2023 statutory sunset date. In other words, we began work at least 18 months before Section 702 authorities were set to expire in December 2023; and we are already behind that schedule because there is only a year before the April 2026 sunset. If Dr. Felten and I are not promptly reinstated, the report will not be complete sufficiently in advance of the reauthorization deadline to allow Congress to consider it, or would have to be significantly truncated or forego analysis of the implementation of some of the intelligence community's new and changed authorities under Section 702. Moreover, the Board cannot issue the Section 702 report without a quorum.

9. Backpay or frontpay could not fully cure the harm to me from my illegal purported termination. First, under the statute, I am entitled to compensation only for "each day during which [I am] engaged in the actual performance of the duties of the Board," 42 U.S.C. § 2000ee(i)(1)(B), so a monetary award would not be available in the absence of reinstatement. Second, even if backpay or frontpay were available in the absence of reinstatement, it would not cure my injury.

The President's purported terminations of my fellow Board members and me have left the Board without a quorum and unable to complete the tasks it is required to complete by law, and have prevented me from participating on the Board in any capacity.  As a rightful Board member with a duly executed commission entitling me to all the "powers, privileges and emoluments" of that office, I have a significant interest in ensuring that the Board continues to operate as intended, as a nonpartisan commission composed of multiple members with differing views, and I separately have a significant interest in continuing to serve in the position that I am legally entitled to hold and continuing to participate in the Board's work, including the forthcoming Section 702 report. I brought this lawsuit to vindicate those rights and interests.  Moreover, my public service on the Board is of great importance to me: I have devoted much of my career to the study and practice of national security, cybersecurity, privacy, and civil liberties law.  I believe that the Board does critical work to ensure that privacy and civil liberties are respected and it is important to me personally, professionally, and as a citizen to continue to contribute to that work.  I do not serve on the Board because of the compensation.

  I declare under penalty of perjury of the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

  Dated: April 16, 2025

                *Travis LeBlanc*
               Travis LeBlanc

# EXHIBIT A



Committee on Civil Liberties, Justice and Home Affairs
The Chairman

IUST-SEC/LIBE D (2025) 2901

Mr Michael McGrath
Commissioner for Democracy, Justice, the Rule of Law and Consumer Protection
European Commission
Rue de la Loi/Wetstraat 200
1049 Brussels

D 300788   06.02.2025

Dear Commissioner McGrath,

The Committee on Civil Liberties, Justice and Home Affairs (LIBE Committee) closely follows all matters linked to the European Commission's adequacy finding for the EU-US Data Privacy Framework mechanism. It was in view of the Commission's assessment that the European Parliament adopted its resolution of 11 May 2023 on the adequacy of the protection afforded by the EU-US Data Privacy Framework (2023/2501(RSP)). Furthermore, during a LIBE Committee mission to Washington in May 2023, LIBE Members had an opportunity to discuss EU-US data transfers with Members of the US Congress, representatives of the US Departments of Justice and Commerce, as well as the Chair of the Federal Trade Commission.

One of the issues considered in the above-mentioned resolution are the competences of the Privacy and Civil Liberties Oversight Board (PCLOB), an independent body responsible for ensuring that privacy and civil liberties are safeguarded. The EU-US Data Privacy Framework established a new review mechanism, allowing individuals in the EU whose personal data are transferred to the US to lodge a complaint before the US authorities. The PCLOB oversees the functioning of this mechanism. Among others, the PCLOB assesses whether surveillance activities carried out under legal provisions such as Section 702 of FISA are necessary, proportionate, and consistent with US privacy principles.

The LIBE Committee has learned that some members of the PCLOB were recently removed by the White House from their positions. As there is only one out of five Board members remaining, the PCLOB is no longer operational due to not reaching the minimum level of members required to have a *quorum*. Therefore, I would be grateful if you could provide me with the Commission's assessment of whether the above-mentioned changes affect the adequacy of the Data Privacy Framework, including whether the mechanism still meets the requirement of "essential equivalence" as established by the Court of Justice in case C-311/18 *Schrems II*.

Yours sincerely,

Javier ZARZALEJOS
Chair of the Committee on Civil Liberties, Justice and Home Affairs

B-1047 Brussels - Tel. +32 2 28 45634
F-67070 Strasbourg - Tel. +33 3 88 1 75634

# EXHIBIT B






HOME   ABOUT   REPORTS   PROJECTS   EVENTS AND PRESS   SECTION 803

# Current Oversight Projects

## Countering Domestic Terrorism and its Impacts on Privacy and Civil Liberties

In this Oversight Project ("Project"), the Board will examine Executive Branch ("Government") policies and activities to counter domestic terrorism. The Board will focus this project on two simultaneous and distinct workstreams: the impact on First Amendment rights; and the impact on privacy and civil liberties of particular groups, such as those with shared racial, religious, political, or ideological affiliations. Across both workstreams, the Board will examine how the Government collects, retains, analyzes, and disseminates information about domestic terrorism threats; and how it operationally responds to and seeks to prevent domestic terrorism. Through the Project, the Board seeks to increase transparency regarding the Government's activities to counter domestic terrorism, and to explore whether any changes to existing policies or activities should be made to better protect privacy and civil liberties.

