APPEAL,CLOSED,TYPE–C

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: <u>1:25–cv–00542–RBW</u>
### *Internal Use Only*

| | |
|---|---|
| LEBLANC et al v. UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD et al | Date Filed: 02/24/2025 |
| Assigned to: Judge Reggie B. Walton | Date Terminated: 05/22/2025 |
| Cause: 42:2000e Job Discrimination (Employment) | Jury Demand: None |
| | Nature of Suit: 890 Other Statutory Actions |
| | Jurisdiction: U.S. Government Defendant |

**Plaintiff**

**TRAVIS LEBLANC**  represented by  **Daniel Reuben Yablon**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
202–942–5009
Email: Daniel.Yablon@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942–5891
Fax: (202) 942–5999
Email: elisabeth.theodore@arnoldporter.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**EDWARD FELTEN**  represented by  **Daniel Reuben Yablon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elisabeth S. Theodore**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD**  represented by  **Douglas C. Dreier**
U.S. ATTORNEY'S OFFICE FOR THE DISTRICT OF COLUMBIA
601 D Street NW

1

Washington, DC 20053
(202) 252–2551
Email: douglas.dreier@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Emily Margaret Hall**
DOJ–Civ
Civil Division, Office of the Assistant
Attorney General
950 Pennsylvania Ave. NW
Washington, DC 20530
202–307–6482
Email: emily.hall@usdoj.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**BETH A WILLIAMS**                             represented by    **Douglas C. Dreier**
*in her official capacity as a Board*                             (See above for address)
*Member of the United States Privacy and*                        *LEAD ATTORNEY*
*Civil Liberties Oversight Board*                                *ATTORNEY TO BE NOTICED*

                                                                 **Emily Margaret Hall**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**JENNY FITZPATRICK**                           represented by    **Douglas C. Dreier**
*in her official capacity as Executive*                           (See above for address)
*Director of the United States Privacy and*                      *LEAD ATTORNEY*
*Civil Liberties Oversight Board*                                *ATTORNEY TO BE NOTICED*

                                                                 **Emily Margaret Hall**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**TRENT MORSE**                                 represented by    **Douglas C. Dreier**
*in his official capacity as Deputy*                              (See above for address)
*Director of Presidential Personnel*                             *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Emily Margaret Hall**
                                                                 (See above for address)
                                                                 *ATTORNEY TO BE NOTICED*

**Defendant**

**DONALD J. TRUMP**                             represented by    **Douglas C. Dreier**
*in his official capacity as President of the*                    (See above for address)
*United States of America*                                       *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Emily Margaret Hall**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Amicus**

**STATE OF FLORIDA**                    represented by  **Jeffrey Paul DeSousa , I**
                                                        OFFICE OF THE ATTORNEY
                                                        GENERAL/FL
                                                        PL–01, The Capitol
                                                        Tallahassee, FL 32399
                                                        850–414–3830
                                                        Email: jeffrey.desousa@myfloridalegal.com
                                                        *LEAD ATTORNEY*
                                                        *ATTORNEY TO BE NOTICED*

**Amicus**

**19 OTHER STATES**

**Amicus**

**ARIZONA LEGISLATURE**

| Date Filed | # | Docket Text |
|---|---|---|
| 02/24/2025 | 1 | COMPLAINT against JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS (Filing Fee $405 receipt number ADCDC–11500318) filed by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Civil Cover Sheet)(Theodore, Elisabeth) Modified on 2/25/2025 as to the payment of filing fee (zmtm). (Entered: 02/24/2025) |
| 02/24/2025 | 2 | REQUEST FOR SUMMONS TO ISSUE *as to the Civil Process Clerk* filed by TRAVIS LEBLANC, EDWARD FELTEN. Related document: 1 Complaint, filed by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Summons as to the Attorney General Pamela Bondi, # 2 Summons as to Trent Morse, # 3 Summons as to President Donald Trump, # 4 Summons as to Beth A. Williams, # 5 Summons as to Jenny Fitzpatrick, # 6 Summons as to the United State Privacy and Civil Liberties Oversight Board)(Theodore, Elisabeth) (Entered: 02/24/2025) |
| 02/24/2025 | 3 | NOTICE of Appearance by Daniel Reuben Yablon on behalf of TRAVIS LEBLANC, EDWARD FELTEN (Yablon, Daniel) (Entered: 02/24/2025) |
| 02/25/2025 |  | Case Assigned to Judge Reggie B. Walton. (zmtm) (Entered: 02/25/2025) |
| 02/25/2025 | 4 | SUMMONS (7) Issued Electronically as to All Defendants, U.S. Attorney and U.S. Attorney General (Attachments: # 1 Notice and Consent)(zmtm) (Entered: 02/25/2025) |
| 02/25/2025 | 5 | GENERAL ORDER FOR CIVIL CASES BEFORE THE HONORABLE REGGIE B. WALTON. Signed by Judge Reggie B. Walton on February 25, 2025. (lcrbw2) (Entered: 02/25/2025) |

| 03/04/2025 | 6 | NOTICE of Appearance by Douglas C. Dreier on behalf of All Defendants (Dreier, Douglas) (Entered: 03/04/2025) |
|---|---|---|
| 03/04/2025 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/25/2025. Answer due for ALL FEDERAL DEFENDANTS by 4/26/2025. (Theodore, Elisabeth) (Entered: 03/04/2025) |
| 03/12/2025 | 8 | AMENDED COMPLAINT against JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS filed by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Exhibit First Amended Complaint – Redline)(Theodore, Elisabeth) (Entered: 03/12/2025) |
| 03/12/2025 | 9 | Joint MOTION to Expedite *Consideration of Cross−Motions for Summary Judgment and to Set a Briefing Schedule* by TRAVIS LEBLANC. (Attachments: # 1 Text of Proposed Order)(Theodore, Elisabeth). Added MOTION for Briefing Schedule on 3/13/2025 (znmw). (Entered: 03/12/2025) |
| 03/12/2025 | 10 | MOTION for Summary Judgment by TRAVIS LEBLANC, EDWARD FELTEN. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Declaration of Travis LeBlanc, # 4 Declaration of Edward Felten, # 5 Text of Proposed Order)(Theodore, Elisabeth) (Entered: 03/12/2025) |
| 03/13/2025 | 11 | ORDER. In accordance with the attached Order, it is hereby ORDERED that the parties' 9 Joint Motion for Expedited Consideration of Cross−Motions for Summary Judgment and to Set a Briefing Schedule is GRANTED. It is further ORDERED that the plaintiffs shall file their motion for summary judgment on or before March 12, 2025. It is further ORDERED that, on or before April 3, 2025, the defendants shall file their combined opposition to the plaintiffs' motion for summary judgment and cross−motion for summary judgment. It is further ORDERED that, on or before April 16, 2025, the plaintiffs shall file their combined opposition to the defendants' cross−motion for summary judgment and a reply in support of their motion for summary judgment. It is further ORDERED that, on or before April 23, 2025, the defendants shall file a reply in support of their cross−motion for summary judgment. It is further ORDERED that, on April 30, 2025, at 2:00 p.m., the parties shall appear before the Court for a motion hearing. The parties shall appear for the motion hearing before the Court in Courtroom 16 on the 6th floor at the E. Barrett Prettyman United States Courthouse, 333 Constitution Avenue, N.W., Washington, D.C. 20001. It is further ORDERED that, on May 14, 2025, at 9:30 a.m., the parties shall appear before the Court for a status conference, via teleconference, by calling 646−828−7666, entering Meeting ID 161 591 8885 followed by the pound key (#), and then entering the Passcode 984979 followed by the pound key (#). This status conference will serve as a target date for the resolution of the parties' summary judgment motions. In the event that the Court is unable to resolve the motions by this date, the parties will be advised in advance that the status conference will be continued to a later date. Signed by Judge Reggie B. Walton on March 13, 2025. (lcrbw2) (Entered: 03/13/2025) |
| 04/03/2025 | 12 | Cross MOTION for Summary Judgment by UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS, JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP. (Attachments: # 1 Memorandum in Support, # 2 Statement of Facts, # 3 Text of Proposed Order)(Dreier, Douglas) (Entered: 04/03/2025) |

| 04/03/2025 | 13 | Memorandum in opposition to re 10 Motion for Summary Judgment, *Duplicate of ECF No. 12* filed by UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS, JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP. (Dreier, Douglas) (Entered: 04/03/2025) |
|---|---|---|
| 04/10/2025 | 14 | AMICUS BRIEF *in Support of Defendants and in Opposition to Plaintiffs' Motion for Summary Judgment* by STATE OF FLORIDA. (DeSousa, Jeffrey) (Entered: 04/10/2025) |
| 04/16/2025 | 15 | RESPONSE re 12 Cross MOTION for Summary Judgment *and REPLY to opposition to motion re 10 MOTION for Summary Judgment* filed by EDWARD FELTEN, TRAVIS LEBLANC. (Attachments: # 1 Statement of Facts Plaintiffs Response to Defendants Statement of Undisputed Material Facts, # 2 Declaration Supplemental Declaration of Travis Leblanc, # 3 Declaration Supplemental Declaration of Edward Felten)(Theodore, Elisabeth) (Entered: 04/16/2025) |
| 04/16/2025 | 16 | REPLY to opposition to motion re 10 Motion for Summary Judgment, filed by EDWARD FELTEN, TRAVIS LEBLANC. (See Docket Entry 15 to view document). (znmw) (Entered: 04/17/2025) |
| 04/23/2025 | 17 | NOTICE of Appearance by Emily Margaret Hall on behalf of All Defendants (Hall, Emily) (Entered: 04/23/2025) |
| 04/23/2025 | 18 | REPLY to opposition to motion re 12 Motion for Summary Judgment, filed by JENNY FITZPATRICK, TRENT MORSE, DONALD J. TRUMP, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, BETH A WILLIAMS. (Attachments: # 1 Appendix – Redline of Statutory Provisions, # 2 Exhibit 1 – Sub–Quorum Policy)(Dreier, Douglas) (Entered: 04/23/2025) |
| 04/30/2025 | | MINUTE ORDER. The public is permitted to attend the motion hearing currently scheduled for April 30, 2025, at 2:00 p.m., by calling 1–833–990–9400, and entering the Meeting ID 011366756. Signed by Judge Reggie B. Walton on April 30, 2025. (lcrbw2) (Entered: 04/30/2025) |
| 04/30/2025 | | Minute Entry for proceedings held before Judge Reggie B. Walton: Motion Hearing held on 4/30/2025 re 10 Plaintiff's Motion for Summary Judgment and 12 Defendants' Cross–Motion for Summary Judgment and Opposition to Plaintiffs Motion for Summary Judgment. Oral arguments heard. Written Opinion forthcoming via Chambers. (Court Reporter: Elizabeth Davila) (zalh) (Entered: 04/30/2025) |
| 05/09/2025 | 19 | ORDER. In accordance with the attached Order, it is hereby ORDERED that, on or before May 12, 2025, at 12:00 p.m., the plaintiffs shall file supplemental declarations from each plaintiff explaining the plaintiffs' basis for asserting at the April 30, 2025, motion hearing that they would not be entitled to any back pay under the Back Pay Act, based on the difference between their compensation as part–time members of the Board and their compensation through other employment. Specifically, the Court requires more than a general assertion that their other compensation exceeds their compensation as members of the Board. The plaintiffs may move to file any exhibits to those supplemental declarations under seal, should they wish to do so. Signed by Judge Reggie B. Walton on May 9, 2025. (lcrbw2) (Entered: 05/09/2025) |
| 05/12/2025 | 20 | NOTICE of Filing of Supplemental Declarations by EDWARD FELTEN, TRAVIS LEBLANC (Attachments: # 1 Declaration – Second Supplemental Declaration of Travis LeBlanc, # 2 Declaration – Second Supplemental Declaration of Edward Felten)(Theodore, Elisabeth) (Entered: 05/12/2025) |

| 05/12/2025 | 21 | SEALED MOTION FOR LEAVE TO FILE DOCUMENT UNDER SEAL filed by EDWARD FELTEN, TRAVIS LEBLANC (This document is SEALED and only available to authorized persons.) (Attachments: # 1 Declaration Second Supplemental Declaration of Edward Felten, # 2 Text of Proposed Order, # 3 Certificate of Service)(Theodore, Elisabeth) (Entered: 05/12/2025) |
| --- | --- | --- |
| 05/12/2025 | 23 | SEALED DECLARATION filed by EDWARD FELTEN, TRAVIS LEBLANC. re 21 Sealed Motion for Leave to File Document Under Seal,. (This document is SEALED and only available to authorized persons.)(zdp) (Entered: 05/16/2025) |
| 05/13/2025 | | MINUTE ORDER. The Court requiring additional time to consider the pending cross−motions for summary judgment in this case, it is hereby ORDERED that the status conference currently scheduled for May 14, 2025, is CONTINUED to May 21, 2025, at 9:30 a.m. The parties shall appear before the Court via teleconference, by calling 646−828−7666, entering Meeting ID 161 591 8885 followed by the pound key (#), and then entering the Passcode 984979 followed by the pound key (#). This status conference will serve as a target date for the resolution of the pending cross−motions for summary judgment. In the event that the Court is unable to resolve the motions by this date, the parties will be advised in advance that the status conference will be continued to a later date. Signed by Judge Reggie B. Walton on May 13, 2025. (lcrbw2) (Entered: 05/13/2025) |
| 05/20/2025 | | MINUTE ORDER. In light of the forthcoming Memorandum Opinion to be issued by the Court, it is hereby ORDERED that the status conference currently scheduled for May 21, 2025, is VACATED. Signed by Judge Reggie B. Walton on May 20, 2025. (lcrbw2) (Entered: 05/20/2025) |
| 05/21/2025 | 24 | MEMORANDUM OPINION. Signed by Judge Reggie B. Walton on May 21, 2025. (lcrbw2) (Entered: 05/21/2025) |
| 05/21/2025 | 25 | ORDER. In accordance with the Memorandum Opinion issued on this same date, it is hereby ORDERED that the 10 Plaintiffs' Motion for Summary Judgment is GRANTED. It is further ORDERED that the 12 Defendants' Cross−Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment is DENIED. It is therefore DECLARED that the terminations of the plaintiffs, Travis LeBlanc and Edward Felten, were unlawful, in violation of 42 U.S.C. § 2000ee, and therefore null and void. It is further ORDERED that the plaintiff Travis LeBlanc remains a member of the Privacy and Civil Liberties Oversight Board ("PCLOB" or "the Board"), having been appointed by the President and confirmed by the Senate to a term expiring on January 29, 2028, and he may be removed by the President prior to expiration of his term only for cause. It is further ORDERED that the plaintiff Edward Felten remains a member of the PCLOB, having been appointed by the President and confirmed by the Senate to a term expiring on January 29, 2025, and being eligible to serve at his discretion until either his successor is confirmed or one year after the date of the expiration of his current term, i.e., January 29, 2026, whichever occurs first, and he may be removed by the President prior to expiration of his holdover term only for cause or upon the confirmation of a successor to his position on the Board. It is further ORDERED that the Privacy and Civil Liberties Oversight Board, defendant Beth A. Williams, defendant Jenny Fitzpatrick, and defendant Trent Morse, as well as their subordinates, agents, and employees, are ENJOINED from treating the plaintiffs as having been removed from their positions as Board members of the Privacy and Civil Liberties Oversight Board during their terms as members of the Board, and from taking any action that would deprive the plaintiffs of their ability to exercise the |

| | | |
|---|---|---|
| | | functions of their office during their terms as members of the PCLOB or deprive the plaintiffs of any right or benefit of that office during their terms as members of the PCLOB. It is further ORDERED that this case is CLOSED. Signed by Judge Reggie B. Walton on May 21, 2025. (lcrbw2) (Entered: 05/21/2025) |
| 05/27/2025 | 26 | NOTICE OF APPEAL TO DC CIRCUIT COURT as to 24 Memorandum & Opinion, 25 Order on Motion for Summary Judgment,,,,,,,,,,,,,,,, by TRENT MORSE, UNITED STATES PRIVACY AND CIVIL LIBERTIES OVERSIGHT BOARD, DONALD J. TRUMP, BETH A WILLIAMS, JENNY FITZPATRICK. Fee Status: No Fee Paid. Parties have been notified. (Hall, Emily) (Entered: 05/27/2025) |

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

TRAVIS LEBLANC; EDWARD FELTEN,

                      *Plaintiffs*,

*v*.

U.S. PRIVACY AND CIVIL LIBERTIES
OVERSIGHT BOARD, et al.,

                      *Defendants*.

Civil Action No. 1:25-cv-542-RBW

## <u>DEFENDANTS' NOTICE OF APPEAL</u>

PLEASE TAKE NOTICE that Defendants hereby appeal to the United States Court of Appeals for the District of Columbia Circuit the Court's May 21, 2025 Order, *see* ECF No. 25, and Memorandum Opinion, *see* ECF No. 24.

Dated: May 27, 2025                              Respectfully submitted,


                                                 YAAKOV M. ROTH
                                                 *Acting Assistant Attorney General*

                                                 /s/ *Emily Hall*_____
                                                 EMILY HALL, D.C. Bar No. 1780317
                                                 *Counsel to the Assistant Attorney General*
                                                 Civil Division
                                                 United States Department of Justice
                                                 950 Pennsylvania Avenue NW
                                                 Washington, DC 20530
                                                 Tel:  (202) 307-6482
                                                 emily.hall@usdoj.gov


                                                 JEANINE FERRIS PIRRO
                                                 United States Attorney

                                                 DOUGLAS C. DREIER
                                                 Assistant United States Attorney
                                                 601 D Street NW
                                                 Washington, DC 20530
                                                 Tel:  (202) 252-2551


                                                 *Counsel for Defendants*

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                        )
TRAVIS LEBLANC, <u>et al.</u>,                          )
                                                        )
                 Plaintiffs,                            )
                                                        )
        v.                                              )     Civil Action No. 25-542 (RBW)
                                                        )
UNITED STATES                                           )
PRIVACY AND CIVIL LIBERTIES                             )
OVERSIGHT BOARD, <u>et al.</u>,                         )
                                                        )
                 Defendants.                            )
_____)

## <u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Plaintiffs' Motion for Summary Judgment, ECF No. 10, is

**GRANTED**.  It is further

**ORDERED** that the Defendants' Cross-Motion for Summary Judgment and Opposition

to Plaintiffs' Motion for Summary Judgment, ECF No. 12, is **DENIED**.  It is therefore

**DECLARED** that the terminations of the plaintiffs, Travis LeBlanc and Edward Felten,

were unlawful, in violation of 42 U.S.C. § 2000ee, and therefore null and void.  It is further

**ORDERED** that the plaintiff Travis LeBlanc remains a member of the Privacy and Civil

Liberties Oversight Board ("PCLOB" or "the Board"), having been appointed by the President

and confirmed by the Senate to a term expiring on January 29, 2028, and he may be removed by

the President prior to expiration of his term only for cause.  It is further

**ORDERED** that the plaintiff Edward Felten remains a member of the PCLOB, having

been appointed by the President and confirmed by the Senate to a term expiring on January 29,

2025, and being eligible to serve at his discretion until either his successor is confirmed or one

year after the date of the expiration of his current term, i.e., January 29, 2026, whichever occurs first, and he may be removed by the President prior to expiration of his holdover term only for cause or upon the confirmation of a successor to his position on the Board.  It is further

ORDERED that the Privacy and Civil Liberties Oversight Board, defendant Beth A. Williams, defendant Jenny Fitzpatrick, and defendant Trent Morse, as well as their subordinates, agents, and employees, are ENJOINED from treating the plaintiffs as having been removed from their positions as Board members of the Privacy and Civil Liberties Oversight Board during their terms as members of the Board, and from taking any action that would deprive the plaintiffs of their ability to exercise the functions of their office during their terms as members of the PCLOB or deprive the plaintiffs of any right or benefit of that office during their terms as members of the PCLOB.  It is further

ORDERED that this case is CLOSED.