### First Amendment Workstream:

The Board will examine how the Government's activities to counter domestic terrorism intersect with First Amendment rights. This will focus on how the Government, in its efforts to counter domestic terrorism:

- Distinguishes First Amendment-protected speech and activity, including political, religious, and protest speech or activity, from domestic terrorism, and how that distinction is reflected in the Government's policy and training;
- Ensures that operational personnel comply with such policy and training as they execute mission activities, including and with respect to communities of color, religious communities, and political groups;
- Collects, retains, analyzes, and disseminates publicly accessible online activity;
- Defines, identifies, evaluates, seeks to counter, and seeks to suppress mis- and disinformation;
- Engages with and/or directs social media companies and other third parties regarding domestic terrorism and all the categories of speech and activities referenced above, and the resulting impact on individual users' or groups' speech; and
- Distinguishes the speech of foreign actors from that of U.S. persons.

### Shared Affiliations Workstream:

The Board will examine whether and how the Government's efforts to counter domestic terrorism uniquely affect the privacy and civil liberties of particular groups, with an emphasis on rights under the Fourth, Fifth, and Fourteenth Amendments to the Constitution. Examples of such groups may include persons with shared racial, religious, political, or ideological affiliations. The Board's project will also cover those groups whose members are suspected of engaging in domestic terrorism, as well as those whose members are targets or victims of domestic terrorism. The project will focus on whether the policies, tools, and resources for counter-terrorism operations are appropriate relative to the threat presented or faced by members of these groups. The Board will examine how the Government, in its efforts to counter domestic terrorism:

- Defines and identifies distinct groups of people that may present or face a significant level of domestic terrorism threat meriting Government response, prevention, or protection activities;
- Assesses the domestic terrorism threat presented or faced by such groups, and prioritizes the Government response, including prevention and protection activities;
- Determines the type, amount, and allocation of resources considering the level of the domestic terrorism threat to and from such groups;
- Ensures that efforts to counter domestic terrorism do not disproportionately or otherwise inappropriately affect particular racial groups, historically underserved communities, religious groups, politically disfavored groups, and other individuals, relative to the threat, and how this is reflected in the Government's policy and training;
- Ensures that operational personnel comply with such policy and training as they execute mission activities, including and with respect to communities of color, religious communities, and political groups; and
- Limits use of racial, religious, political, or ideological affiliation as a predicate for investigation or surveillance.

## Executive Order 14086

The Board will conduct oversight to carry out the two oversight roles envisioned for the PCLOB in Executive Order 14086 on Enhancing Safeguards for United States Signals Intelligence Activities. Specifically, the Board will review implementation of the updated policies and procedures adopted by the intelligence agencies pursuant to the executive order to ensure that they are consistent with the enhanced safeguards contained in the order, and will, to the extent feasible, conduct an annual review, as prescribed by Section 3(e) of the executive order, of the redress process established by the order.



## FBI Collection of Open-Source Data

The Board is reviewing the FBI's acquisition and use of data from open-source or commercially available sources as part of its efforts to protect the nation against terrorism, as well as the legal, policy, and technological safeguards in place to protect privacy and civil liberties.

### Facial Recognition and Other Biometric Technologies in Aviation Security

The Board is reviewing how biometric technologies are used to verify identity at each phase of an air journey, considering both operational benefits and privacy and civil liberties concerns.



### Tactical Terrorism Response Teams

The Board will review the use of Tactical Terrorism Response Teams (TTRTs) by U.S. Customs and Border Protection. This review will examine TTRT authorities, activities, and encounters at ports of entry and within the border zone, with particular focus on interactions between TTRTs and U.S. persons; information sharing between TTRTs and other government agencies; the effectiveness of TTRTs in countering terrorism; and whether the program appropriately safeguards privacy and civil liberties.

### FISA Section 702

The Board released its updated Report on the Surveillance Program Operated Pursuant to Section 702 of the Foreign Intelligence Surveillance Act on September 28, 2023. Subsequently, FISA Section 702 was reauthorized for two years under the Reforming Intelligence and Securing America Act of 2024 (RISAA). In advance of Section 702's April 19, 2026 sunset date, the Board will provide an update to its 2023 report, focusing on recent changes to the program. Notably, RISAA imposed new requirements for and limitations on Section 702, including more stringent requirements for certain FBI queries, increased training and reporting requirements, new disciplinary rules for noncompliance, and mandatory use of FISA Court amici in Section 702 certifications. RISAA also expanded certain aspects of the program, including an expansion of the definition of "electronic communications service provider;" an expansion of the definition of "foreign intelligence information" to include the international production, distribution, and financing of certain drugs and precursors; and an expansion of the use of Section 702-acquired information for vetting non-US persons traveling to the country. The Board will evaluate Section 702 programmatic changes and compliance since 2023, including the impact on U.S. persons. In particular, the Board will evaluate how the Intelligence Community (IC) has implemented legislative changes as well as technical, policy, and procedural updates to the program that impact privacy and civil liberties.



### Reports by Privacy & Civil Liberty Officers

The Board receives and reviews reports from Civil Liberties and Privacy Officers under Section 803 of the Implementing Recommendations of the 9/11 Commission Act of 2007.

### Critical Infrastructure Cybersecurity

The Board receives and reviews reports under Executive Order 13636, Improving Critical Infrastructure Cybersecurity.



Return to Top



U.S. PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD

Contact PCLOB
(202) 296-4649
info@pclob.gov

Careers
FOIA
EEO/No Fear Act
Plain Writing Act
Privacy
Vulnerability Disclosure Policy
Non-Disclosure Agreement
USA.gov
OSC.gov
Agency Lapse Plan
Statement on the Use of Artificial Intelligence