SO ORDERED this 21st day of May, 2025.

REGGIE B. WALTON
United States District Judge

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TRAVIS LEBLANC, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 25-542 (RBW) |
| | ) |
| UNITED STATES | ) |
| PRIVACY AND CIVIL LIBERTIES | ) |
| OVERSIGHT BOARD, <u>et al.</u>, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

This case concerns the authority of the President of the United States to remove without cause members of the United States Privacy and Civil Liberties Oversight Board (the "PCLOB" or the "Board"), an independent, nonpartisan board of experts tasked with analyzing and reporting on the Executive Branch's counterterrorism actions—as well as the development and implementation of counterterrorism-related laws, regulations, and policies by Congress and the Executive Branch—to ensure that privacy and civil liberties are adequately considered and protected.  <u>See generally</u> 42 U.S.C. § 2000ee.

The plaintiffs, Travis LeBlanc and Edward Felten, bring this civil action against the defendants—the PCLOB; Beth Williams, in her official capacity as a Board member of the PCLOB; Jenny Fitzpatrick, in her official capacity as Executive Director of the PCLOB; Trent Morse, in his official capacity as Deputy Director of Presidential Personnel; and Donald J. Trump, in his official capacity as President of the United States of America—challenging the President's termination of the plaintiffs' positions on the Board, which they argue violates federal law and the Due Process Clause of the Fifth Amendment to the United States

Constitution.  See First Amended Complaint ("Am. Compl.") at 1, ECF No. 8.  Currently

pending before the Court are the Plaintiffs' Motion for Summary Judgment ("Pls.' Mot."), ECF

No. 10, and the defendants' cross-motion for summary judgment, see Defendants' Cross-Motion

for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment

("Defs.' Mot."), ECF No. 12.

Upon careful consideration of the parties' submissions,[1] their arguments during the

hearing on the motions, and the plaintiffs' supplemental declarations, the Court concludes the

following: (1) the plaintiffs' removals were unlawful because although the plain text of the

PCLOB's organic statute does not include an express textual removal restriction, the Board's

structure and function clearly indicate that Congress intended to create such a restriction on the

President's removal power; (2) the restriction as it applies to the plaintiffs is constitutional; and

(3) the plaintiffs' requested declaratory and injunctive relief is both available and appropriate

under the circumstances presented to the Court in this case.  Accordingly, the Court must grant

the plaintiffs' motion for summary judgment and deny the defendants' cross-motion for

summary judgment.

---

[1] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Mem."), ECF No. 10-1; (2) the Plaintiffs' Statement of Undisputed Material Facts ("Pls.' Facts"), ECF No. 10-2; (3) the Declaration of Travis LeBlanc ("LeBlanc Decl."), ECF No. 10-3; (4) the Declaration of Edward Felten ("Felten Decl."), ECF No. 10-4; (5) the defendants' Memorandum of Points and Authorities in Support of Defendants' Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Defs.' Mem."), ECF No. 12-1; (6) the Defendants' Statement of Material Facts as to Which There Is No Genuine Dispute ("Defs.' Facts"), ECF No. 12-2; (7) the Plaintiffs' Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of Motion for Summary Judgment ("Pls.' Opp'n"), ECF No. 15; (8) the Plaintiffs' Response to Defendants' Statement of Undisputed Facts ("Pls.' Resp."), ECF No. 15-1; (9) the Supplemental Declaration of Travis LeBlanc ("LeBlanc Suppl. Decl."), ECF No. 15-2; (10) the Supplemental Declaration of Edward Felten ("Felten Suppl. Decl."), ECF No. 15-3; (11) the Defendants' Reply in Further Support of Cross-Motion for Summary Judgment ("Defs.' Reply"), ECF No. 18; (12) the Second Supplemental Declaration of Travis LeBlanc ("LeBlanc 2d Suppl. Decl."), ECF No. 20-1; and (13) the Redacted Second Supplemental Declaration of Edward Felten ("Felten 2d Suppl. Decl."), ECF No. 20-2.

# I.    BACKGROUND

**A.    Legislative History and Statutory Background**

**1.    The Creation of the PCLOB**

In the aftermath of the terrorist attacks on the United States on September 11, 2001, Congress and then-President George W. Bush established the National Commission on Terrorist Attacks Upon the United States (the "9/11 Commission"), and they tasked the 9/11 Commission with investigating the "facts and circumstances" relating to those attacks and providing recommendations for how to protect the country from future such attacks.  The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States xv (2004).  And, on July 22, 2004, the 9/11 Commission released its final report, in which it made a number of recommendations relating to the United States' government's protection against and response to the continued threat of terrorism.  See id. at 395.

In making its terrorism prevention recommendations, the 9/11 Commission recognized that "the American public has vested enormous authority in the U[nited ]S[tates] government[]" in its fight against terrorism.  Id. at 394.  The 9/11 Commission emphasized that this "shift of power and authority to the government calls for an enhanced system of checks and balances to protect the precious liberties that are vital to our way of life."  Id.  Acknowledging the difficulty of balancing the protection of the nation on one hand and on the other hand the need to simultaneously prevent the government from violating privacy and civil liberties interests, which are the hallmark of our nation's ethos, the 9/11 Commission made several recommendations to enhance the protection of civil liberties and privacy rights.  See id. at 395.  Specifically, the 9/11 Commission recommended that "[a]t this time of increased and consolidated government authority, there should be a board within the [E]xecutive [B]ranch to oversee adherence to the

guidelines we recommend and the commitment the government makes to defend our civil liberties." Id.

In response to the 9/11 Commission Report, Congress enacted the Intelligence Reform and Terrorism Prevention Act of 2004 (the "IRTPA"), Pub L. No. 108-458, 118 Stat. 3638, which established the PCLOB to engage in the oversight function recommended by the 9/11 Commission Report, see id. § 1061, 118 Stat. at 3684–88.  Although Congress echoed the 9/11 Commission Report's call for "an enhanced system of checks and balances" to protect civil liberties, id. § 1061(a)(2), 118 Stat. at 3684, it chose to initially constitute the PCLOB within the Executive Office of the President (the "EOP"), see id. § 1061(b), 118 Stat. at 3684, and specifically directed that the Board "shall perform its functions within the [E]xecutive [B]ranch and under the general supervision of the President[,]" id. § 1061(k), 118 Stat. at 3688.

The PCLOB was initially composed of a chairman and vice chairman, each of whom were to "be appointed by the President, by and with the advice and consent of the Senate[,]" id. § 1061(e)(1)(B), 118 Stat. at 3686, as well as "three additional members appointed by the President[,]" without the advice and consent of the Senate, id. § 1061(e)(1)(A), 118 Stat. at 3686. And rather than delineating a term of service, Congress prescribed that all members of the PCLOB, including the chairman and vice chairman, "shall each serve at the pleasure of the President." Id. § 1061(e)(1)(E), 118 Stat. at 3687.  Pursuant to the IRTPA—and as it remains today—the PCLOB requires a quorum of three members to carry out many of its statutorily-mandated tasks.  See id. § 1061(e)(3), 118 Stat. at 3687.

Congress delineated two minimum qualifications for members of the Board: (1) that they "be appointed from among trustworthy and distinguished citizens outside the Federal Government who are qualified on the basis of achievement, experience, and independence[,]" id.

4

§ 1061(e)(1)(A), 118 Stat. at 3687; and (2) that, once appointed, no member could "while serving on the Board, be an elected official, officer, or employee of the Federal Government, other than in the capacity as a member of the Board[,]" id. § 1061(e)(1)(E), 118 Stat. at 3687.

Pursuant to the IRTPA, the PCLOB's mandate was "to ensure that concerns with respect to privacy and civil liberties are appropriately considered in the implementation of laws, regulations, and [E]xecutive [B]ranch policies related to efforts to protect the Nation against terrorism." Id. § 1061(c)(3), 118 Stat. at 3685. To carry out its mandate, Congress prescribed the PCLOB's core functions. First, the PCLOB was to advise the President and Executive Branch agencies and departments on "the development and implementation of such regulations and [E]xecutive [B]ranch policies[,]" id. § 1061(c)(1)(C), 118 Stat. at 3685, and "on proposals to retain or enhance a particular governmental power," id. § 1061(c)(1)(D), 118 Stat. at 3685. Second, the PCLOB was to "continually review[,]" inter alia, Executive Branch "regulations, . . . policies, and procedures[,]" and their implementation, as well as "related laws pertaining to efforts to protect the Nation from terrorism, and other actions by the [E]xecutive [B]ranch related to efforts to protect the Nation from terrorism to ensure that privacy and civil liberties are protected[,]" id. § 1061(c)(2), 118 Stat. at 3685. And third, the PCLOB was to issue a report to Congress, at least annually, apprising it of the Board's activities. See id. § 1061(c)(4), 118 Stat. at 3685.

Although the PCLOB was authorized to request information and have access to all relevant records, including classified information, see id. § 1061(d)(1), 118 Stat. at 3685–86, Congress did not provide the PCLOB with subpoena power, see generally id. § 1061, 118 Stat. at 3684–88. Instead, Congress established a process by which the PCLOB could request assistance from the Attorney General. Specifically, Congress directed that, if an individual failed to

5

comply with the PCLOB's request within forty-five days of receiving such a request for information, the PCLOB was to notify the Attorney General.  See id. § 1061(d)(1)(D)(ii), 118 Stat. at 3686.  Congress further directed that, upon receiving such a notification from the PCLOB, the Attorney General: (1) "shall provide an opportunity for the person subject to the request to explain the reasons for not complying with the request[,]" id. § 1061(d)(2)(A), 118 Stat. at 3686; and (2) "shall review the request and may take such steps as appropriate to ensure compliance with the request[,]" id. § 1061(d)(2)(B), 118 Stat. at 3686 (emphasis added). Similarly, in the event that information or assistance from any agency "is, in the judgment of the Board, unreasonably refused or not provided," id. § 1061(d)(3), 118 Stat. at 3686, the Board was to "report the circumstances to the head of the department or agency concerned[,]" id., 118 Stat. at 3686, who—subject to two exceptions,[2] see id. § 1061(d)(4), 118 Stat. at 3686—was to ensure compliance with the request "[i]f the requested information or assistance may be provided to the Board in accordance with applicable law," id. § 1061(d)(3), 118 Stat. at 3686.

## 2.  Reconstitution of the PCLOB as an Independent Agency

However, within several years following the PCLOB's establishment, Congress began debating whether there should be significant changes to the PCLOB as it became clear that the Board—as then constituted—was too closely tied to the President, and the Executive Branch more broadly, to be meaningfully independent, thus failing to satisfy Congress's objective of establishing an "enhanced system of checks and balances[,]" The 9/11 Commission Report at 394, regarding the federal government's counterterrorism powers.  One original member of the

---

[2] The IRTPA provided that agencies were not to furnish information under two broad national security exceptions: (1) where the Director of National Intelligence, in consultation with the Attorney General, determined it was "necessary to withhold information requested [by the Board] . . . to protect the national security interests of the United States[,]" id. § 1061(d)(4), 118 Stat. at 3686; or (2) where the Attorney General determines such withholding was necessary "to protect sensitive law enforcement or counterterrorism information or ongoing operations[,]" id., 118 Stat at 3686.

Board, Lanny J. Davis, who resigned in response to White House edits to the PCLOB's first annual report to Congress, later testified before Congress on July 24, 2007, that "it simply was not possible to have independent oversight while being treated as if [the Board members] were part of the White House staff." Privacy in the Hands of Government: The Privacy and Civil Liberties Oversight Board and the Privacy Officer of the U.S. Department of Homeland Security, Hearing Before the Subcomm. on Com. & Admin. L. of the H. Comm. on the Judiciary, 110 Cong. 33 (July 24, 2007) (testimony of Lanny J. Davis). Mr. Davis testified that, although the Board members "saw a contradiction and even a tension[]" in the Board's construction as both an oversight board and as a board within the White House, id., these tensions came to a head when the White House provided "extensive redlining" to the Board's first annual report, without the Board's prior knowledge, including "significant deletions of substantive parts of [the Board's] report[,]" id.; see John Solomon & Ellen Nakashima, White House Edits to Privacy Board's Report Spur Resignation, Wash. Post. (May 15, 2007) (reporting that "[t]he Bush administration made more than 200 revisions to the [PCLOB's] report . . . , including the deletion of a passage on anti-terrorism programs that intelligence officials deemed 'potentially problematic' intrusions on civil liberties[]").[3]

The following month, in light of these concerns regarding the PCLOB's authority and independence, Congress enacted legislation removing the Board from the EOP and reconstituted it as an independent agency—still within the Executive Branch—pursuant to the Implementing Recommendations of the 9/11 Commission Act (the "9/11 Commission Act") § 801(a), Pub. L. 110-53, 121 Stat. 266 (codified as amended at 42 U.S.C. § 2000ee). In doing so, the 9/11

---

[3] Available at https://www.washingtonpost.com/archive/national/2007/05/15/white-house-edits-to-privacy-boards-report-spur-resignation/c7967467-c99f-4bb5-aa8a-261c6b6273ed/.

Commission Act made a number of fundamental changes to the PCLOB's structure and functions, the vast majority of which remain in effect today.

The 9/11 Commission Act's structural reforms to the PCLOB included revisions to the Board's membership qualifications and selection process that were consistent with Congress's desire for greater independent expertise. First, the 9/11 Commission Act directed that all members of the Board, not just the chairman and vice chairman, were to be "appointed by the President, by and with the advice and consent of the Senate." Compare id. § 801(a) (codified as amended at 42 U.S.C. § 2000ee(h)(1)), with IRTPA § 1061(e)(1)(A), (B), 118 Stat. at 3686. Second, the 9/11 Commission Act revised the qualifications for membership on the PCLOB, emphasizing that Board members "shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation[,]" and further promoted the Board's nonpartisan nature by directing that "in no event shall more than [three] members of the Board be members of the same political party." Compare 9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(h)(2)), with IRTPA § 1061(e)(1), 118 Stat. at 3686. Third, Congress excised the provision stating that the members "shall each serve at the pleasure of the President[,]" IRTPA § 1061(e)(1)(E), 118 Stat. at 3687, and added a provision directing that "[e]ach member of the Board shall serve a term of six years[,]"[4] see 9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(h)(4)).

Along with these changes to the PCLOB's structure and membership, Congress reoriented the PCLOB's purpose and core functions. Whereas, in its prior iteration, the

---

[4] Under the current version of the PCLOB's organic statute, a member "may be reappointed to one or more additional terms[,]" 42 U.S.C. § 2000ee(h)(4)(B), and "may continue to serve for up to one year after the date of expiration[ of his or her term], at the election of the member[]" preceding their reappointment or "until the member's successor has been appointed and qualified[,]" id. § 2000ee(h)(4)(D).

PCLOB's scope of responsibility was limited to "ensur[ing] that concerns with respect to privacy and civil liberties are appropriately considered in the <u>implementation</u> of laws, regulations, and [E]xecutive [B]ranch policies related to efforts to protect the Nation against terrorism[,]" IRTPA § 601(c)(3), 118 Stat. at 3684 (emphasis added), pursuant to the 9/11 Commission Act, and as currently constituted, the PCLOB's purpose is now two-fold, namely:

> (1) analyz[ing] and review[ing] actions the [E]xecutive [B]ranch takes to protect the Nation from terrorism, ensuring that the need for such actions is balanced with the need to protect privacy and civil liberties; and

> (2) ensur[ing] that liberty concerns are appropriately considered in the <u>development and implementation</u> of laws, regulations, and <u>policies</u> related to efforts to protect the Nation against terrorism.

9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(c)) (emphasis added).

Consistent with these revised objectives, Congress expanded and clarified the PCLOB's core functions in several ways. First, the PCLOB advises Congress and the Executive Branch on the consideration of privacy and civil liberties concerns in the proposal and implementation of legislation, regulations, and policies relating to counterterrorism, as well as on proposals "to retain or enhance" certain government powers. <u>See</u> <u>id.</u> (codified as amended at 42 U.S.C. § 2000ee(d)(1)). Second, the Board performs an oversight function by "continually review[ing]" Executive Branch regulations, policies, and procedures, information-sharing practices, and other actions relating to counterterrorism, in order to determine whether such actions "appropriately protect privacy and civil liberties" and "are consistent with governing laws, regulations, and policies regarding privacy and civil liberties." <u>Id.</u> (codified as amended at 42 U.S.C. § 2000ee(d)(2)). Third, the PCLOB "receive[s] and review[s] reports and other information" from privacy and civil liberties officers within the Executive Branch and, when appropriate,

makes recommendations to, or coordinates the activities of, those officers.  Id. (codified as amended at 42 U.S.C. 2000ee(d)(3)).  Fourth, members of the PCLOB "appear and testify before Congress upon request."  Id. (codified as amended at 42 U.S.C. § 2000ee(d)(4)).

As part of its statutory obligations, the PCLOB must "periodically submit, not less than semiannually, reports[]" to Congress and the President, id. (codified as amended at 42 U.S.C. § 2000ee(e)(1)), which are required to include, inter alia, a description of the PCLOB's "major activities" during the relevant period, "information on the findings, conclusions, and recommendations of the Board resulting from its advice and oversight functions[,]" and "the minority views" as to any of these findings, conclusions, and recommendations.  Id. (codified as amended at 42 U.S.C. §§ 2000ee(e)(2)(A)–(C)).

In addition to providing advice to Congress, the PCLOB is now required to play a role in educating the public regarding its work.  Accordingly, Congress directed the PCLOB to "make its reports, including its reports to Congress, available to the public to the greatest extent that is consistent with the protection of classified information and applicable law," id. (codified as amended at 42 U.S.C. § 2000ee(f)(1)), and "hold hearings and otherwise inform the public of its activities," consistent with these same protections,[5] id. (codified as amended at 42 U.S.C. § 2000ee(f)(2)).

---

[5] Courts have routinely referenced and relied upon the PCLOB's public representations and conclusions in reviewing legal challenges to certain government surveillance programs.  See Am. C.L. Union v. Clapper, 785 F.3d 787, 798–99 (2d Cir. 2015) (agreeing with the PCLOB's conclusion that the government's statutory interpretation underpinning a bulk telephone records program was at odds with the text of the statute); United States v. Muhtorov, 20 F.4th 558, 588 (10th Cir. 2021); United States v. Hasbajrami, 945 F.3d 641, 649 n.4 (2d Cir. 2019) (noting that "many Section 702 procedures remain highly classified," and that "[o]ur discussion here is drawn from declassified public sources and in large part from the report on Section 702 surveillance produced by the Privacy and Civil Liberties Oversight Board"); United States v. Mohamud, 843 F.3d 420, 440 (9th Cir. 2016); Wikimedia Found. v. Nat'l Sec. Agency, 14 F.4th 276, 280–81 (4th Cir. 2021).

Consistent with Congress's reconstitution and reorientation of the Board as an independent agency, Congress removed language in the prior version of the PCLOB's organic statute directing that "[t]he Board shall perform its functions within the [E]xecutive [B]ranch and under the general supervision of the President." Compare generally id. (codified as amended at 42 U.S.C. § 2000ee)), with IRTPA § 1061(k), 118 Stat. at 3688.

At the same time, Congress again decided not to grant the PCLOB subpoena authority, despite proposals that it do so. See H.R. Rep. No. 110-259, at 321 (2007) (Conf. Rep.). Instead, the PCLOB's organic statute, as amended via the 9/11 Commission Act, merely authorizes the Board to, "at the direction of a majority of the members of the Board, submit a written request to the Attorney General" that he or she issue a subpoena to a person outside the Executive Branch, 9/11 Commission Act § 801(a) (codified as amended at 42 U.S.C. § 2000ee(g)(1)(D)), and that, upon receipt of that request, the Attorney General shall either "issue the subpoena as requested" or "provide the Board, in writing, with an explanation of the grounds on which the subpoena request has been modified or denied[,]"[6] id. (codified as amended at 42 U.S.C. § 2000ee(g)(2)(A)). Therefore, while Congress reoriented the Board's structure, the nature and scope of its functions, and its relationship to the President, Congress stopped short of vesting the reconstituted Board with power to compel compliance with its investigations.

## B.    Factual Background

The plaintiffs are two members of the PCLOB who allege that they were removed from the Board by the President without any expressed reason for their removals. "Plaintiff Travis LeBlanc was nominated [to the PCLOB] by President [Donald J.] Trump in August

---

[6] In the event that the Attorney General denies a request from the Board, the Attorney General must notify the House and Senate Judiciary Committees. See id. (codified as amended at 42 U.S.C. § 2000ee(g)(2)(B)).

2018[,] . . . and confirmed unanimously by the Senate in July 2019, for a term expiring January

29, 2022." Pls.' Facts ¶ 1 (citing LeBlanc Decl. ¶ 2); see Defs.' Facts ¶ 1.[7] "Mr. LeBlanc was

renominated by [then-]President [Joseph R.] Biden on March 29, 2022, and confirmed

unanimously by the Senate on September 14, 2022, for a second term expiring on January 29,

2028." Pls.' Facts ¶ 2 (citing LeBlanc Decl. ¶ 3); see Defs.' Facts ¶ 2. "Plaintiff Edward Felten

was nominated [to the PCLOB] by President Trump in March 2018[,] . . . and confirmed

unanimously by the Senate in October 2018, for a term expiring January 29, 2019." Pls.' Facts

¶ 3 (citing Felten Decl. ¶ 2); see Defs.' Facts ¶ 3. "Dr. Felten was renominated by President

Trump on March 14, 2019[,] and reconfirmed unanimously by the Senate on June 27, 2019, for a

second term that [ ] ran through January 29, 2025." Pls.' Facts ¶ 4 (citing Felten Decl. ¶ 2); see

Defs.' Facts ¶ 4. However, under the PCLOB's organic statute, Dr. Felten was eligible to

continue serving at his discretion until either his successor was confirmed or one year after the

date of the expiration of his first term, i.e., January 29, 2026, whichever occurred first. See Pls.'

Facts ¶ 5 (citing Felten Decl. ¶ 2); Defs.' Facts ¶ 5; see also 42 U.S.C. § 2000ee(h)(4)(D). Both

plaintiffs "have expertise in civil liberties and privacy and experience relevant to their service on

the PCLOB." Pls.' Facts ¶ 7; Defs.' Facts ¶ 7; see LeBlanc Decl. ¶ 4 (detailing Mr. LeBlanc's

credentials); Felten Decl. ¶ 3 (detailing Dr. Felten's credentials). And, both plaintiffs are

Democrats. See Pls.' Facts ¶ 13; Defs.' Facts ¶ 13.

On "January 21, 2025, . . . [the p]laintiffs each received separate emails from [d]efendant

Morse, sent from a White House email address," stating:

> On behalf of President Donald J. Trump, I am writing to request your resignation
> as a Member of the Privacy and Civil Liberties Oversight Board. Please submit

---

[7] The defendants take issue with the plaintiffs' representation that the plaintiffs were "confirmed unanimously"
because, according to the defendants, they were "confirmed by a voice vote, which is not necessarily unanimous and
where the tally of votes is not recorded." Defs.' Facts ¶ 1; see id. ¶¶ 3, 4 (incorporating the same objection).

your resignation to me by close of business on Thursday, January 23, 2025. If we have not received your resignation by that time, your position will be terminated. Should the President determine your services are still needed, you will receive additional correspondence.[8]

Pls.' Facts ¶ 14 (citations omitted); Defs.' Facts ¶ 14. "Defendant Morse did not identify any cause or offer any explanation for the requested resignation or for the threatened termination of" either plaintiff, Pls.' Facts ¶¶ 15–16; Defs.' Facts ¶¶ 15–16, and neither of the plaintiffs was "provided advanced notice, a hearing, or any other process prior to the President's decision to terminate them[,]" Pls.' Facts ¶ 17; see Defs.' Facts ¶ 17 (indicating that the plaintiffs "received notice that the President was requesting their resignation on January 21, 2025, and that they would be terminated effective January 23, 2025, if they did not do so"). Despite receiving these emails, the plaintiffs did not—and to date, have not—resigned from their positions as members of the PCLOB, see Pls.' Facts ¶ 18; Defs.' Facts ¶ 18, and "continued working on PCLOB matters through Monday, January 27[, 2025,]" Pls.' Facts ¶ 22; see Defs.' Facts ¶ 22.

The plaintiffs represent that defendant Williams, a Republican and the sole remaining member of the PCLOB, see Pls.' Facts ¶ 13; Defs.' Facts ¶ 13, along with defendant Fitzpatrick, the Executive Director of the PCLOB, effectuated the plaintiffs' challenged terminations, see Pls.' Facts ¶ 19. Specifically, the plaintiffs represent that on "January 23, 2025, [d]efendant Williams informed PCLOB staff that the three Democratic Board members would be terminated that evening[,]" id., and "ordered PCLOB staff to stay past the close of business . . . for the purpose of effectuating [the p]laintiffs' anticipated removals from the Board[,]"[9] id. ¶ 20. The

---

[8] The third Democratic member and then-Chair of the Board, Sharon Bradford Franklin, whose extended term was set to expire on January 29, 2025, also received such an email. See Pls.' Facts ¶¶ 12–13; Defs.' Facts ¶¶ 12–13.

[9] The defendants argue that the plaintiffs "fail[ed] to support the allegations" regarding defendant Williams' involvement in their termination because the allegations in the LeBlanc and Felten declarations "are both based solely on inadmissible hearsay" due to the fact that they represent that the plaintiffs were told by PCLOB staff members about what they had been told. Defs.' Facts ¶ 19; see id. ¶¶ 20, 23, 24. The defendants further argue that

(continued . . .)

13

plaintiffs further represent that, on January 27, 2025, after "[d]efendant Morse notified [d]efendant Williams to terminate [the p]laintiffs[,]" id. ¶ 23, defendant Williams "directed PCLOB staff to cut off [the p]laintiffs' access to their PCLOB email accounts, revoke their access to the PCLOB's offices, remove them from the PCLOB website as active Board members, and terminate them from the agency[,]" id. ¶ 24.  That same day, the plaintiffs received notifications "that they had been locked out of their PCLOB email accounts."  Id. ¶ 25; Defs.' Facts ¶ 25.

Later on January 27, 2025, the "[p]laintiffs received, via their non-government email addresses, separate emails from [d]efendant Morse," stating: "This email confirms that your position on the Privacy and Civil Liberties Oversight Board was terminated on Thursday, January 23, 2025, at 17:01."  Pls.' Facts ¶ 26; Defs.' Facts ¶ 26.  After both plaintiffs "requested a copy of the official Presidential action terminating them[,]" Pls.' Facts ¶ 27; Defs.' Facts ¶ 27,

---

(. . . continued)

the plaintiffs "cannot testify to [d]efendant Williams's state of mind[]" in regards to their allegation that she ordered PCLOB staff to stay late for the purpose of effectuating the plaintiffs' removals.  Id. ¶ 20.  However, as the plaintiffs note, Federal Rule of Evidence 801(d)(2)(D) directs that a statement is not hearsay when it is "offered against an opposing party and[] . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed . . ."  Fed. R. Evid. 801(d)(2)(D).

Here, the PCLOB itself is a party, and the challenged statements were made by PCLOB staff members to the plaintiffs—themselves PCLOB employees until their challenged terminations—about directions they allegedly received from defendant Williams as part of their duties as PCLOB staff members.  Further, these staff members were allegedly told by defendant Williams that they were expected to remove the plaintiffs from the PCLOB website.  See Pls.' Facts ¶ 20.  And, counter to the defendants' position, the mere fact that the staff members are at this point unidentified does not preclude these statements from being converted into admissible evidence in light of the circumstantial evidence that they were speaking on a matter within the scope of their employment.  See, e.g., Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 134 (3d Cir. 1997) (concluding that statements made by unidentified meeting participants were admissible because "the sources of the statements are identified sufficiently to establish that they were made by agents of [the defendant corporation] acting within the scope of and during the existence of their employment relationship") (citation omitted)).  Therefore, based on this record, the Court concludes that the plaintiffs' evidence is "capable of being converted into admissible evidence," Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007), and, thus, its consideration is permissible at the summary judgment stage.  And, because the defendants do not otherwise dispute these facts, the Court will consider them as undisputed for the purposes of this Memorandum Opinion.  See Fed. R. Civ. P. 56(e)(2).

14

defendant Morse responded to Mr. LeBlanc: "This email serves as the Presidential action[,]"[10] Pls.' Facts ¶ 29; Defs.' Facts ¶ 29. "Defendant Morse's January 27[, 2025,] email did not identify any cause or offer any explanation for [the p]laintiffs' termination[,]" Pls.' Facts ¶ 31 (citations omitted); see Defs.' Facts ¶ 31, and the plaintiffs represent that President Trump has not otherwise informed them that they were terminated for cause,[11] see Pls.' Facts ¶¶ 32–33 (citations omitted); Defs.' Facts ¶¶ 32–33.

The plaintiffs emphasize that "[t]he President terminated all three Democratic members of the Board but did not terminate Ms. Williams, the sole Republican member of the Board." Pls.' Facts ¶ 35; Defs.' Facts ¶ 35. And, because the PCLOB already had two vacant Board positions, the plaintiffs represent that the President's decision to terminate the three Democratic members means that "[t]he PCLOB now lacks the quorum necessary to conduct its statutorily mandated functions."[12] Pls.' Facts ¶ 37; see also 42 U.S.C. § 2000ee(h)(5). Specifically, the plaintiffs note that prior to their challenged terminations, they "were working on PCLOB's mandatory semi-annual report to Congress, a report on the use of facial recognition in aviation security, and a forthcoming report to Congress on Section 702 of the Foreign Intelligence Surveillance Act[ ('Section 702'),]" ahead of the expiration of its statutory authorization in April 2026. Pls.' Facts ¶¶ 38–39; see generally 50 U.S.C. § 1551(a). The plaintiffs further indicate that because "[d]rafting the PCLOB's report on Section 702 will take many months and the

---

[10] According to the plaintiffs, "[d]efendant Morse did not respond to Dr. Felten['s request for a copy of the official Presidential action terminating his position]." Pls.' Facts ¶ 28; see Defs.' Facts ¶ 28.

[11] As with the plaintiffs, then-Chair Bradford Franklin, was terminated on January 27, 2025, with no indication of cause for her termination. See Pls.' Facts ¶¶ 13, 30, 34; Defs.' Facts ¶¶ 13, 30, 34.

[12] The defendants do not dispute that the PCLOB now lacks a quorum, but they do challenge the plaintiffs' assertion "that this quorum is necessary for the Board to continue to conduct its statutorily mandated functions[,]" Defs.' Facts ¶ 37, representing instead that the Board has "significant authority . . . to operate in a sub-quorum status[,]" id., including "continu[ing] to work on projects previously opened by a quorate Board, as well as issu[ing] staff reports and reports by individual members[,]" id. (citation omitted). The Court discusses this dispute in the context of the plaintiffs' entitlement to a permanent injunction. See infra Sec. III.B.2.

report will need to clear an extensive accuracy and classification review[,]" Pls.' Facts ¶ 40 (citations omitted); see Defs.' Facts ¶ 40, "[i]f [they] are not reinstated, it is highly unlikely that the PCLOB's report on Section 702 will be completed before Congress is required to act on the Section 702 reauthorization[,]"[13] Pls.' Facts ¶ 41.

## C.    Procedural History

The plaintiffs filed their original Complaint in this case on February 24, 2025, see Complaint ("Compl.") at 1, ECF No. 1, and they subsequently filed their Amended Complaint on March 12, 2025, see Am. Compl. at 1.  On that same date, the plaintiffs filed their motion for an expedited summary judgment decision.  See Pls.' Mot. at 1.  On April 3, 2025, the defendants filed their combined opposition to the plaintiffs' motion and cross-motion for an expedited summary judgment ruling.  See Defs.' Mot. at 1.  On April 16, 2025, the plaintiffs filed their combined opposition to the defendants' cross-motion and reply in support of their motion for summary judgment.  See Pls.' Opp'n at 1.  And, on April 23, 2025, the defendants filed their reply in support of their cross-motion for summary judgment.  See Defs.' Reply at 1.  Upon the parties' completion of their summary judgment briefing, and considering the parties' requests for expedited resolution of this matter, the Court held a hearing on the parties' motions on April 30, 2025.  See Minute ("Min.") Entry (Apr. 30, 2025).  And, following the hearing, the Court ordered the plaintiffs to submit supplemental declarations in support of their arguments regarding the availability of backpay.  See Order at 1 (May 9, 2025), ECF No. 19; see LeBlanc 2d Suppl. Decl.; Felten 2d Suppl. Decl.

---

[13] The defendants dispute the plaintiffs' representations, indicating instead "that, because the Board issued an extensive report on Section 702 less than two years ago, the amount of time required to prepare this update, which will be far shorter, is substantially less[,]" Defs.' Facts ¶ 40, and therefore, they contend that it is "unduly speculative" to represent that the Board will be unable to complete an update to its report before Congress is required to act on the Section 702 reauthorization, id. ¶ 41.

## II.    STANDARD OF REVIEW

### A.    Motion for Summary Judgment Pursuant to Federal Rule of Civil Procedure 56

A court may grant a Rule 56 motion for summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment[.]" Id. The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Accordingly, unsupported allegations or conclusory statements are not sufficient to defeat summary judgment, see Ass'n of Flight Attendants-CWA v. U.S. Dep't of Transp., 564 F.3d 462, 465–66 (D.C. Cir. 2009); Pub. Citizen Health Rsch. Grp. v. Food & Drug Admin., 185 F.3d 898, 908 (D.C. Cir. 1999) ("[C]onclusory allegations unsupported by factual data will not create a triable issue of fact."

17

(citations and internal quotation marks omitted)).  And, the non-moving party "must set forth specific facts showing that there [are] genuine issue[s] for trial," Anderson, 477 U.S. at 256. Therefore, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a summary judgment motion; rather, "there must be [some] evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.

When a non-moving party supports its position via affidavit or declaration, "[it] must set forth . . . specific facts[,]" Ass'n of Flight Attendants-CWA, 564 F.3d at 465 (internal quotation marks omitted), pursuant to Rule 56(e), "that is, it 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated,'" id. (quoting Fed. R. Civ. P. 56(e)(1)).  "Although, as a rule, statements made by the party opposing a motion for summary judgment must be accepted as true for the purpose of ruling on that motion, some statements are so conclusory as to come within an exception to that rule." Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); see also Dist. Intown Props. Ltd. P'ship v. District of Columbia, 198 F.3d 874, 878 (D.C. Cir. 1999) ("[T]he court must assume the truth of all statements proffered by the non-movant except for conclusory allegations lacking any factual basis in the record." (emphasis added)).  Moreover, the non-moving party "must support his allegations . . . with facts in the record; a mere unsubstantiated allegation . . . creates no genuine issue of fact and will not withstand summary judgment[.]"  Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993).

## III.    ANALYSIS

The plaintiffs argue that they are entitled to summary judgment on their claims because "the PCLOB's organic statute prohibits the President from removing Board members without cause[,]" Pls.' Mem. at 17, and that, under Supreme Court precedent, "the PCLOB is precisely

18

the kind of nonpartisan, multi-member, expert agency that Congress can constitutionally insulate from at-will removal[,]" rendering the President's removal of the plaintiffs unlawful,[14] id. at 2. Accordingly, the plaintiffs request that the Court "declare the[ir] purported terminations . . . to be unlawful," id. at 34, as well as issue an injunction or writ of mandamus "requiring the immediate reinstatement of [the] plaintiffs to their position as Board members and forbidding any actions that would deprive the plaintiffs of their ability to carry out their duties as Board members[,]" id.

In response, the defendants argue that they are entitled to summary judgment because, "[u]nlike in other cases presenting seemingly similar issues, the Board's organic statute does not impose any restrictions on the President's authority to remove Board [m]embers[,]" Defs.' Mem. at 1 (citation omitted), and, even if the Court could construe the statute to include such a restriction, it should refrain from doing so pursuant to the canon of constitutional avoidance, see id. at 16. Further, the defendants argue that "even if any removal protections could be divined, [the p]laintiffs would not be entitled to reinstatement[,]" id. at 2, because the Court lacks the authority to order reinstatement and the plaintiffs "have not demonstrated that mandamus is warranted[,]" id. at 20.

The Court will first address whether the PCLOB's organic statute protects Board members from at-will removal by the President, either by its plain text or based on the Board's structure and function. Because it ultimately concludes that it does, and that such protections are consistent with the separation of powers, the Court will then address whether the plaintiffs are entitled to any of their requested relief.

---

[14] Because the Court ultimately concludes that the plaintiffs' removals were unlawful under federal law, the Court need not reach the question of whether their removals violate the Due Process Clause. See Pls.' Mem. at 33–34.

A.    **Whether the President's Removal of the Plaintiffs Was Unlawful**

1.    **Whether the PCLOB's Organic Statute Restricts the Authority of the President to Remove Members of the PCLOB at Will**

As indicated above, the plaintiffs argue that they are entitled to summary judgment on their claims because "the PCLOB's organic statute prohibits the President from removing Board members without cause." Pls.' Mem. at 17. The defendants do not contend that the plaintiffs' removals were for cause, but rather that their removals were lawful because "the Board's organic statute does not impose any restrictions on the President's authority to remove Board [m]embers." Defs.' Mem. at 1 (citing 42 U.S.C. § 2000ee). The Court will address each of these arguments in turn.

Under Supreme Court precedent, "absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'" Carlucci v. Doe, 488 U.S. 93, 99 (1988) (quoting Keim v. United States, 177 U.S. 290, 293 (1900)). Therefore, "[b]ecause of the background presumption that the President may remove anyone he appoints, Congress must make it clear in a statute if it wishes to restrict the President's removal power." Severino v. Biden, 71 F.4th 1038, 1044 (D.C. Cir. 2023) (citing Carlucci, 488 U.S. at 99). Congress can make such a restriction clear in one of two ways: (1) through "the plain text of [the] statute[,]" Severino, 71 F.4th at 1044 (first citing Seila L. LLC v. Consumer Fin. Prot. Bureau, 591 U.S. 197, 230–31 (2020); then citing Carlucci, 488 U.S. at 99); or (2) "through the statutory structure and function of an office[,]" id. (first citing Seila L., 591 U.S. at 230; then citing Wiener v. United States, 357 U.S. 349, 353 (1958)).

"These two tests ask only whether a statute should be read as limiting the President's removal power." Id. at 1044 n.2. "If a statute does so, the question of the constitutionality of that restriction would still need to be decided." Id. (citing Free Enter. Fund v. Pub. Co. Acct.

Oversight Bd., 561 U.S. 477, 486–87 (2010)).  However, because "[c]ourts will not assume Congress legislated a potential separation of powers problem unless the statutory text makes Congress's intent to test constitutional lines apparent[,]" id. at 1044 (citing, inter alia, Jennings v. Rodriguez, 583 U.S. 281, 296 (2018) (noting that "[w]hen a 'serious doubt' is raised about the constitutionality of an Act of Congress," courts, pursuant to the canon of constitutional avoidance, will seek to avoid such constitutional questions so long as "after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction") (citations omitted)), once a Court has concluded under Severino that Congress clearly indicated such a removal restriction, the canon of constitutional avoidance does not apply and the Court must proceed to determine the constitutionality of that restriction.

The Court will address each of these tests in turn, before proceeding to the constitutional analysis, if necessary.

### a.    Whether the Plain Text of the PCLOB's Organic Statute Restricts the President's Removal Power

The plaintiffs rely on the legislative history of the PCLOB's organic statute, as well as collateral provisions in its current text, for the proposition that Congress—although it did not include an express textual removal restriction—nonetheless clearly intended to protect Board members from removal by the President, at least without cause.  See Pls.' Mem. at 19.  Specifically, the plaintiffs argue that, in response to the above-discussed concerns relating to the PCLOB's independence as initially constituted, Congress "substantially amended the Board's organic statute[]" to ensure the Board's independence.  Id.  In support of their position, the plaintiffs emphasize that, in amending the PCLOB's organic statute:

> Congress removed the Board from the Executive Office of the President, deleted language stating that Board members "serve[d] at the pleasure of the President," deleted language stating that the "Board shall perform its functions within the

[E]xecutive [B]ranch and under the general supervision of the President," added a
requirement of partisan balance, and gave Board members fixed terms of office.

Id.  Thus, according to the plaintiffs, "[t]he[] [amended] textual provisions, along with the text

Congress deleted when it amended the statute in 2007, make it unambiguously clear that

Congress intended to impose removal restrictions."  Id. at 20.  And, according to the plaintiffs,

because the PCLOB's organic stature directs that "[e]ach member of the Board shall serve a term

of [six] years[,]" 42 U.S.C. § 2000ee(h)(4) (emphasis added), with no caveats, the statute clearly

"mandates that members will hold office for a fixed six-year term, not only so long as the

President chooses to keep them[,]" Pls.' Mem. at 20.

The defendants respond that the absence of an explicit restriction on removal in the

PCLOB's organic statute is fatal to the plaintiffs' claims because "[w]here Congress intends to

protect principal officers from removal, it does so clearly."  Defs.' Mem. at 3 (citations omitted).

Thus, according to the defendants, the plaintiffs' reliance on the statute's legislative history and

these collateral provisions are futile.  See id. at 4.  Moreover, the defendants contend that the

plaintiffs' reading of the PCLOB's organic statute would insulate the plaintiffs from any removal

by the President, including for significant misconduct and wrongdoing, "mean[ing] that

congressional silence as to removal offers stronger removal protections than [other] statutes

invalidated" by the Supreme Court in prior cases.  Id.  Finally, the defendants argue that the

plaintiffs' reliance on the changes Congress made in the 9/11 Commission Act is misplaced

because "Congress replaced [IRTPA] Section 1061 wholesale, remodeling the Board and

replacing its original organic statute with what was, in effect, an entirely new statutory

provision[,]" and thus, "[t]his is not an instance in which a reader may draft inferences from

Congress's choice to line-item remove certain provisions from the statute."  Id. at 7.

22

In construing whether the PCLOB's organic statute provides restrictions on the removal of Board members, several well-settled principles of statutory interpretation must guide the Court's analysis.  First, as with any issue of statutory interpretation, the Court must "begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  United States v. Albertini, 472 U.S. 675, 680 (1985) (quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)).  Thus, where the statute of the language is "plain, 'the sole function of the courts is to enforce it according to its terms.'"  United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241 (1989) (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917)).  Moreover, the Court must also interpret the statute so as "to give effect, if possible, to every clause and word of a statute."  Duncan v. Walker, 533 U.S. 167, 174 (2001) (quoting United States v. Menasche, 348 U.S. 528, 538–39 (1955)).  In doing so, the Court is mindful that "[s]tatutory construction . . . is a holistic endeavor."  United Savings Ass'n v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 371 (1988).  Therefore, the Court must consider "the object and policy of the entire statutory scheme in interpreting a provision within that scheme."[15]  United States v. Fahnbulleh, 742 F. Supp. 2d 137, 146 (D.D.C. 2010) (Walton, J.) (citing Richards v. United States, 369 U.S. 1, 11 (1962)) (holding that courts must not construe statutory provisions "in isolation from the context of the whole Act," but rather courts "must look to the provisions of the whole law, and to its object and policy").

---

[15] The Court is unpersuaded by the defendants' argument that because Congress engaged in a "complete overhaul" of the PCLOB's organic statute and did not include an explicit removal provision, the Court should essentially discount the import of any individual change to the statute.  Defs.' Reply at 8.  The defendants provide no legal authority that supports their position, and, as the plaintiffs note, courts—including the Supreme Court—regularly engage in statutory interpretation under similar circumstances.  See Pls.' Opp'n at 6 (citing Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241 (2004)).

However, in conducting its analysis, the Court must also adhere to the Supreme Court's admonition that "absent a 'specific provision to the contrary, the power of removal from office is incident to the power of appointment.'"  Carlucci, 488 U.S. at 99 (quoting Keim, 177 U.S. at 293) (emphasis added).  As another member of this Court has noted, because "Congress knows how to codify an explicit removal protection[,]" Stirrup v. Biden, 662 F. Supp. 3d 12, 24 (D.D.C. 2023), "it is doubtful that anything [other] than an explicit removal protection would constitute a 'specific provision' under Carlucci," id. at 25 (citing Carlucci, 488 U.S. at 99).

And, in Severino, the District of Columbia Circuit implicitly incorporated Carlucci's requirement for a "specific provision" in concluding that Congress may clearly indicate its intent to impose a removal restriction in the "plain text of a statute."  71 F.4th at 1044 (citing Carlucci, 488 U.S. at 99).  This comports with the Supreme Court's decision in Seila Law, which Severino also cited for that same proposition, in which the Supreme Court focused on the specific provision in the Dodd-Frank Act that provided for-cause removal protections.  See Seila L., 591 U.S. at 229 (interpreting the Act's provision that the Director of the Consumer Financial Protection Bureau (the "CFPB") "may be removed for 'inefficiency, neglect of duty, or malfeasance in office[]'" (quoting 12 U.S.C. § 5491(c)(3)).  Thus, the most natural reading of Severino is that the first test, i.e., the "plain text" test, is a narrow inquiry focused on whether there is a "specific provision" expressly restricting removal, as opposed to the second test's broader inquiry as to an agency or board's "structure and function," which is derived from the statutory text as a whole.  See Severino, 71 F.4th at 1047 (noting that when an agency's structure and function is "operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential

24

removal, even without an <u>explicit textual statement</u> to that effect") (emphasis added) (citations omitted).

Here, as indicated above, the plaintiffs rely on several collateral provisions contained in the statute—along with the statute's legislative history—in support of their position that Congress made it clear through the "plain text" of the statute that PCLOB members are entitled to removal protection. Specifically, the plaintiffs argue that (1) the removal of the PCLOB from the Executive Office of the President; (2) the deletion of statutory language stating that Board members "serve[d] at the pleasure of the President[;]" (3) the deletion of language stating that the Board was to perform its work "under the general supervision of the President[;]" (4) the addition of a requirement of partisan balance; and (5) the addition of a fixed term-of-office provision amount to such a clear indication of Congress's intent to limit the President's removal power, despite the lack of any express textual removal restriction in the statutory language. Pls.' Mem. at 19.

For the following reasons, the Court concludes that these provisions, even when considered collectively, do not satisfy <u>Carlucci</u>'s "specific provision" requirement, as incorporated by <u>Severino</u>. First, the plaintiffs argue that the requirement that "[e]ach member of the Board <u>shall serve</u> a term of [six] years[,]" 42 U.S.C. § 2000ee(h)(4), "is inconsistent with removal at will[,]" Pls.' Mem. at 20, because "[t]he plain statutory text mandates that members will hold office for a fixed six-year term, not so long as the President chooses to keep them[,]" <u>id.</u> However, the D.C. Circuit in <u>Severino</u> concluded that Supreme Court precedent counsels that "a defined term of office [acts] as a cap rather than an entitlement." 71 F.4th at 1075. In reaching this conclusion, the Circuit relied on the Supreme Court's decision in <u>Parsons v. United States</u>, in which the Supreme Court upheld the President's removal of U.S. Attorneys from office

despite a term-of-office provision directing that they "shall be appointed for a term of four years."  167 U.S. 324, 338 (1897).  And, as the Circuit noted in <u>Severino</u>, "[t]he Supreme Court subsequently reaffirmed <u>Parsons</u>' understanding of a defined term of office as a cap rather than entitlement."  71 F.4th at 1045 (citing <u>Myers v. United States</u>, 272 U.S. 52, 146–47 (1926)).  Thus, as another member of this Court has noted, "the most natural reading of <u>Parsons</u>[ is] that such provisions are not standalone restrictions on the President's removal power."  <u>Spicer v. Biden</u>, 575 F. Supp. 3d 93, 99 (D.D.C. 2021).

The plaintiffs argue that <u>Parsons</u> and <u>Severino</u> are distinguishable for two reasons.  First, they argue that the language in the PCLOB's organic statute mandating that members "shall serve" their fixed terms is distinct from the statutory language in <u>Parsons</u>, which provided that officers "shall be appointed for a term of four years[,]" 167 U.S. at 327–28.  However, another member of this Court has rejected term-of-office provisions as express textual removal restrictions under similar circumstances where members "serve for three years each" "except that any member whose term of office has expired <u>shall continue to serve</u> until his successor is appointed."  <u>Spicer</u>, 575 F. Supp. 3d at 95; <u>see also</u> <u>id.</u> at 99 (concluding that <u>Parsons</u> and its progeny foreclosed that plaintiff's efforts to distinguish <u>Parsons</u> based on the same legislative history here).  The plaintiffs' argument in this case appears to indicate that where, as in <u>Spicer</u>, members "serve" fixed terms, but "shall continue to serve" thereafter until their successor assumes the position, they are removable at will during their designated terms but are only removable for cause after that term expires.  The Court doubts that Congress would intentionally create such an outcome based on the statutory text.  Thus, the Court cannot conclude that, despite binding precedent and the untenable practical implications of the plaintiffs' argument, the PCLOB members' term-of-office provision constitutes an express textual removal restriction.

In further support of their position, the plaintiffs emphasize that other courts, including the D.C. Circuit, have upheld implied removal protections relating to other agencies with "shall serve" statutory language.  See Pls.' Opp'n at 12–13.  However, those courts' assumptions that members of the agencies at issue were protected from at-will removal were based on the structure and function of the agencies in those cases, rather than on the particular statutory language governing those agencies.[16]  See Federal Election Comm'n v. NRA Pol. Victory Fund, 6 F.3d 821, 826 (D.C. Cir. 1993) (noting that the Federal Election Commission "is patterned on the classic independent regulatory agency sanctioned . . . in Humphrey's Executor[v. United States, 295 U.S. 602 (1935),]" and concluding that the limitation on the President's removal power could likely be implied "by the Commission's structure and mission as well as the commissioners' terms"); Secs. & Exch. Comm'n v. Blinder, Robinson & Co., 855 F.2d 677, 682 (10th Cir. 1988) (drawing parallels between the Securities and Exchange Commission's function and that of the Federal Trade Commission in Humphrey's Executor). Therefore, to the extent these cases have any bearing on the plaintiffs' claims, they provide guidance as to whether the structure and function of the PCLOB prescribes the outcome in this case, not whether the plain text of the statute does so.

Second, the plaintiffs argue that, unlike in Severino, the term-of-service provision does not stand alone, because Congress clearly indicated a textual removal protection by its removal of the PCLOB from the EOP, as well as its deletion of statutory language stating that Board members "serve[d] at the pleasure of the President" and operated under the "general supervision

---

[16] Nor is the Court persuaded by the plaintiffs' argument that because Congress has "repeatedly paired 'shall serve' language with explicit removal carveouts in other appointment statutes, . . . Congress understands the phrase standing alone to confer tenure protections[,]" Pls.' Opp'n at 13 (listing statutes), because adopting such an interpretation would be directly at odds with Parsons, which remains binding on this Court, and would run counter to the presumption that "Congress legislates against the backdrop of existing law[,]" Parker Drilling Mgmt. Servs., Ltd. v. Newton, 587 U.S. 601, 611 (2019) (quoting McQuiggin v. Perkins, 569 U.S. 383, 398 n.3 (2013)).

of the President[.]"  Pls.' Mem. at 21.  To be sure, this legislative history provides support for Congress's intent to make the PCLOB more independent, and it is relevant to the Court's analysis of the PCLOB's structure and function set forth below.  However, the plain text of the statute does not allow the Court to read into the statute a "specific provision"—i.e., an express textual removal restriction—where there is not one.[17]  Carlucci, 488 U.S. at 99.

The plaintiffs also emphasize that the 2007 amendments indicated that the PCLOB was to be an "independent" agency in light of Congress's other revisions to the PCLOB's organic statute because the Board would not be able to operate independently if the President could remove members at will over policy disagreements.  See Pls.' Mem. at 23.  However, the Supreme Court has noted that the term "independent" alone "does not necessarily mean that [an] [a]gency is 'independent' of the President[,]" rather than merely indicating that it "is not part of and is therefore independent of any other unit of the Federal Government."  Collins v. Yellen, 594 U.S. 220, 248–49 (2021).  Again, Congress's revisions to the PCLOB's organic statute may indeed indicate that the Board's "structure and function" is incompatible with at-will removal, Severino, 71 F.4th at 1044, but regarding the plain text of the statute alone, Congress's characterization of the PCLOB as "independent" in its organic statute does not convert any of the collateral provisions in the statute into an express textual removal restriction, see Collins, 594 U.S. at 249.

Finally, and most importantly, the fact that Congress revised the statutory text and still failed to include an express protection against removal further cuts against the plaintiffs' argument that the plain text of the statute provides a removal restriction.  Accordingly, the Court

---

[17] Similarly, although the plaintiffs argue that such a reading of the plain text of the statute would nullify many of the other provisions Congress changed in 2007, see Pls.' Mem. at 22–23, those changes are relevant to the revisions of the PCLOB's structure and function, not to the existence of any "specific provision" regarding removal, Carlucci, 488 U.S. at 99.

concludes that the "plain text" of the PCLOB's organic statute does not clearly indicate Congress's intent to impose a removal restriction.  Severino, 71 F.4th at 1044.  The Court will therefore next address whether the structure and function of the PCLOB clearly indicates Congress's intent to impose such a removal restriction, even absent an explicit textual removal limitation provision in the statute.

### b.    Whether the Structure and Function of the PCLOB Indicates Congress's Intent to Restrict the President's Removal Power

The plaintiffs argue that Congress "'clearly indicate[d] its intent to restrict removals through the statutory structure and function' of the PCLOB[,]" Pls.' Mem. at 23 (quoting Severino, 71 F.4th at 1044), because: (1) "[t]he Board's composition, requirements for the appointment of members, and the structure of members' terms each reflect Congress's design to insulate members from presidential control and removal[,]" id.; and (2) its "functions make clear that independence from presidential influence is critical and that Congress thus could not have sought to allow removal at will[,]" id. at 26.  The defendants respond that the plaintiffs have "fail[ed] to demonstrate that the structure and function of the Board are 'operationally incompatible with at-will presidential removal[,]'" Defs.' Mem. at 11 (quoting Severino, 71 F.4th at 1047), in light of the omission of any explicit removal restriction, and because the Board "serves primarily advisory functions[]" directed at the Executive Branch, see id. at 13.  The defendants further argue that, had Congress included removal restrictions, such restrictions "would present constitutional questions about the applicability of Humphrey's Executor to" the PCLOB based on those functions, id. at 15, and thus, the canon of constitutional avoidance counsels in favor of their narrower interpretation of the statute, see id. at 16.

As indicated above, the Circuit in Severino noted that Congress can make a removal restriction clear based on the "structure and function" of the agency in question.  71 F.4th at

1044 (first citing <u>Seila L.</u>, 591 U.S. at 230; then citing <u>Wiener</u>, 357 U.S. at 353).  According to the Circuit, "under <u>Humphrey's Executor</u>'s and <u>Wiener</u>'s binding precedent, when Congress assigns to an agency quasi-judicial or quasi-legislative functions that are deemed to be operationally incompatible with at-will Presidential removal, that can be a relevant signal that Congress meant for members of that agency to be shielded from Presidential removal, even without an explicit textual statement to that effect."  <u>Id.</u> at 1047.  And, as previously indicated, courts, including the D.C. Circuit, have indicated precisely that regarding two other independent agencies, namely the Federal Election Commission (the "FEC") and the Securities and Exchange Commission (the "SEC").  <u>See</u> <u>Federal Election Comm'n</u>, 6 F.3d at 826 (noting that it was "likely correct" that, even in the absence of an express removal provision, the President could only remove members of the FEC for cause); <u>Blinder, Robinson & Co.</u>, 855 F.2d at 681 (assuming, in the absence of an express removal provision, that the President had the authority to remove SEC members only for cause).

In <u>Severino</u>, the D.C. Circuit concluded that the structure and function of the Administrative Conference of the United States ("ACUS" or "the Conference") were not "operationally incompatible with at-will Presidential removal[,]" 71 F.4th at 1047, because "[f]ar from the 'absolute freedom from Executive interference' deemed so mission-critical in <u>Humphrey's Executor</u> and <u>Wiener</u>, the Council's design and function reflect the opposite: Integration and cooperation with the Executive Branch is vital to the successful accomplishment of the Conference's consultative role[,]" <u>id.</u> at 1049 (internal citation omitted).

In doing so, the D.C. Circuit made clear that the ACUS's structure had none of the qualities of a classic independent agency or board in <u>Humphrey's Executor</u> or <u>Wiener</u>.  The ACUS was made up of between "75 and 101 members who reflect a mix of governmental and

30

outside experts[,]" far from the classic five-member board structure.  See Severino, 71 F.4th at 1040 (citing 5 U.S.C. § 593(a)).  And, roughly half of the ACUS members were subject to removal at will because their positions on the ACUS were a byproduct of their other positions in the Executive Branch, underscored by the fact that they were to act as representatives of those agencies as part of the ACUS.  See 71 F.4th at 1049 (noting that Congress "made roughly half of the Conference's membership, and up to half of the Members of the Council, employees of the Executive Branch").  Congress also gave ACUS members three-year terms, "ensuring that no member could outlast a President."  Id. (citing 5 U.S.C. § 595(b)).  And, although the members of the ACUS served staggered terms, the Circuit noted that the staggered nature of the ACUS members' terms was not designed to last because half of the members were Executive Branch members and would change with the administration.[18]  See id.  Finally, the Circuit noted that although the fact that non-governmental ACUS members were unpaid "gives them a certain independence from the President and Congress[,]" their "volunteer service[] . . . only underscores how diametrically opposed their role is to the weighty quasi-judicial jobs at issue in Wiener and Humphrey's Executor."  Id.

Apart from its structure, the D.C. Circuit also emphasized the clear distinctions between the ACUS's wholly advisory function and the functions of the independent agencies at issue in Humphrey's Executor and Wiener.  The Circuit concluded that "[p]roducing advice for the Executive Branch is the Conference's raison d'etre[,]" id. at 1048, and that it was "created specifically for the purpose of helping '[f]ederal agencies, assisted by outside experts' to 'study

---

[18] Although not discussed by the Circuit, other ACUS member selection requirements underscore the sharp contrast between the ACUS and classic independent agencies and boards.  Specifically, while the ACUS Chairman was to select certain members "in a manner which will provide broad representation of the views of private citizens and utilize diverse experience[,]" see 5 U.S.C. § 593(b)(6), and was to select among individuals with expertise in federal administrative procedure, see id., there was no requirement of partisan balance, see generally id. § 593.

mutual problems, exchange information, and develop recommendations[,]'" id. (quoting 5 U.S.C. § 591(1)); see also id. (emphasizing that "[t]he Executive Branch is the planet around which all of the [ACUS]'s responsibilities revolve").  And, although the ACUS had a few statutory obligations to "submit informational reports to Congress[,]" id., and it was "permitted to inform the legislative and judicial branches about aspects of administrative procedure[,]" id. (emphasis added) (citing 5 U.S.C. § 594(1)), the Circuit emphasized that "the overwhelming majority of the Conference's work focuses on and contributes to the internal workings of the Executive Branch[,]" id.  Accordingly, the Circuit found that "[t]he occasional assistance [the ACUS] provides to the other Branches is a byproduct of that mission."  Id.  Thus, at bottom, the Circuit concluded that "Congress designed the [ACUS] to be a forum inside the Executive Branch for shop talk and collaboration with external experts[,]" id., rather than a genuinely independent agency.

To the contrary, the PCLOB's structure, unlike that of the ACUS, is clearly "patterned on the classic" multimember expert board at issue in Humphrey's Executor.  Federal Election Comm'n, 6 F.3d at 826.  The PCLOB has five members, each of whom are appointed by the President and confirmed by the Senate, see 42 U.S.C. § 2000ee(h)(1), and each of whom are selected "solely on the basis of" their expertise regarding civil liberties and privacy, see id. § 2000ee(h)(2).  And, unlike the ACUS members, the plaintiffs are not otherwise employees of the Executive Branch, and, by law, cannot be.  See 42 U.S.C. § 2000ee(h)(3).  In that sense, PCLOB members resemble the Federal Trade Commissioners at issue in Humphrey's Executor, who held their positions independent of any other position in the Executive Branch.

The PCLOB is also designed to be nonpartisan, as members are required to be selected "without regard to political affiliation, but in no event shall more than [three] members of the

Board be members of the same political party[,]" id.; and the members serve staggered,[19] six-year terms, see id. § 2000ee(h)(4).  Although the defendants argue that some PCLOB members' terms overlap and thus are not perfectly staggered, see Defs.' Reply at 10, the terms of the members nonetheless appear designed to promote "the independence, autonomy, and non-partisan nature" of the PCLOB, Severino, 71 F.4th at 1049 (quoting United States v. Wilson, 290 F.3d 347, 359 (D.C. Cir. 2002)).  Finally, members of the PCLOB are paid for performing their services as members of the Board, unlike the ACUS members' volunteer service.  See 42 U.S.C. § 2000ee(i)(B); see also Severino, 71 F.4th at 1049.

Second, the PCLOB's function is squarely in line with those of the multimember expert boards recognized by Humphrey's Executor and its progeny.  Although the defendants seek to draw parallels between the quintessentially executive advice function of the ACUS and the PCLOB's function, while part of the PCLOB's function is to provide advice to the Executive Branch, Congress made clear in the 2007 amendments that many of the PCLOB's responsibilities are also to Congress.  See, e.g., 42 U.S.C. § 2000ee(d), (e) (detailing the PCLOB's functions and reporting requirements).  Thus, unlike the ACUS, the PCLOB's responsibilities to Congress are not merely a "byproduct" of its responsibilities to provide advice to the Executive Branch.  Severino, 71 F.4th at 1048.

In contrast to the ACUS's function as a "forum inside the Executive Branch for shop talk and collaboration with external experts[,]" id. at 1049, the PCLOB's function, first and foremost,

---

[19] Although the parties do not dispute that the Board members serve staggered terms, the Court notes that such a stagger is not expressly required by the PCLOB's organic statute.  See generally 42 U.S.C. § 2000ee.  However, it does appear to the Court that members' terms have largely been staggered as a matter of practice, and the PCLOB's own characterizations support a finding that the terms of the members are in fact staggered.  See Privacy & C.L. Oversight Bd., History and Mission, https://www.pclob.gov/About/HistoryMission (last visited May 21, 2025) ("Under the 9/11 Commission Act, the Board is comprised of a full-time Chairman and four part-time Members, each appointed by the President, with the advice and consent of the Senate, to staggered[,] six-year terms.") (emphasis added).

—and consistent with the very name of the Board—is to conduct <u>oversight</u>.[20]  Although the defendants argue that the PCLOB's function, like that of the ACUS, is to "review" Executive Branch regulations and actions, the PCLOB's mandate extends far beyond that function.  As indicated above, Congress, in enacting the changes it did in 2007, reoriented the PCLOB's function away from exclusively advising the President and other Executive Branch officials, and toward also advising Congress in support of its legislative function in the counterterrorism context.  That reorientation was made clear by Congress's removal of language included in the initial iteration of the PCLOB's organic statute that the Board's work was "for the purpose of providing advice to the President" or to the heads of Executive Branch agencies.  <u>Compare</u> 42 U.S.C. § 2000ee(d)(1), <u>with</u> IRTPA § 1061(c)(1), 118 Stat. at 3684.  To the contrary, in the amended statute, that role includes informing Congress of any recommendations made to the Executive Branch that were not adopted, in order to ensure that Congress is aware of any areas for further oversight or legislation in the absence of Executive Branch action.  <u>See</u> 42 U.S.C. § 2000ee(e)(2)(D).

Congress appears to have weighed the PCLOB's recommendations and testimony heavily in its consideration of the reauthorization and reform of certain surveillance authorities within the PCLOB's designated domain, in light of its requests that Board members testify as to whether and to what extent reforms are necessary, <u>see, e.g.</u>, <u>Fixing FISA: How a Law Designed to Protect Americans Has Been Weaponized Against Them</u>, <u>Hearing Before the Subcomm. on Fed. Gov't Surveillance of the H. Comm. on the Judiciary</u>, 118 Cong. 9 (April 27, 2023)

---

[20] The defendants argue that the plaintiffs' emphasis on oversight is misplaced because "Inspectors General, who likewise perform oversight functions within the Executive Branch, 'may be removed from office by the President.'" Defs.' Reply at 12 (quoting 5 U.S.C. § 403(b)(1)(A)).  However, as the plaintiffs noted at the April 30, 2025, motion hearing, the structure and function of Inspectors General differs greatly from the PCLOB.  Specifically, Inspectors General "shall report to and be under the general supervision of" the relevant agency head, 5 U.S.C. § 403(a), which clearly distinguishes it from the PCLOB and other independent boards. Therefore, the defendants' argument on this point is misplaced.

(featuring testimony from two PCLOB members), and its track record of seriously debating—or adopting—many of the PCLOB's recommendations, see, e.g., U.S. Privacy & C.L. Oversight Bd., Recommendations Assessment Report at 1–2 (Feb. 5, 2016) (reporting that Congress's enactment of the USA FREEDOM Act "addressed most of the recommendations in [the] PCLOB's" report on a particular surveillance program).[21]  Thus, the PCLOB's purpose and function is far closer to the Federal Trade Commission's (the "FTC") "specified duties as a legislative . . . aid" in Humphrey's Executor, 295 U.S. at 628, as it is tasked with investigating and providing recommendations to Congress to ensure that new and existing laws adequately protect privacy and civil liberties, and providing oversight of the government's implementation of those laws to ensure that the Executive Branch is acting in conformity with Congress's will.

Beyond these differences, there are significant indicia that the "'absolute freedom from Executive interference' deemed so mission-critical in Humphrey's Executor and Wiener[,]" Severino, 71 F.4th at 1049, is just as mission-critical for the PCLOB's operation.  One such indicia is that "[w]hen performing its fact-finding, investigatory, and monitoring functions, . . . the [PCLOB] is often required to criticize the policies of the Executive that are contrary to" privacy and civil liberties.  Berry v. Reagan, Civil Action No. 83-3182, 1983 WL 538, at *4 (D.D.C. Nov. 14, 1983), vacated as moot, 732 F.2d 949 (D.C. Cir. 1983) (per curiam).

For example, in 2013, a bipartisan group of United States Senators requested that the PCLOB investigate and report publicly on two National Security Agency ("NSA") surveillance programs following the publication of a series of media reports "based on unauthorized disclosures of classified documents by Edward Snowden, a contractor for the [NSA]." Privacy &

---

[21] Available at https://documents.pclob.gov/prod/Documents/OversightReport/8ab510df-738f-44b5-a73a-08d1336d544d/Recommendations_Assessment_Report_20160205%20-%20Completed%20508%20-%2010252022.pdf.

35

C.L. Oversight Bd., <u>Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court</u> 1 (Jan. 23, 2014).[22]  In response, the PCLOB issued two reports—its first report on Section 702, as well as a second report on the telephone records program conducted pursuant to Section 215 of the USA PATRIOT Act.  <u>See</u> <u>id.</u>  And, in the PCLOB's report on Section 215, the majority of the PCLOB concluded that the Section 215 program "d[id] not provide an adequate legal basis to support the program," <u>id.</u> at 10, and that "the program violate[d] the Electronic Communications Privacy Act[,]" <u>id.</u>  The PCLOB majority reached this conclusion after its "independent[] examin[ation]" of the statutory scheme, noting that it "disagreed with the conclusions of the government and the [Foreign Intelligence Surveillance] Court[]" that the program was statutorily authorized.  <u>Id.</u> at 57.  Therefore, the PCLOB recommended that the government terminate the program.[23]  <u>See</u> <u>id.</u> at 168.

The PCLOB's report on Section 215 is far from the only time the PCLOB has been at odds with the Executive Branch over its counterterrorism programs.  Indeed, in its most recent report on Section 702, the PCLOB recommended, <u>inter alia</u>, that Congress require "individualized and particularized judicial review" by the Foreign Intelligence Surveillance Court (the "FISC") for all U.S. person queries of communications obtained through the use of Section 702.  <u>See</u> Privacy & C.L. Oversight Bd., <u>Report on the Surveillance Program Operated</u>

---

[22] Available at https://documents.pclob.gov/prod/Documents/OversightReport/ec542143-1079-424a-84b3-acc354698560/215-Report_on_the_Telephone_Records_Program.pdf.

[23] In making its recommendations, the PCLOB conducted its own independent policy analysis of the value of the Section 215 program, scrutinizing publicly available examples that "members of the intelligence community ha[d] cited as demonstrating successful use of the program." <u>Id.</u> at 148.  Ultimately, the PCLOB determined that these "success stories" did not withstand close scrutiny, <u>id.</u>, and that Executive Branch officials' "suggestions to [the Board] that the program should be preserved because it might [have value] in the future" provided "little reasons to expect that it is likely to provide significant value, much less essential value, in safeguarding the nation in the future[,]" <u>id.</u> at 155.

Pursuant to Section 702 of the Foreign Intelligence Surveillance Act 12 (Sept. 28, 2023).[24]  But see id. at B-44 (Separate Statement of Board Members Beth A. Williams and Richard E. DiZinno) (disagreeing with the Board majority's recommendation for such a requirement). Therefore, it is clear to the Court that the PCLOB's function, contrary to the defendants' assertions at the April 30, 2025, motion hearing, is not only to provide information and advice that the President desires to receive, but is rather to act as an independent, objective check on the exercise of the government's counterterrorism authorities.  And, at times, that might demand the delivery of information critical of the Executive Branch's actions or contrary to its positions.

Based on the above factors, the Court concludes that the PCLOB's structure and function as a multimember, nonpartisan, expert oversight board is "operationally incompatible with at-will Presidential removal[,]" Severino, 71 F.4th at 1047, and thus, it is obvious that Congress intended for the Board to perform its statutory duties without "the Damocles' sword of removal by the President" over members' heads,[25] Wiener, 357 U.S. at 356.  Accordingly, the Court

---

[24] Available at https://documents.pclob.gov/prod/Documents/OversightReport/054417e4-9d20-427a-9850-862a6f29ac42/2023%20PCLOB%20702%20Report%20(002).pdf.

[25] At the April 30, 2025, motion hearing, the defendants argued that the Supreme Court in Collins cast doubt on the availability of removal protections for other boards with a structure similar to that of the PCLOB.  However, the Supreme Court's dicta in Collins—i.e., whether Congress had "impos[ed] any restriction on the President's power to remove the agency's leadership[,]" 594 U.S. at 249—indicates that the Court was focusing solely on when the word "independent" is used in a statute, whether courts may infer removal protections based solely on such usage, see id. (noting that the interplay between express removal protections and the use of the word "independent" "shows that the term 'independent' does not necessarily connote independence from Presidential control, and we refuse to read that connotation into the [ ] Act").  The Court does not draw from that dicta anything to suggest that members of those boards are—or are not—entitled to removal protection based on the structure and function of the boards.  And, the defendants have provided no other case law establishing that members of these boards are not entitled to removal protections.  Indeed, at least one of the agencies referenced by the defendants is subject to litigation before another member of this Court over purportedly unlawful removals of agency officials.  See Harper v. Bessent, No. 25-cv-1294 (AHA) (D.D.C. filed Apr. 28, 2025) (challenging the President's removal of members of the National Credit Union Administration Board without cause).  Therefore, the defendants' reference to these boards in the context of the PCLOB's structure and function is inapposite.

concludes that the Board's structure and function clearly indicates Congress's intent to protect its members from removal, at least without cause.[26]

The defendants, in an apparent effort to preclude a constitutional analysis by the Court, argue that the canon of constitutional avoidance weighs in favor of the Court adopting their narrower interpretation of the statute, in order to avoid "'serious doubts' about the constitutionality of [the p]laintiffs' interpretation of the statute[.]" Defs.' Mem. at 17. However, because "[c]ourts will not assume Congress legislated a potential separation of powers problem unless the statutory text makes Congress's intent to test constitutional lines apparent[,]" Severino, 71 F.4th at 1044 (citing, inter alia, Jennings, 583 at 296)—either by virtue of the "plain text" of the statute or through the structure and function of the agency, as indicated by the language of the statute as a whole, id.—the canon of constitutional avoidance is inapplicable here. Thus, having concluded that the structure and function of the PCLOB, as set forth in the statutory text as a whole, makes clear that Congress intended to restrict the President's removal authority regarding members of the PCLOB, the Court must proceed to determine whether those restrictions violate the separation of powers.[27] See id. at 1044 n.2.

_____

[26] Nor does reading the statute as including a removal protection produce "absurd" results by insulating Board Members from any removal, even under extraordinary circumstances such as malfeasance. Defs.' Mem. at 4. As the plaintiffs concede, the Court's interpretation of the President's removal authority under the PCLOB's organic statute "does not require the [C]ourt to conclude that PCLOB members are protected from for-cause termination." Pls.' Opp'n at 13 n.2. Rather, the plaintiffs admit that the Court "could reasonably interpret the PCLOB removal protection to extend only to removals without cause, because Congress legislated against a background understanding that, when it confers tenure protection, that protection usually permits removal for cause." Id. And, there is good reason for adopting such a position because it would ensure that PCLOB members are provided the same protection as other multimember expert boards—but no more, and no less. However, because the defendants concede that the plaintiffs' removals were without cause, the Court need not conclusively determine this issue.

[27] The plaintiffs argue that the defendants have "intentionally decline[d]" to argue that the PCLOB's removal restriction is unconstitutional, Pls.' Opp'n at 21, and therefore the Court should treat its constitutional argument as waived, see id. at 22. However, Severino counsels that, upon the Court concluding that the PCLOB's organic "statute should be read as limiting the President's removal power[,]" 71 F.4th at 1044 n.2, "the question of the constitutionality of that restriction would still need to be decided[,]" id. Therefore, the Court must proceed to determine whether the restriction in this case is constitutional.

**2. Whether Congress's Restriction of the President's Removal Power Regarding Members of the PCLOB Runs Afoul of the Separation of Powers**

The plaintiffs argue that the PCLOB fits squarely within those multimember expert agencies at issue in Humphrey's Executor and its progeny, and therefore the restriction on the President's removal power in this case comports with the separation of powers. See Pls.' Mem. at 32. The defendants do not—and, indeed, could not—argue that Humphrey's Executor is not still good law and binding on the Court, see generally Defs.' Mem.; Defs.' Reply, because the Supreme Court has repeatedly upheld Congress's constitutional prerogative to restrict the President's removal powers for multimember expert boards, see, e.g., Seila L., 591 U.S. at 228 (declining to revisit Humphrey's Executor). Although couched in constitutional avoidance language, the defendants essentially make a more limited argument—that these restrictions are unconstitutional because the PCLOB does not fit within Congress's judicially-recognized authority under Humphrey's Executor and its progeny. See Defs.' Mem. at 19. The Court will canvas the relevant Supreme Court precedent before addressing the PCLOB's fit within this exception to the President's removal power.

**a. The President's Removal Power**

Because Article II of the Constitution vests the President with executive power and requires that the President "take Care that the Laws be faithfully executed[,]" U.S. Const. Art. II, § 3, cl. 1, the Supreme Court has held that the President has a general power to remove executive officers, see Myers, 272 U.S. at 163–64. Indeed, the Supreme Court has emphasized that "the President's removal power is the rule, not the exception." Seila L., 591 U.S. at 228.

However, the Supreme Court has also recognized two exceptions to that rule, "represent[ing] what up to now have been the outermost constitutional limits of permissible congressional restriction on the President's removal power." Id. (quoting PHH Corp. v.

39

Consumer Fin. Prot. Bureau, 881 F.3d 75, 196 (D.C. Cir. 2018) (Kavanaugh, J., dissenting) (internal quotation marks omitted)).  First, the Supreme Court has repeatedly recognized that Congress, pursuant to its own constitutional authority, has the power to protect from removal "multimember expert agencies that do not wield substantial executive power," id. at 217—i.e., multimember bodies with "quasi-judicial" or "quasi-legislative" functions, see id.; see also Humphrey's Ex'r, 295 U.S. at 629.  Second, the Supreme Court has recognized an exception for "inferior officers with limited duties and no policymaking or administrative authority[.]"  Seila L., 591 U.S. at 228; see Morrison v. Olson, 587 U.S. 654, 691–92 (1988) (upholding the constitutionality of Title VI of the Ethics in Government Act, which provided for-cause removal protections for independent counsel appointed by a specialized court to investigate federal government officials).  Because the PCLOB members are appointed by the President with the advice and consent of the Senate, they are not inferior officers, and therefore, the inferior officer exception under Morrison is inapplicable here.  Thus, the Court will only assess whether the PCLOB fits within the exception recognized by the Supreme Court in Humphrey's Executor.

### b.  The **Humphrey's Executor** Exception

In Humphrey's Executor, the Supreme Court upheld statutory removal protections afforded to members of the FTC, a five-member board of experts, balanced based on political party affiliation, whose members were appointed by the President with the advice and consent of the Senate to serve staggered, seven-year terms, and were protected by an express for-cause removal restriction.  295 U.S. at 619–20.  Since the issuance of that opinion in 1935, the Supreme Court has reaffirmed Humphrey's Executor's protections for multimember independent agencies that share the same characteristics as the 1935 FTC.  See, e.g., Wiener, 357 U.S. at 350 (upholding removal restrictions regarding members of the War Claims Commission).

40

More recently, the Supreme Court has concluded that it could not "extend" <u>Humphrey's Executor</u> to certain independent agencies with a single director.  <u>Seila L.</u>, 591 U.S. at 205; <u>see Collins</u>, 594 U.S. at 251 (concluding the same).  In <u>Seila Law</u>, the Supreme Court distinguished the CFPB from <u>Humphrey's Executor</u> in several ways.  First, the Court observed that the CFPB's structure was "almost wholly unprecedented[,]" 591 U.S. at 220, because the CFPB was an "independent agency led by a single Director and vested with significant executive power[,]" <u>id.</u> (citing <u>Free Enter. Fund</u>, 561 U.S. at 483), rather than an agency led by a multimember board. Second, the Court noted that "[b]ecause the CFPB is headed by a single Director with a five-year term, some Presidents may not have an opportunity to shape its leadership and thereby influence its activities." <u>Id.</u> at 225.  And third, the Court emphasized that "[t]he CFPB's receipt of funds outside the appropriations process further aggravates the agency's threat to Presidential control." <u>Id.</u> at 226.  Accordingly, the <u>Seila Law</u> Court concluded that Congress's for-cause removal restrictions regarding the CFPB's single director violated the separation of powers.[28] <u>See id.</u> at 213.

In declining to "extend" the exception, the <u>Seila Law</u> Court reiterated its application to "multimember expert agencies that do not wield substantial executive power[.]" <u>Id.</u> at 218. And, in doing so, that Court noted that "[r]ightly or wrongly, the [<u>Humphrey's Executor</u>] Court viewed the FTC (as it existed in 1935) as exercising 'no part of the executive power.'" <u>Id.</u> at 215 (quoting <u>Humphrey's Ex'r</u>, 295 U.S. at 628), because "it was 'an administrative body' that performed 'specific duties as a legislative or as a judicial aid[,]'" <u>id.</u> (quoting <u>Humphrey's Ex'r</u>, 295 U.S. at 628).  The <u>Seila Law</u> Court noted that the <u>Humphrey's Executor</u> Court had

---

[28] Subsequently, the Supreme Court in <u>Collins</u> concluded that "[a] straightforward application of [the Court's] reasoning in <u>Seila Law</u> dictate[d] the result" that the statutory removal protection afforded to the single Director of the Federal Housing Finance Agency was unconstitutional.  594 U.S. at 251.

"identified several organizational features that helped explain its characterization of the FTC as non-executive": (1) that because it was "[c]omposed of five members—no more than three from the same political party—the Board was designed to be 'non-partisan' and to 'act with entire impartiality[,]" id. at 216 (quoting Humphrey's Ex'r, 295 U.S. at 624); (2) its "duties were 'neither political nor executive,' but instead called for 'the trained judgment of a body of experts' 'informed by experience[,]'" id. (quoting Humphrey's Ex'r, 295 U.S. at 624); and (3) "the Commissioners' staggered, seven-year terms enabled the agency to accumulate technical expertise and avoid a 'complete change' in leadership 'at any one time[,]'" id. (quoting Humphrey's Ex'r, 295 U.S. at 624).  And, although the FTC had certain "powers of investigation," Humphrey's Ex'r, 295 U.S. at 621, the Supreme Court in Seila Law recognized that the Humphrey's Executor Court characterized these investigative powers as part of the FTC's functions "as a legislative agency" in "making investigations and reports" to Congress, 591 U.S. at 215 (quoting Humphrey's Ex'r, 295 U.S. at 628).

Here, as an initial matter, the PCLOB's structure—a five-member board of experts, balanced along partisan lines, whose members are appointed by the President with the advice and consent of the Senate to serve staggered terms—fits well within the historical tradition of independent agencies.  Therefore, it does not appear to the Court that Seila Law's additional factors—i.e., whether an agency's structure and terms of office impede the President's ability to influence that agency; and whether the agency receives funding outside the normal appropriations process—apply.  See Consumers' Rsch. v. Consumer Prod. Safety Comm'n, 91 F.4th 342, 355 (5th Cir. 2024) (concluding that Seila Law did not apply to the Consumer Product Safety Commission because the Commission "fits squarely within" the Humphrey's Executor exception for multimember expert boards).  However, even assuming arguendo that the Seila

Law factors did apply in this case, the Board members' staggered, six-year terms, see 42 U.S.C. § 2000ee(h)(4), and the Board's reliance on the appropriations process, see generally, U.S. Privacy & C.L. Oversight Bd., Congressional Budget Justification: Fiscal Year 2025 (2024)[29] both provide each President with "an opportunity to shape [the Board]'s leadership and [otherwise] influence its activities[,]"[30] see Seila L., 591 U.S. at 225–26, and thus these additional factors present no issue in this case. The question, then, is whether the PCLOB members "closely resemble[] the FTC Commissioners" as described by the Supreme Court in Humphrey's Executor. Seila L., 591 U.S. at 217. For the following reasons, the Court concludes that they do, and accordingly, Congress may constitutionally protect PCLOB members from removal.

First, the PCLOB mirrors the 1935 FTC in that it is composed of five members, with no more than three from the same political party; the selection criteria emphasize the substantive expertise and qualifications for these members; and the Board is nonpartisan in nature. See 42 U.S.C. § 2000ee(h)(2) ("Members of the Board shall be selected solely on the basis of their professional qualifications, achievements, public stature, expertise in civil liberties and privacy, and relevant experience, and without regard to political affiliation, but in no event shall more than [three] members of the Board be members of the same political party."). These features all clearly indicate that the Board was designed to be nonpartisan and act impartially. And, as with the FTC in Humphrey's Executor, the Board's duties are "neither political nor executive," but

---

[29] Available at
https://documents.pclob.gov/prod/Documents/FinancialReport/1068/FY25%20%20PCLOB%20CBJ%20-%20508%20Complete%20-%20Mar%2025,%202024.pdf.

[30] Indeed, President Trump appointed both plaintiffs to their positions with the advice and consent of the Senate during his first term in office, and upon returning to office, two positions on the Board—including the position of Chair upon the expiration of Ms. Bradford Franklin's holdover term—are currently vacant, independent of the plaintiffs' positions.

rather the product of "the trained judgment of a body of experts" "informed by [their] expertise." 295 U.S. at 629. Finally, members serve staggered, six-year terms, allowing members—and the Board as a whole—to avoid wholesale changes and to accumulate technical expertise. See id.

Moreover, the PCLOB's structure—consistent with other multimember expert boards— ensures a greater level of accountability, both between members of the Board, and between the Board majority and the President and public. See PHH Corp., 881 F.3d at 148 (Henderson, J., dissenting) (noting that "a minority party of a multimember agency is a 'built-in monitoring system,' dissenting when appropriate and serving as a 'fire alarm' for the President and the public" (quoting Rachel E. Barkow, Insulating Agencies: Avoiding Capture Through Institutional Design, 89 Tex. L. Rev. 15, 41 (2010)); see id. at 166 (Kavanaugh, J., dissenting) ("In lieu of Presidential control, the multi-member structure of independent agencies operates as a critical substitute check on the excesses of any individual independent agency head."). This ventilation of disparate views is of particular importance in the context of the government's counterterrorism authorities given their significant implications for privacy and civil liberties interests.

Nor does the PCLOB exercise substantial executive power, or for that matter, any executive power beyond that of the FTC in 1935. Although the defendants argue that the Humphrey's Executor exception applies only to multimember bodies that are "said not to exercise any executive power[,]" Defs.' Mem. at 18 (quoting Seila L., 591 U.S. at 216), as indicated above, the Seila Law Court explained its reasoning as to why the 1935 FTC was viewed as non-executive in nature, and the PCLOB shares these same characteristics. Moreover, adopting the defendants' argument would appear to indicate that all executive agencies,

44

regardless of their structure and function, exercise executive power, directly contradicting binding Supreme Court precedent.

The defendants further argue that the PCLOB, far from being a "mere legislative or judicial aid," id. at 19 (quoting Seila L., 591 U.S. at 218), is a freestanding executive agency that performs executive functions such as (1) advising the President on national security matters; (2) "possess[ing] the authority to enforce subpoenas it requests from the Attorney General in federal court[,]" and being otherwise authorized to access certain information as part of its oversight and reporting missions; and (3) "coordinat[ing] the activities of [ ] privacy officers and civil liberties officers on relevant interagency matters[,]" id. (citations omitted).

However, upon review of the record and the relevant case law, the Court is not persuaded by the defendants' position. First, the PCLOB does not have any authority to compel or otherwise bind the Executive Branch to do or cease doing anything, nor does it have such authority over any other governmental or private entities. See generally 42 U.S.C. § 2000ee. For example, the PCLOB cannot enforce subpoenas—or even issue them—despite the defendants' representations to the contrary. See id. § 2000ee(g)(1)(D) (noting that "at the direction of a majority of the members of the Board, [the PCLOB may] submit a written request to the Attorney General of the United States that the Attorney General require, by subpoena[,]" certain information); id. § 2000ee(g)(2) (noting that the Attorney General shall either "issue the subpoena as requested[]" or explain its decision to modify or deny the PCLOB's request) (emphasis added). Nor does the PCLOB adjudicate claims, engage in rulemaking, or have the power to impose any form of punishment. See generally 42 U.S.C. § 2000ee.

Second, as discussed above regarding the PCLOB's structure and function, the defendants' characterization of the PCLOB's function as being primarily advisory in nature is

clearly inconsistent with the statutory text, which makes clear that the PCLOB's oversight and reporting requirements are to act as an independent check in aid of Congress's legislative activity, rather than merely in support of advising the Executive Branch.  <u>See</u> <u>supra</u> Sec. III.A.1.b.  Therefore, although the PCLOB may have access to certain information and otherwise interact with members of the Executive Branch, its "powers of investigation" clearly enable its responsibilities not just to the Executive Branch, but also to make recommendations to Congress, which "have serve[d] as the basis of congressional legislation."  <u>Humphrey's Ex'r</u>, 295 U.S. at 621.  Accordingly, to the extent that the PCLOB's powers constitute the exercise of any executive power—and the Court doubts that is the case—these investigative powers are clearly in support of the Board's "specified duties as a legislative . . . aid."  <u>Seila L.</u>, 591 U.S. at 215 (quoting <u>Humphrey's Ex'r</u>, 295 U.S. at 628).  At bottom, the PCLOB does not legally or otherwise "hold enormous power over" anyone, whether through rulemaking, regulation, or the adjudication of disputes.  <u>PHH Corp.</u>, 881 at 165 (Kavanaugh, J., dissenting).  Nor does the PCLOB "pose a significant threat to individual liberty and the constitutional system of separation of powers and checks and balances."  <u>Id.</u>

Therefore, for all of the above reasons, the Court concludes that Congress's restriction of the President's removal authority regarding members of the PCLOB comport with the separation of powers.  Accordingly, because such a restriction is constitutional, and because the defendants do not dispute that the plaintiffs' removals were without cause, the Court concludes that the plaintiffs' removals were unlawful.

**B.    Remedies**

Having concluded that the plaintiffs' removals were unlawful, the Court must now determine what remedies are warranted.  The plaintiffs request that the Court declare that (1) the President lacks the authority to remove them from their positions as members of the PCLOB

"without cause or on the basis of their party affiliation," or "take actions that would deprive the plaintiffs of their ability to exercise the functions of their office," and (2) "the purported terminations of the plaintiffs from their office are void and without legal effect."  Am. Compl., Exhibit ("Ex.") 5 (Proposed Order) at 1, ECF No. 10-5.  The plaintiffs also request that the Court permanently enjoin all defendants—except the President—to restore the plaintiffs to their positions as Board members and to "take no action that would deprive the plaintiffs of their ability to exercise the functions of their office or deprive the plaintiffs of any right or benefit of that office."  Id.  The defendants respond that, even if the Court concludes that the President's removal of the plaintiffs from their positions was unlawful—as it now has—reinstatement is inappropriate here because "[r]einstatement exceeds the equitable powers of an Article III court and would intrude on the President's Article II authority to appoint officers of the United States, and [the p]laintiffs have not demonstrated that mandamus is warranted."  Defs.' Mem. at 20.

For the reasons set forth below, the Court concludes that (1) because the President's removal of the plaintiffs from their positions as Board members was unlawful, the plaintiffs are entitled to the declaratory relief they seek; (2) the plaintiffs have carried their burden of showing that they are entitled to the permanent injunction they seek; and (3) because injunctive relief is available, a writ of mandamus is not appropriate, but that issuance of the writ would be appropriate, should injunctive relief be unavailable for any reason.

### 1.  Declaratory Judgment

The plaintiffs first seek a judgment declaring that their terminations from the PCLOB were unlawful and therefore are null and void.  See Am. Compl., Ex. 5 (Proposed Order) at 1. The defendants, other than arguing that the plaintiffs' claims should be denied on the merits, do not appear to contend that declaratory judgment would be unavailable should the Court conclude that the plaintiffs' removals were unlawful.  See generally Defs.' Mem.; Defs.' Reply.

Pursuant to the Declaratory Judgment Act, "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).  The Declaratory Judgment Act "provides neither jurisdiction nor a cause of action, but rather a form of relief when the case is already properly before the Court." Harris v. Bessent, ___ F. Supp. 3d ___, ___, No. 25-cv-412 (RC), 2025 WL 679303, at *8 (D.D.C. Mar. 4, 2025), (citing C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth., 310 F.3d 197, 201 (D.C. Cir. 2002)), stay lifted, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025).  Because the Act does not provide an independent basis for jurisdiction or a distinct cause of action, "just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." California v. Texas, 593 U.S. 659, 672 (2021) (citing MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 126–27 (2007)).  As the Supreme Court has noted, in order to satisfy Article III, a dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests[,]" and it must also be "'real and substantial' and 'admi[t] of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" MedImmune, 549 U.S. at 127 (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41 (1937)).  To constitute a live controversy, the dispute must be "of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." Preiser v. Newkirk, 422 U.S. 395, 402 (1975) (emphasis omitted) (quoting Md. Cas. Co. v. Pac. Co., 312 U.S. 270, 273 (1941)).

"[I]t is well settled that a declaratory judgment always rests within the sound discretion of the court." President v. Vance, 627 F.2d 353, 365 n.76 (D.C. Cir. 1980) (citing Brillhart v. Excess Ins. Co. of Am., 316 U.S. 491, 494 (1942)).  While there are no dispositive factors in

determining whether to grant declaratory relief, such relief will "ordinarily be granted only when it will either 'serve a useful purpose in clarifying the legal relations in issue' or 'terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" Id. (quoting E. Borchard, Declaratory Judgments 299 (2d ed. 1941)).

Other members of this Court have uniformly concluded that declaratory relief is available under similar circumstances in recent cases challenging the removal of independent agency members, concluding that where a case relates to the unlawful removal of such a member, a declaratory judgment would serve a useful purpose to clarify the legal relations between the parties and afford relief from the underlying challenged actions. See Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *8; Wilcox v. Trump, ___ F. Supp. 3d ___, ___, No. 25-cv-334 (BAH), 2025 WL 720914, at *15 (D.D.C. Mar. 6, 2025), stay lifted, No. 25-5037, 2025 WL 1021435 (D.C. Cir. Apr. 7, 2025); Grundmann v. Trump, ___ F. Supp. 3d ___, ___, No. 25-cv-425 (SLS), 2025 WL 782665, at *11 (D.D.C. Mar. 12, 2025).  So too here.  The plaintiffs have challenged their removals from the PCLOB and seek to clarify whether they may resume their work as members of the Board.  The defendants, on the other hand, contend that their removals were lawful and that Congress did not—and cannot—restrict the President's removal authority in this case.  And, as indicated above, the defendants have not disputed the availability of declaratory judgment if otherwise warranted.  Consistent with the position of its colleagues, the Court concludes that, for the reasons set forth above, it must grant the plaintiffs' request for declaratory relief and enter a declaratory judgment in favor of the plaintiffs.

## 2.  Reinstatement Through Injunctive Relief

The plaintiffs also request that the Court reinstate them to their positions on the Board by issuing a permanent injunction against all defendants except the President.  See Pls.' Mem. at 37. The defendants, make two arguments against injunctive relief consistent with arguments the

government has made in similar cases concerning the challenged removals of independent

agency members. First, the defendants argue that historically courts of equity could not restrain

by injunction the removal of a public officer, and that because the plaintiffs here are principal

officers—rather than inferior officers or employees—the Court does not have the authority to

grant the requested injunctive relief. See Defs.' Mem. at 21. And second, the defendants

contend that, even if the Court has the authority to grant injunctive relief, the plaintiffs have

failed to show that they are entitled to such relief in this case. See id. at 24.

Plaintiffs seeking to show that they are entitled to a permanent injunction must satisfy a

four-factor test in order to obtain such "drastic and extraordinary" relief. Monsanto Co. v.

Geertson Seed Farms, 561 U.S. 139, 165 (2010). Specifically, the plaintiffs must establish:

> (1) that [they] ha[ve] suffered an irreparable injury; (2) that remedies available at
> law, such as monetary damages, are inadequate to compensate for that injury;
> (3) that, considering the balance of hardships between the plaintiff[s] and [the]
> defendant[s], a remedy in equity is warranted; and (4) that the public interest
> would not be disserved by a permanent injunction.

Id. at 156–57 (quoting eBay Inc. v. MercExchange L.L.C., 547 U.S. 388, 391 (2006)). "The

decision to grant or deny permanent injunctive relief is an act of equitable discretion by the

district court[.]" eBay, 547 U.S. at 391 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305,

311–13 (1982)). The Court will first address the defendants' argument that the Court does not

have the legal authority under Article III to provide such relief, before addressing each of these

factors in turn.

### a. Whether the Court May Provide Injunctive Relief

As indicated above, the defendants argue that reinstatement is not a proper equitable

remedy because a court sitting in equity "has no jurisdiction over the appointment and removal

of public officers[,]" Defs.' Mem. at 21 (quoting In re Sawyer, 124 U.S. 200, 212 (1888)), and

50

"reinstatement is beyond the equitable authority of the [C]ourt to impose because it 'impinges on the "conclusive and preclusive" power through which the President controls the Executive Branch that he is responsible for supervising[,]'" id. (quoting Dellinger v. Bessent, No. 25-5028, 2025 WL 559669, at *16 (D.C. Cir. Feb. 15, 2025) (Katsas, J., dissenting)).  The plaintiffs counter that "the Supreme Court has repeatedly reaffirmed the authority of federal courts to order reinstatement, whether via mandamus, quo warranto, or equitable remedies."  Pls.' Mem. at 34 (listing cases).  The plaintiffs further argue that, apart from formal reinstatement, binding D.C. Circuit precedent counsels that the Court has the authority to de facto reinstate officers who have been wrongfully removed by the President by enjoining subordinate officers—but not the President—to restore the plaintiffs to their positions as members of the Board.  See id. (citing Severino, 71 F.4th at 1042–43).

The Court is unpersuaded by the defendants' arguments in light of relevant D.C. Circuit precedent and the consistent practice of other members of this Court in applying the Circuit's precedent.  Specifically, the D.C. Circuit has made clear that courts may "reinstate a wrongly terminated official 'de facto,' even without a formal presidential reappointment."  Severino, 71 F.4th at 1042–43 (citing Swan v. Clinton, 100 F.3d 973, 980 (D.C. Cir. 1996)).  Although the defendants argue that these cases addressed standing, rather than the availability of a particular remedy and the scope of courts' authority to provide a remedy, these arguments are unavailing in light of applicable precedent from the Circuit.  Indeed, in Swan, the Circuit concluded that it could order the subordinate agency officials there to "treat[] [the plaintiff] as a member of the [ ] Board and allow[] him to exercise the privileges of that office."[31]  100 F.3d at 980.

---

[31] Because the Court ultimately concludes that it has the authority to grant the plaintiffs relief in the form of de facto reinstatement under Severino, it need not wade into the broader debate over the historical boundaries between legal and equitable relief, although other members of this Court have recently concluded that reinstatement is appropriate

(continued . . .)

The defendants argue that de facto reinstatement through an injunction of subordinate officials—but not the President—nonetheless effectively targets the President because it is the President alone who has the power to appoint Board members.  See Defs.' Mem. at 21–22.  However, Swan and Severino are binding precedent on this Court, and the defendants have offered no legal authority in support of their position that the Court cannot enjoin the subordinate officials in this case.  Nor could they offer such legal authority "because, as a general matter, courts undoubtedly have authority to constrain unlawful presidential action by enjoining the President's subordinates."  Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *16 (citing, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 582, 589 (1952) (affirming the district court's judgment restraining the Secretary of Commerce from carrying out unconstitutional presidential action)).

Therefore, based on binding D.C. Circuit precedent, and absent compelling argument for why this case should be treated differently, the Court concludes that it is within its authority to provide the plaintiffs with their requested injunctive relief, should the Court determine that doing so is appropriate in this case.  Accordingly, the Court will next assess whether the plaintiffs have established that they are entitled to injunctive relief against all defendants except the President.

---

(. . . continued)

equitable relief in these circumstances because the Supreme Court "ha[s] recognized that federal courts are generally empowered to review the claims of discharged federal employees." Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *10 (citing Sampson v. Murray, 415 U.S. 61, 71–62 (1974)); see Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *16 n.22 (concluding the same).

Further, as the D.C. Circuit has noted, a request for injunctive relief is "essentially a request for a writ of mandamus in this context," Swan, 100 F.3d at 973 n.1, and, as discussed below, see infra Sec. III.B.3, the Court concludes that mandamus would be appropriate if injunctive relief were not available.  Similarly, because the Court concludes that these remedies are available, it need not address the plaintiffs' request for administrative mandamus under the Administrative Procedure Act (the "APA").  See Pls.' Mem. at 36.

**b.  Irreparable Harm and Inadequate Remedy at Law**

The first two factors of the Court's permanent injunction analysis, i.e., whether there is irreparable harm and an inadequate remedy at law, "are often considered together."  Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *15 n.20 (listing cases).

To establish irreparable harm for the purposes of seeking injunctive relief, plaintiffs challenging their terminations must sufficiently show "harm [that is] certain and great . . .  and so imminent that there is a clear and present need for equitable relief to prevent [such] irreparable harm."  League of Women Voters of U.S. v. Newby, 838 F.3d 1, 7 (D.C. Cir. 2016) (citation, internal quotation marks, and alterations omitted).  "[P]roving 'irreparable' injury is a considerable burden," Power Mobility Coal. v. Leavitt, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (Walton, J.) (quoting Wis. Gas Co. v. Fed. Energy Regul. Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985)), and establishing the mere "possibility of irreparable harm" is not sufficient to satisfy this burden, Winter, 555 U.S. at 22.

Additionally, the injury "must be beyond remediation," Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006), and, generally, "economic loss does not, in and of itself, constitute irreparable harm," Wis. Gas. Co., 758 F.2d at 674.  More specifically, "the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."  Davenport v. Int'l Bhd. of Teamsters, AFL-CIO, 166 F.3d 356, 367 (D.C. Cir. 1999) (quoting Sampson v. Murray, 415 U.S. 61, 90 (1974)).

"Economic harm may qualify as irreparable, however, 'where a plaintiff's alleged damages are unrecoverable.'"  Nat'l Ass'n of Mortg. Brokers v. Bd. of Governors of Fed. Rsrv. Sys., 773 F. Supp. 2d 151, 180 (D.D.C. 2011) (quoting Sterling Com. Credit—Michigan, LLC v. Phoenix Indus. I, LLC, 762 F. Supp. 2d 8, 16 (D.D.C. 2011)); see Nat'l Mining Ass'n v. Jackson,

768 F. Supp. 2d 34, 53 (D.D.C. 2011) (Walton, J.) (noting that while "the mere fact that economic losses may be unrecoverable does not, in and of itself, compel a finding of irreparable harm," the "recoverability of monetary losses can, and should, have some influence on the irreparable harm calculus").  But, even where economic loss is unrecoverable, "the loss 'must . . . be serious in terms of its effect on the plaintiff.'"  Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (quoting Gulf Oil Corp. v. Dep't of Energy, 514 F. Supp. 1019, 1026 (D.D.C. 1981)).

Here, the plaintiffs argue that they have suffered irreparable harm without another adequate legal remedy available to them because (1) they are not entitled to money damages in light of their part-time status as Board members and the PCLOB's compensation provisions, see Pls.' Opp'n at 30–31; and (2) they have been "'depriv[ed] of [their] statutory right to function' as [ ] member[s] of the [PCLOB],' which carries profound consequences for the Board[,]" id. at 31 (quoting Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *13).  In response, the defendants argue that the plaintiffs have not established that they have suffered irreparable harm because (1) they would be entitled to backpay, evinced by their inclusion of a request for backpay in the original Complaint in this case, see Defs.' Reply at 19; and (2) the deprivation of their positions as Board members does not constitute irreparable harm, see Defs.' Mem. at 25.  The Court will address these alleged harms in turn.

In support for the plaintiffs' first argument, they contend that unlike in some other cases arising out of challenged terminations of independent agency officials, they would not be entitled to money damages, had they retained that request in their Amended Complaint, which they have

not done.[32]  The plaintiffs note that "[u]nlike federal career employees, PCLOB members earn

no salary[,]" Pls.' Opp'n at 30 (citing 42 U.S.C. § 2000ee(i)(1)(B)); rather, as part-time PCLOB

members, they "receive compensation only 'for each day during which that member is engaged

in the <u>actual</u> performance of the duties of the Board[,]" <u>id.</u> (citing 42 U.S.C. § 2000ee(i)(1)(B)).

Therefore, according to the plaintiffs, because they <u>did not actually</u> perform any work following

their challenged terminations, they are not entitled to backpay, nor would they be entitled to front

pay because they could not actually perform their Board duties following their terminations.  <u>See</u>

<u>id.</u>  The defendants respond that (1) the plaintiffs' request for an award of backpay in their

original Complaint indicates that backpay would be available in this case, <u>see</u> Defs.' Reply at 19;

and (2) such backpay is available and able to be calculated because "an award of backpay

assumes that a terminated employee would have been working when the employee would

normally have worked[,]" <u>id.</u> (citation omitted).

However, at the April 30, 2025, hearing on the pending motions, the plaintiffs

represented that they had removed their backpay request upon recognizing that they are not

entitled to money damages in the form of either backpay or front pay under the PCLOB's

organic statute, and the defendants do not dispute the plaintiffs' characterization of the statute in

this regard, nor do they cite any other statute that would make backpay available to the plaintiffs

under the circumstances in this case.[33]

---

[32] The plaintiffs initially included backpay as part of their requested relief but removed that request as part of their Amended Complaint.  <u>Compare</u> Compl. at 26, <u>with</u> Am. Compl. at 26.

[33] The plaintiffs also argued at the motion hearing that they would not be eligible for backpay pursuant to the Back Pay Act.  Specifically, the Back Pay Act provides that a wrongfully terminated federal employee "on correction of the personnel action," is entitled to "an amount equal to all or part of the pay, allowances, or differentials, as applicable which the employee normally would have earned . . . less any amounts earned by the employee through other employment during that period."  5 U.S.C. § 5596(b)(1).  However, the plaintiffs argue that they are not entitled to any backpay because they each earn more money through their other, private-sector employment, than they do through their part-time employment with the PCLOB, <u>see</u> LeBlanc 2d Suppl. Decl. ¶ 4; Felten 2d Suppl.

(continued . . .)

Even assuming <u>arguendo</u> that backpay was unavailable, and thus, the plaintiffs' economic losses are irretrievable, the Court concludes that they have not shown that such irretrievable loss is sufficiently "serious in terms of its effect on" the plaintiffs. <u>Cal. Ass'n of Priv. Postsecondary Schs.</u>, 344 F. Supp. 3d at 170 (quoting <u>Gulf Oil Corp.</u>, 514 F. Supp. at 1026). Although the Court does not discount that the plaintiffs have suffered some economic harm by not being permitted to perform their PCLOB duties, and will continue to suffer additional harms if not reinstated, by their own admission, their PCLOB compensation is "modest" and not the reason they serve as members of the Board. Pls.' Opp'n at 31. Nor do the plaintiffs provide "specific details regarding the extent to which [they] will suffer [from their economic losses]." <u>Nat'l Ass'n of Mortg. Brokers</u>, 773 F. Supp. 2d at 181. Therefore, despite these unrecoverable economic losses, the Court cannot conclude that such harm is irreparable.

The plaintiffs next argue that they have established that they have suffered irreparable harm because they have been deprived of their "statutory right to function" as members of the Board, which also carries profound consequences for the Board itself. Pls.' Mem. at 31 (quoting <u>Harris</u>, ___ F. Supp. 3d, at ___, 2025 WL 679303, at *13). Specifically, the plaintiffs argue that because the Board no longer has its statutorily-mandated quorum, it cannot perform certain statutory requirements, such as initiating new oversight projects, formally finalizing existing projects, or retaining staff. <u>See id.</u> at 32. The plaintiffs argue that these requirements are "highly time sensitive" in light of the upcoming statutory sunset of Section 702, which is set to expire in April 2026. <u>Id.</u> at 32–33.

---

(. . . continued)
Decl. ¶ 4, and they declare that they have earned more money through those positions since their challenged terminations than they would have made from their positions on the PCLOB, <u>see</u> LeBlanc 2d Suppl Decl. ¶ 5; Felten 2d Suppl. Decl. ¶ 5. However, the Court need not conclusively determine whether backpay is available under this theory because, as the Court explains below, it concludes that the plaintiffs have failed to show irreparable economic harm, assuming <u>arguendo</u> that backpay is unavailable.

56

The defendants argue that the plaintiffs have failed to establish irreparable harm in this regard because loss of employment is not an irreparable harm, even where an individual has been deprived of a "unique, singular, or high-level position[.]"  Defs.' Mem. at 24.  The defendants further argue that the cases upon which the plaintiffs rely in support of their irreparable harm position are distinguishable for several reasons.  According to the defendants, unlike in other recent cases before other members of this Court, there is no statutory restriction here on the President's removal power.  See id. at 26.  Further, the defendants argue that the plaintiffs would be entitled to backpay, which is the traditional remedy for unlawful termination.  See id. at 27.  Finally, the defendants contend that unlike the agencies at issue in other cases, the PCLOB "can continue to fulfill its mandate without [the p]laintiffs[']" participation in light of its sub-quorum authority, id. at 29, and therefore, there is no irreparable disruptive effect to the Board itself, see id. at 26–29.

In cases arising out of the purportedly unlawful termination of government employees, plaintiffs challenging their terminations "must make a showing of irreparable injury sufficient in kind and degree to override[,]" Sampson, 415 U.S. at 84, (1) the "disruptive effect" to the "administrative process" resulting from injunctive relief, id. at 83; (2) the Court's general deference to the government "in the 'dispatch of its own affairs,'" id. at 83 (quoting Cafeteria & Rest. Workers Union, Loc. 473, AFL-CIO v. McElroy, 367 U.S. 886, 896 (1961)); and (3) "the traditional unwillingness of courts of equity to enforce contracts for personal service either at the behest of the employer or of the employee[,]" id. (citation omitted).

In Sampson, the Supreme Court concluded that the plaintiff—a probationary employee within the General Services Administration—had failed to establish irreparable harm beyond mere economic loss or reputational harm, and thus her harm was insufficient to entitle her to

injunctive relief.  Id. at 91–92.  However, in reaching this conclusion, the Supreme Court acknowledged that "cases may arise in which the circumstances surrounding an employee's discharge, together with the resultant effect on the employee, may so far depart from the normal situation that irreparable injury might be found[,]" and that district courts have authority to grant injunctive relief to terminated government employees "in [that] genuinely extraordinary situation."  Id. at 92 n.68.

Several other members of this Court have recognized such irreparable harm in cases involving the removal of individuals appointed to independent, multimember boards based on "the[ir] 'unlawful removal from office by the President' and 'the obviously disruptive effect' that such removal has on the organization's functioning."  Wilcox, ___ F. Supp. 3d, at ___, 2025 WL 720914, at *15 (quoting Berry, 1983 WL 538, at *5); see Harris v. Bessent, ___ F. Supp. 3d ___, ___, 2025 WL 521027, at *6–9 (D.D.C. Feb. 18, 2025) (finding that the plaintiff had established irreparable harm from being removed as a member of the Merit Systems Protection Board in granting a temporary restraining order); Grundmann, ___ F. Supp. 3d, at ___, 2025 WL 782665, at *17 (concluding the removed chair of the Federal Labor Relations Authority had established irreparable harm); Berry, 1983 WL 538, at *5 (concluding the same regarding the removal of members of the United States Commission on Civil Rights).

For example, in Berry, the district court recognized such irreparable harm where the President's removal of members of the United States Commission on Civil Rights deprived the Commission of a quorum, thus disrupting the Commission's "ability to fulfil its [statutory] mandate" to draft its final report.  1983 WL 538, at *5.  In making its finding, the district court—relying on Sampson—found the plaintiffs' injury was sufficient to entitle them to injunctive relief for several reasons.  First, the district court found that because it was "not clear that the

President ha[d] the power to remove Commissioners at his discretion[,]" there was no indication that the court was required to give the government the usual latitude it is given to conduct its affairs. Id. Second, the district court found that because the Commissioners served in a quasi-legislative capacity, "in the furtherance of civil rights in this country[,]" rather than a federal employee who serves in a personal service capacity, the courts' general aversion to enforcing personal service contracts was not applicable. Id. And third, the plaintiffs—by virtue of their positions on an independent commission, rather than within a department of government—"d[id] not have administrative, statutory, or other relief that is readily available to many federal employees." Id.

Here too, the Court concludes that the plaintiffs' removals by the President constitute a "genuinely extraordinary situation." Id. To reiterate, the plaintiffs are appointed by the President, with the advice and consent of the Senate, to a nonpartisan, multimember board of experts, and they have been tasked—based on their expertise relating to privacy and civil liberties—with the weighty responsibility of ensuring that the federal government's counterterrorism actions adequately protect these interests. See, e.g., Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *15 (noting that the plaintiff had been "deprived of a presidentially appointed and congressionally confirmed position of high importance"). Although the defendants argue that "the deprivation of a unique, singular, or high-level position is . . . [not] an irreparable injury[,]" Defs.' Mem. at 24, all of the legal authority they cite for that proposition involved lower-level or state officials, and is therefore inapposite, see id., especially in light of the recent persuasive authority from other members of this Court.[34]

---

[34] The defendants also cite the Supreme Court's decision in Raines v. Byrd for the proposition that "public officials have no individual right to the powers of their offices." Id. at 27 (citing 521 U.S. 811, 820–21 (1997)). However, the issue in Raines was whether six members of Congress could establish legislative standing to challenge the

(continued . . .)

The plaintiffs' removals also implicate core separation of powers issues, which is strikingly different from the "routine" employment circumstances of the probationary employee at issue in <u>Sampson</u>.  As the Court has concluded, Congress clearly indicated its intent to insulate the plaintiffs as PCLOB members from executive branch interference based on the Board's structure and function, which is incompatible with at-will removal.  <u>See</u> <u>infra</u> Sec. III.A.2; <u>see also</u> <u>Harris v. Bessent</u>, ___ F. Supp. 3d at ___, 2025 WL 679303, at *13 (emphasizing that the Merit Systems Protection Board's "independence would evaporate if the President could terminate its members without cause").  Although the defendants attempt to distinguish these cases based on the absence of an explicit "statutory restriction on the President's removal power[,]" Defs.' Mem. at 26, the Court has nonetheless concluded that the PCLOB's organic statute restricts the President's removal power, <u>see</u> <u>supra</u> Sec. III.A.2, and thus the Court rejects the defendants' attempt to distinguish these other cases based on whether that removal protection

---

(. . . continued)

passage of the Line Item Veto Act, which these members voted against and which gave the President "the authority to 'cancel' certain spending and tax benefit measures after he [ ] signed them into law."  <u>Id.</u> at 814.  The plaintiffs claimed that they suffered an injury for the purposes of Article III standing because the bill diminished "the legal and practical effect of all votes they may cast on bills" subject to the President's line item veto power, divested them "of their constitutional role in the repeal of legislation[,]" and expanded Executive power at the expense of their power as legislators.  521 U.S. at 816.  The Supreme Court concluded that the plaintiffs could not establish standing because their purported injury was based on "the abstract dilution of institutional legislative power[,]" <u>id.</u> at 826, rather than "hav[ing] been deprived of something to which they <u>personally</u> are entitled—such as their seats as Members of Congress after their constituents had elected <u>them</u>[,]" <u>id.</u> at 821.  Here, by contrast, although the plaintiffs have not been elected to their positions as Board members, they were appointed by the President, with the advice and consent of the Senate, to positions that the Court has found are protected by constitutional removal restrictions.  Thus, they "have been deprived of something to which they <u>personally</u> are entitled[.]"  <u>Id.</u>

Further, although <u>Raines</u> references the Tenure of Office Act—which restricted the President's removal power without the consent of Congress, and was "passed by Congress over the veto of President Andrew Johnson[,]" <u>id.</u> at 826—the Supreme Court was clearly focused on whether the President would have had Article III standing to challenge the constitutionality of that statute even "before he ever thought about firing a cabinet member," <u>id.</u> at 827, which it said would have "improperly and unnecessarily plunged [the federal courts] into the bitter political battle being waged between the President and Congress[,]" <u>id.</u>  Contrary to the constitutional dilemma such an encounter would create for the judiciary, the Supreme Court went on to note that the federal courts <u>did</u> properly hear a case regarding the constitutionality of that statute after an official who was removed by the President despite those protections brought suit challenging his removal, <u>see</u> <u>id.</u> at 827 (citing <u>Myers</u>, 272 U.S. at 52).  Therefore, <u>Raines</u>' reference to cases involving removal does nothing to undermine the plaintiffs' claims here.

arises out of the "plain text" of the statute as compared to arising from the "statutory structure and function" of an agency.

Finally, upon review of the PCLOB's organic statute and the PCLOB Sub-Quorum Policy, the Court concludes that the plaintiffs' removals give rise to irreparable harm by depriving them of their "statutory rights to function as [PCLOB members]" and thereby impeding the ability of the PCLOB to function as envisioned by Congress. Berry, 1983 WL 538, at *5. The defendants contend that, unlike the plaintiffs in Berry, the plaintiffs' removals in this case do not create irreparable harm because the Board "will not cease to exist and may resume full functioning" upon the resumption of a quorum, Defs.' Mem. at 28–29, and "the Board is quite capable of fulfilling its missions when in a sub-quorum status[,]" Defs.' Reply at 18, especially in light of the fact that "the Board has operated in a sub-quorum status for large portions of its history[,]" id. Further, in regards to the pending reauthorization of Section 702, the defendants counter that the plaintiffs have failed to establish that this factor constitutes irreparable harm because the PCLOB prepared a "thorough report of approximately 300 pages regarding Section 702[]" less than two years ago, which included the plaintiffs' views, Defs.' Mem. at 29, and thus any update to the report will be "far shorter" and require "substantially less[]" time to prepare, Defs.' Facts. ¶ 40, due to the recency and thoroughness of its prior report on the same authority.

The Court is unpersuaded by any of the defendants' arguments. Pursuant to the PCLOB Sub-Quorum Policy, without a quorum the PCLOB may not, inter alia: issue advice in the name of the Board, issue any Board reports, submit its statutorily-required Semi-Annual Report, or request a subpoena from the Attorney General. See Defs.' Reply, Ex. 1 (Privacy & C.L. Oversight Bd., Sub-Quorum Authorities and Operations When the Position of Chair is Vacant:

Policy 102-01 5 (Oct. 23, 2024) ("PCLOB Sub-Quorum Policy")), ECF No. 18-2.  Nor, clearly, can the PCLOB comply with its statutory mandate to apprise Congress of any minority views regarding its oversight of Executive Branch counterterrorism actions and the authorities under which these actions are taken if the President has removed all but one member of the Board.  See 42 U.S.C. § 2000ee(e)(2)(C).

These constraints clearly apply to the PCLOB's contribution to Congress's assessment regarding whether and how to reauthorize Section 702.  The defendants do not dispute that the Board cannot issue its Section 702 report without a quorum or that the Board—as opposed to the sole remaining individual member—can provide advice to Congress as it debates whether and how to reauthorize the authority, which grants the government important and broad surveillance powers, but also has the potential to significantly intrude on privacy and civil liberties interests. Moreover, the plaintiffs represent, and the defendants do not dispute, that the plaintiffs' representations that, in its prior reauthorization of Section 702, Congress imposed new restrictions on the authority, but also expanded certain aspects of the authority, including the definition of which entities constitute an "electronic communications service provider[]" and the definition of what amounts to "foreign intelligence information[,]" as well as "an expansion of the use of Section 702-acquired information for vetting non-U[.]S[.] persons traveling to the [United States]."  Pls.' Opp'n at 33.  Therefore, the Court is unpersuaded by the defendants' representations that the PCLOB's anticipated report on Section 702 will amount to a mere update of its last report, rather than an extensive substantive report, thereby obviating the need for the Board as a whole—or any of the members not affiliated with the President's political party—to offer new and possibly contrary advice relating to the recent expansions of the authority.  See Defs.' Mem. at 29.

And, although PCLOB staff may conduct certain activities and issue certain advice and oversight reports in the form of a "Staff Report" if those projects were initiated by a quorum of the Board, such activities may be restricted by the "unanimous action of the remaining Board [m]ember(s) during a sub-quorum period." Id. at 4. Therefore, as now composed, the single remaining member unilaterally controls any staff activities and reports issued by the staff. Admittedly, the PCLOB only had one member between March 2017 and September 2018 due to the failure to fill the vacant seats, see U.S. Privacy & C.L. Oversight Bd., Board Members, https://www.pclob.gov/Board/Index (last visited May 21, 2025); however, it is the Court's view that the President's removal of the plaintiffs, resulting in the Board consisting of a single member of the President's political party, deprives the Board of the very structure and function that Congress constructed in making it an independent and nonpartisan entity, thus undermining its ability to be a truly independent watchdog that would provide candid, bipartisan oversight based on the members' expertise and collective wisdom.[35]

Thus, the Court concludes that the plaintiffs' removals have caused irreparable harm because their removals deprive the plaintiffs of their "statutory rights to function" as members of the PCLOB and impedes the ability of the PCLOB to function as an independent watchdog in furtherance of protecting civil liberties and privacy interests, as envisioned by Congress, Berry, 1983 WL 538, at *5, and that other "remedies available at law, such as monetary damages, are inadequate to compensate for that injury[,]" Monsanto Co., 561 U.S. at 165 (quoting eBay, 547

---

[35] Although the Commission in Berry—unlike the PCLOB—was set to expire, the Court concludes these harms resulting from the plaintiffs' removals are nonetheless irreparable. Further, the length of the previous period in which the PCLOB was without a quorum between 2017 and 2018, as well as the lack of any indication in the record that the President has sought to replace the plaintiffs on the Board, leaves open the possibility that the Board may be disabled for an extended period of time due to the President's actions.

63

U.S. at 391).  Accordingly, the Court concludes that the first two injunctive factors weigh in favor of granting the plaintiffs' request for injunctive relief.

### c.  The Balance of the Equities and the Public Interest

Finally, the Court must weigh the balance of equities and the public interest.  As the Supreme Court has noted, "these factors merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009).  Relevant here, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  League of Women Voters of U.S., 838 F.3d at 12 (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)).  And, as a corollary, the government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required."  R.I.L-R v. Johnson, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting Rodriguez v. Robbins, 715 F.3d 1127, 1145 (9th Cir. 2013)).

Here, the plaintiffs argue that these final two factors weigh in favor of granting injunctive relief because their removals by the President have rendered the PCLOB without a quorum, resulting in the PCLOB's inability to fulfill its statutory responsibilities.  See Pls.' Mem. at 39. Specifically, the plaintiffs again point to the upcoming reauthorization of Section 702, which, as indicated above, is set to expire in April 2026, and they argue that the Board has limited time in which to fulfill its statutory duty to "provid[e] advice on proposals to retain or enhance a particular government power."  See id. (quoting 42 U.S.C. § 2000ee(d)(1)(D)).  The defendants, rather than directly confronting the plaintiffs' arguments, counter that these final two factors weigh against awarding injunctive relief "[b]ecause the Board is an executive agency exercising executive power, [and thus] an injunction functionally reinstating one of its principal officers

64

would raise grave separation-of-powers concerns and work a great and irreparable harm to the Executive." Defs.' Mem. at 30.

For the following reasons, the Court agrees with the plaintiffs. First, although the parties disagree on the effects of the PCLOB's sub-quorum status, the Court concludes that the PCLOB's statutory obligations are significantly impeded by the loss of a quorum due to the plaintiffs' challenged removals. Consistent with that conclusion, the Court is thus persuaded that the final two injunctive factors weigh in favor of the plaintiffs because of the general but "substantial public interest in the for-cause removal protections Congress has given to certain members of independent agencies[,]" Harris, ___ F. Supp. 3d at ___, 2025 WL 679303, at *14, and specifically, the substantial public interest in these protections as they relate to the PCLOB and its statutory mandate. There is a substantial public interest in the effective oversight of the government's counterterrorism actions and authorities, which is furthered by independent, candid, and expert advice being provided to the President, as well as to Congress as it debates reauthorizing important—yet controversial—authorities that have significant potential impact on privacy and civil liberties.

The D.C. Circuit made clear in its en banc decision to lift the stay on the district courts' orders in Harris and Wilcox that the defendants, on the other hand, cannot demonstrate irreparable harm under the circumstances presented in this case and others like it "because the claimed intrusion on presidential power only exists if Humphrey's Executor and Wiener are overturned." Harris v. Bessent, No. 25-5037, 2025 WL 1021435, at *2 (D.C. Cir. Apr. 7, 2025).[36] Thus, consistent with the Circuit's recent decision in Harris and Wilcox, as well as

___

[36] At the April 30, 2025, motion hearing, the defendants argued that any reliance on the D.C. Circuit's en banc decision lifting the stay in the consolidated appeal in Harris and Wilcox "would be inappropriate because that decision has been administratively stayed by the U.S. Supreme Court and a decision there is forthcoming."

(continued . . .)

65

those by other members of this Court, the Court concludes that the balance of equities and the public interest weigh in favor of granting the plaintiffs the injunctive relief they seek.

Accordingly, having determined that all four of these factors weigh in favor of granting the plaintiffs' motion, the Court concludes that issuance of a permanent injunction against all defendants except the President is warranted in this case.

### 3. Reinstatement Through Writ of Mandamus

Finally, the plaintiffs ask the Court to issue a writ of mandamus if it ultimately concludes that no other relief is available.  See Am. Compl. ¶ 87.  Specifically, the plaintiffs argue that they are entitled to mandamus because "[s]ince the advent of federal judicial review, the Supreme Court has recognized the federal courts' authority to order the instatement of federal officials to positions they lawfully hold[,]" including via mandamus.  See Pls.' Mem. at 34 (quoting Marbury v. Madison, 5 U.S. 137, 172–73 (1803)).  The defendants argue that, even if the Court concludes—as it now has—that the PCLOB's organic statute protects members from removal without cause, there is still no "clear and indisputable" right to relief due to the purported separation of powers concerns raised by the defendants in their constitutional avoidance argument, as well as the parties' disagreement over the proper interpretation of the PCLOB's organic statute.  See Defs.' Mem. at 31.  The defendants further argue that, in any event, "the President's determination of who should be entrusted with the authorities of a principal executive officer is anything but ministerial[,]" and thus, there is no "clear nondiscretionary duty" to reinstate the plaintiffs.  Id.

---

(. . . continued)

However, neither party has requested that the Court defer ruling on these expedited motions for summary judgment based on the pending decision in that case, and the defendants have provided no legal authority for their position that the Court may simply ignore recent Circuit authority that is directly applicable here while the authority is pending review by the Supreme Court.

Under 28 U.S.C. § 1361, mandamus relief is proper only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to [the] plaintiff." In re Nat'l Nurses United, 47 F.4th 746, 752 n.4 (D.C. Cir. 2022) (quoting Muthana v. Pompeo, 985 F.3d 893, 910 (D.C. Cir. 2021)). And, "mandamus jurisdiction under § 1361 merges with the merits." Muthana, 985 F.3d at 910 (quoting Lovitky v. Trump, 949 F.3d 753, 759 (D.C. Cir. 2020)).

The party seeking mandamus has the "burden of showing that [his or her] right to issuance of the writ is 'clear and indisputable.'" Gulfstream Aerospace Corp. v. Mayacamas Corp., 485 U.S. 271, 289 (1988) (citing Bankers Life & Cas. Co. v. Holland, 346 U.S. 379, 384 (1953)). And, even upon such a showing by the plaintiff, the issuance of a writ of mandamus is within the Court's discretion, In re Cheney, 406 F.3d 723, 729 (D.C. Cir. 2005), after consideration of "whether judicial intervention would be appropriate" in light of the Circuit's admonishment that mandamus is a "drastic remedy reserved for extraordinary circumstances[,]" In re Nat'l Nurses United, 47 F.4th at 752–53 (first citing Cheney v. U.S. Dist. Ct., 542 U.S. 367, 380 (2004); then citing In re Pub. Emps. for Env't Resp., 957 F.3d 267, 273 (D.C. Cir. 2020)).

Based on the Court's conclusion that the PCLOB's organic statute limits the President's authority to remove the plaintiffs, at least without cause, the Court finds that the first two mandamus factors are satisfied because it is "clear and undisputable" that the President was not permitted to terminate the plaintiffs under the circumstances in this case. Gulfstream Aerospace Corp., 485 U.S. at 289 (quoting Bankers Life & Cas. Co., 346 U.S. at 384). And, as the D.C. Circuit "ha[s] often stated in the mandamus context, a ministerial duty can exist even 'where the interpretation of the controlling statute is in doubt,' provided that 'the statute, once interpreted, creates a peremptory obligation for the officer to act.'" Swan, 100 F.3d at 978 (quoting 13th

Reg'l Corp. v. U.S. Dep't of Interior, 654 F.2d 758, 760 (D.C. Cir. 1980)).  Therefore, the

defendants' argument that there is no "clear and indisputable" right to relief in this case must be

rejected.

Second, the Court concludes that mandamus would be appropriate in this case because,

by removing the plaintiffs without cause in violation of the PCLOB's organic statute, the

defendants violated a nondiscretionary duty.  The defendants argue that mandamus cannot issue

for the reinstatement of principal executive officers, and that, in any event, because the

"[p]laintiffs have been removed from their office, [ ] the only way to return them is to reappoint

them to the Board[,]" and "[m]andamus cannot accomplish that weighty task."  Defs.' Reply

at 20.  However, this is precisely what the Supreme Court indicated would be appropriate in

Marbury.  Specifically, the Marbury Court concluded that Marbury—who was a principal

executive officer, having been appointed as a justice of the peace in Washington, D.C., see 5

U.S.C. at 155—would have been entitled to a writ of mandamus compelling the delivery of his

commission, had the Court properly possessed jurisdiction, see id. at 173.  And, contrary to the

defendants' position, binding D.C. Circuit precedent counsels that the Court has the authority to

de facto reinstate the plaintiffs to their positions by granting relief against subordinate officials—

i.e., all defendants except the President—and mandamus in this context would constitute

essentially the same relief.[37]  See, e.g., Swan, 100 F.3d at 976 n.1.  Therefore, the Court joins

other members of this Court who have concluded that, absent an adequate alternative remedy,

mandamus relief would be available based on "the voluminous precedent demonstrating that

---

[37] The defendants also argue, as they did regarding the plaintiffs' requested injunctive relief, that the plaintiffs are
entitled to backpay, and thus, they have an adequate remedy available to them.  See Defs.' Mem. at 32.  However, as
the Court concluded above, see supra Sec. III.B.2, backpay is not in fact available to the plaintiffs.  And, in any
event, the Supreme Court in Marbury made clear in the mandamus context that "[t]he value of a public office not to
be sold, is incapable of being ascertained; and the applicant has a right to the office itself, or to nothing."  5 U.S.C.
at 173.  Therefore, this argument fails.

courts of law issued mandamus relief in similar situations at the time Congress passed the All

Writs Act in 1789 and over the ensuing centuries." Harris, ___ F. Supp. 3d at ___, 2025 WL

679303, at *15; see Wilcox, ___ F. Supp. 3d at ___, 2025 WL 720914, at *16 n.22.

However, because the Court has concluded that a preliminary injunction is warranted in

this case, the plaintiffs have an adequate alternative remedy, and mandamus is therefore not

appropriate.  See In re Nat'l Nurses United, 47 F.4th at 752 n.4 (quoting Muthana, 985 F.3d

at 910).  Nonetheless, if injunctive relief were found to be unavailable to the plaintiffs, this third

prong would be satisfied and, thus, the Court would have to conclude that mandamus would be

appropriate here, especially in light of the fact that it provides essentially the same relief as their

requested injunctive relief.

## IV.     CONCLUSION

In our founders' astute and perceptive wisdom, "[c]hecks and balances were established

in order that this should be a 'government of laws and not of men.'"  Myers, 272 U.S. at 84

(Brandeis, J., dissenting).  And, our constitutional system, based on the separation of powers,

was adopted "not to promote efficiency but to preclude the exercise of arbitrary power."  Id.

at 85.  At times, our elected officials "often confus[e] the issue of a power's validity with the

cause it is invoked to promote, [and] confound the permanent executive office with its temporary

occupant."  Youngstown Sheet & Tube Co., 343 U.S. at 634 (Jackson, J., concurring).  "The

tendency is strong to emphasize transient results upon policies[ . . . ]and lose sight of enduring

consequences upon the balanced power structure of our Republic."  Id.

Our system of checks and balances is of the utmost urgency and necessity today in the

realm of national security and counterterrorism, where Congress has authorized an aggressive

response to the attacks on September 11, 2001, but was also mindful of the significant risks these

enhanced powers posed to the privacy and civil liberties of the American citizenry. Indeed, as the 9/11 Commission found, and Congress enshrined in the PCLOB's organic statute:

> The choice between security and liberty is a false choice, as nothing is more likely to endanger America's liberties than the success of a terrorist attack at home. Our history has shown us that insecurity threatens liberty. Yet, if our liberties are curtailed, we lose the values that we are struggling to defend.

42 U.S.C. § 2000ee(b)(3) (quoting The 9/11 Commission Report at 395).

In response to the 9/11 Commission Report, Congress created an independent, multimember board of experts and tasked its members with the weighty job of overseeing the government's counterterrorism actions and policies, and recommending changes to ensure that those actions and policies adequately protect privacy and civil liberties interests. And, as the Court has now concluded, that responsibility is incompatible with at-will removal by the President, because such unfettered authority would make the Board and its members beholden to the very authority it is supposed to oversee on behalf of Congress and the American people. To hold otherwise would be to bless the President's obvious attempt to exercise power beyond that granted to him by the Constitution and shield the Executive Branch's counterterrorism actions from independent oversight, public scrutiny, and bipartisan congressional insight regarding those actions. And, when the President contravenes a statutory scheme designed by Congress to ensure that these interests are adequately protected, it is specifically the "province and duty" of the independent Judiciary to "say what the law is." Marbury, 5 U.S. at 177. Fulfilling that obligation, the Court concludes for the foregoing reasons that it must grant the plaintiffs' motion for summary judgment and deny the defendants' cross-motion for summary judgment.

**SO ORDERED** this 21st day of May, 2025.[38]

REGGIE B. WALTON
United States District Judge

---

[38] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.